**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED SECURITIES LITIGATION | File No. 08-cv-11278 (DLC)<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**REVISED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.     Introduction.............................................................................................................. 1

II.    Jurisdiction and Venue.......................................................................................... 4

III.   Parties....................................................................................................................... 5

   A.   Plaintiff ............................................................................................................... 5

   B.   The Parent Company......................................................................................... 5

   C.   The Individual Defendants................................................................................ 6

IV.    Substantive Allegations ........................................................................................ 7

   A.   Background ......................................................................................................... 7

   B.   Examples of ANZ's Precarious Business Transactions................................. 10

   C.   The ASIC and What It Uncovered that Resulted in the Enforceable Undertaking .......... 15

   D.   Materially Misleading Statements ................................................................. 20

   E.   The Truth Emerges Causing Plaintiffs and the Other Members of the Class To Suffer

   Damages................................................................................................................... 29

   F.   Additional Scienter Allegations....................................................................... 33

V.     Class Action Allegations ..................................................................................... 35

VI.    Causes of Action .................................................................................................. 37

   Count I .................................................................................................................... 37

   Against ALL Defendants for Violations of Section 10(b)................................... 37

   of The Exchange Act and Rule 10b-5 Promulgated Thereunder......................... 37

   Count II ................................................................................................................... 38

   Against the individual defendants for ................................................................ 38

   Violation of Section 20(a) of the exchange Act ................................................. 38

VII.   Prayer for Relief................................................................................................... 38

VIII.  Jury Trial Demanded........................................................................................... 39

Lead Plaintiff Legacy Solutions, Inc. ("Plaintiff"), by and through counsel, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") and Australian Securities Investments Commission ("ASIC") filings, as well as other filings, reports, and advisories, press releases, and media reports about Australia and New Zealand Banking Group Limited ("ANZ") and several of Australia and New Zealand Banking Group Limited's senior directors and/or officers also named herein as defendants (collectively "Defendants").  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.      This is a federal securities class action brought on behalf or purchasers of ANZ American Depository Receipts ("ADRs") from November 1, 2006 through and including July 27, 2008 (the "Class Period").

2.      ANZ is an institutional banking and financial services group that, during the relevant time period, provided a range of banking and financial services products which included, among others, Equity Financing, a line of business that posed unacceptable reputational and financial risks to ANZ.

3.      Equity finance is a form of securities lending where a party that seeks to borrow cash transfers securities it owns to a lender as collateral.  The value of the securities in a typical equity finance transaction is greater than the amount of cash loaned against those securities.

4.      Throughout the Class Period, ANZ made numerous materially false and misleading public statements including, among others, that "ANZ recognizes the importance of effective risk management to its business success.  Management is committed to achieving

strong risk control, resulting in 'no surprises' and a distinctive risk management capability."

5.      ANZ had a long history of lacking necessary internal controls.  Indeed, beginning as early as 2005, ANZ knowingly operated its Equity Finance business despite the absence of the most basic financial controls typical of any banking institution engaged in securities lending.  In particular, ANZ Equity Finance lacked credit limits, conditions relating to the quantity and quality of securities accepted as loan collateral, and loan to value ratios applied to such securities.  In fact, there was not even any record at ANZ of approval of the initial Equity Finance product.

6.      According to an ANZ Securities Lending Review related to Equity Finance, dated March 2005, ANZ had total financial exposure of $771 million in outstanding Equity Finance loans.  The March 2005 Securities Lending Review reported that, among other things, no credit limits had been established with respect to customers with whom ANZ had existing Equity Finance arrangements and no process had been established to assess or manage counterparty credit risk.  The March 2005 Securities Lending Review recommended no further expansion of ANZ's Equity Finance business and that credit limits be imposed on existing customers.

7.      Subsequent to the March 2005 Securities Lending Report, Equity Finance did not accept new customers, however, exposures to existing customers were not capped at their current levels and there was substantial delay formally imposing new credit limits on existing customers. In February 2006, ANZ permitted the Equity Finance business to accept as collateral any listed security and did not limit exposures to individual securities.  This led to ANZ acquiring as loan collateral many large holdings of illiquid securities with small market capitalizations.

8.      An ANZ lending model that addressed these essential and rudimentary credit risk issues was developed in July 2006.  Ultimately, the amount of cash and securities loaned by

ANZ Equity Finance customers peaked at approximately $2 billion in August 2007, the middle of the Class Period herein. The July 2006 lending model, however, was not finally implemented at ANZ Equity Finance until March 2008, too late for ANZ to avoid massive financial losses on bad Equity Finance loans.

9.     On or about March 17, 2008, the ANZ's Equity Finance business began to unravel when Opes Prime Group Limited ("Opes Prime"), an Equity Finance customer that owed ANZ approximately $650 million, informed ANZ that an Opes Prime customer requested the return of $95 million in stock Opes Prime had transferred to ANZ as Equity Finance collateral and Opes Prime had none of the cash or securities needed to accommodate its customer's request.

10.     Thereafter, on or about March 19, 2008, ANZ knowingly engaged in a transaction with Opes Prime that constituted a preferential transfer in order to at least defer imminent losses on its Opes Prime loans. ANZ loaned Opes Prime $95 million to obtain a lien on $650 million worth of securities and had the deal not been made ANZ would have had to pay Opes Prime $300 million and wait in line with other Opes Prime creditors.

11.     On July 28, 2008, the end of the Class Period, ANZ announced that significant provisions related to bad loans were going to be taken that were expected to adversely affect the Company's profits in 2008. ANZ's 2008 profits were expected to fall as much as $800 million to $3.1 billion after the Company also warned its second-half 2008 results would be hit by losses on soured loans.

12.     On July 28, 2008, the market price of ANZ ADRs fell from $17.24 per ADR to $14.57 per ADR or about 15.5% of its closing price on the prior day of trading. The market price of ANZ ADRs has never recovered and currently trades at approximately $12.00 per share.

II.    **JURISDICTION AND VENUE**

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§1331, 1337 and 1367 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. § 1391.  Substantial acts in furtherance of the alleged fraud and/or

its effects have occurred within this District.  In addition, defendant ANZ maintains an office in

this district.

15.    In connection with the acts alleged herein, Defendants, directly or indirectly, used

the means and instrumentalities of interstate commerce, including but not limited to the mails,

interstate telephone communications, and the facilities of the national securities markets.

16.    During the Class Period, ANZ conducted operations in the United States.  As of

September 30, 2007, ANZ had 1,327 branches and other points of representation worldwide,

including those in the United States.

17.    Until July 2007, ANZ listed its ADRs on the New York Stock Exchange

("NYSE").

18.    In June 2007, ANZ announced its intention to withdraw the listing of its ADRs

and the underlying ordinary shares from the NYSE and deregister from the United States

Securities and Exchange Commission ("SEC").  In or about June 2007, ANZ applied for

deregistration from the US Securities and Exchange Commission (SEC) as a Foreign Private

Issuer of Securities in the United States; the deregistration became effective in October 2007.

19.    Following the delisting of its ADRs from the NYSE, the Company's ADRs

traded, and continue to trade, in the over-the-counter ("OTC") securities market on the Pink

Sheets electronic platform operated by Pink Sheets LLC in the United States under the new

ticker symbol: ANZBY and the CUSIP number: 05258304.

20.     The Bank of New York Mellon Corporation is the Depositary for the Company's ADR program in the United States.

21.     In it's 2007 Annual Report, signed by Defendants Goode and Smith, ANZ represented that in regards to its ADR customers, the company would "maintain the strong control and financial governance frameworks established under Sarbanes-Oxley compliance," and further stated that "ANZ also monitors best practice developments in corporate governance across other relevant jurisdictions [besides Australia and New Zealand] including the US."

22.     In it 2007 Shareholder Review, ANZ stated that "[w]e also have a substantial presence in the key financial centres of London and New York."

## III.   PARTIES

### A.     Plaintiff

23.     Plaintiff Legacy Solutions, Inc. bought ANZ ADRs during the Class Period and was thereby damaged.  On April 1, 2009, Legacy Solutions, Inc was appointed Lead Plaintiff by the Court.  Plaintiffs' transactions in ANZ ADRs are listed in Exhibit 1.

### B.     The Parent Company

24.     Defendant ANZ is one of the largest companies in Australia and New Zealand and a major international banking and financial services group.  It is engaged in providing a range of banking and financial products and services to retail, small business, corporate and institutional clients.  The Company conducts its operations in a number of countries, including the United States.  It is headquartered in Melbourne, Australia and has a U.S. office at 1177 Avenue of the Americas New York, New York 10036.

**C.**    **The Individual Defendants**

25.    Defendant Charles B. Goode has been the Chairman of the Board of Directors at ANZ since August 1995 and a Director since July 1991.  He serves on the Audit Committee, the Risk Committee and the Governance Committee.  As a member of the Audit Committee, the Risk Committee and the Governance Committee, he was responsible for, *inter alia*, reviewing the work of internal audits, as well as overseeing, monitoring and reviewing the ANZ's risk management principles, policies, strategies, processes and controls including credit, market, liquidity, balance sheet, operational risk and compliance frameworks.

26.    [Deleted].

27.    Defendant Michael Roger Pearson Smith has been the Chief Executive Officer ("CEO") and the Executive Director of the Board of Directors at ANZ since October 1, 2007.  Mr. Smith has served on the Credit and Trading Risk Committee (the "CTR Committee") since October 1, 2007.  The CTR Committee of ANZ approved credit, market and reputational risk control for ANZ.  The CTR Committee played "a pivotal role" in relation to the control framework established for ANZ's Equity Finance Unit and was authorized to make general credit decisions and specific credit decisions for ANZ's larger or higher risk customers, such as Opes Prime and Primebroker Securities.

28.    Defendant Peter Marriott is the Chief Financial Officer of ANZ and has held that position since July 1997, and he was Company Secretary of ANZ throughout the Class Period.

29.    Herein, Defendants Goode, Smith and Marriott will be collectively

referred to as the "Individual Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

30.    This is a federal class action brought on behalf of investors who purchased ANZ American Depository Receipts ("ADRs") between November 1, 2006 and July 27, 2008, inclusive.  ADRs allow foreign equities to be traded on U.S. stock exchanges; in fact, this is how stock of most foreign companies trade in U.S. stock markets.  ADRs are issued by U.S. depositary banks, and each one represents one or more shares of a foreign stock, or a fraction of a share.  ADRs are created when a broker purchases the company's shares on the U.S. market and delivers them to the depositary's local custodian bank, which then instructs the depositary bank to issue ADRs.  ADRs may trade freely, just like any other security, either on an exchange or in the over-the-counter market.

31.    ANZ operates a business unit within transaction banking (which is within the broader business unit known as "Institutional"[1]) of ANZ, known as "ANZ Custodian Services."

32.    ANZ Custodian Services provides, among other things, the following services:

 a.   Standard Securities Lending - loan of securities to institutional borrowers, collateralized by cash or securities.  ANZ acquires the securities lent to institutional borrowers from certain of its custody clients pursuant to Australian Master Securities Lending Agreements entered into between ANZ and those clients;

 b.   Equity Finance - functionally similar to Standard Securities Lending, involving the provision of collateral to clients under a securities lending facility, the extent of which is determined by reference to the value of listed securities transferred by the client to ANZ and a loan to valuation ratio.  The collateral is usually less than the value of the securities borrowed, where those securities are borrowed by ANZ. After the Class

---

1    ANZ "Institutional" oversees ANZ Custodian Services which in turn oversees the Equity Finance and Securities Lending Units.

Period, ANZ terminated its Equity Finance unit and ANZ Custodian
Services ceased to offer this product in July 2008.

33.    ANZ provides custodian services to a range of clients, including managed
investment schemes and other investment mangers, superannuation funds, financial institutions,
private clients and other business units operated by other parts of ANZ.

34.    The provision of custodian services carries inherent risks principally as a result of
the extremely large volume of transactions involved in conducting such a business.  Transaction
risk and compliance risk are two of the most prominent risks faced by a custody business such as
ANZ's.  Throughout the Class Period, these risks were not understood and ignored by ANZ.

35.    By Defendants' own admissions,[2] during the Class Period, ANZ Custodian
Services unit lacked the fundamental financial controls expected of any finance business and,
unbeknownst to the public, as a result of the lack of internal controls, ANZ was conducting
precarious equity financing and securities lending activity.  For example, within the period from
2005 through the end of the Class Period, ANZ failed to implement, among other things:
appropriate credit limits; standards for quality and quantity of securities accepted by ANZ as
collateral; and loan to value limits on borrowing.

36.    Additionally, ANZ's lack of internal controls resulted in ANZ Custodian Services
having inexcusable deficiencies relating to the following:

    a.   the performance of reconciliations;

    b.   a breakdown in proper processes;

    c.   resourcing;

---

2    *See* ANZ's August 22, 2008 Securities Lending Review (attached as Exhibit 2)
(hereinafter the "Securities Lending Review").  The 2008 Securities Lending Review was
conducted by, inter alia, Defendant Michael Roger Pearson Smith and the General Counsel for
ANZ.

    d.  risk management;

    e.  responses to beneficial tracing notices;

    f.  prohibited acquisitions and substantial holdings notifications;

    g.  significant breach reporting; and

    h.  compliance culture

37.    Defendants' own admissions show that in 2005, an Internal Audit of ANZ gave an "adverse rating to ANZ Custodian Services and a seriously adverse rating for the ANZ Lending unit in particular." The Board of Directors of ANZ was "made aware of these audit findings," and in October 2005 an Internal Audit segment report was presented to the Board which noted "a new adverse rating for 'Custody, including Securities Lending.'" The findings of the 2005 Internal Audit were not disclosed to investors.

38.    Defendants' own admissions also show that problems related to the processes, personnel and systems used in the Equity Finance and Standard Securities Lending businesses and the risks associated with these businesses were identified in three reviews of the control environment conducted by ANZ internal audits between 2005 and 2007 for ANZ Custodian Services. The ANZ Securities Lending unit (which formed part of ANZ Custodian Services) "was given an adverse or seriously adverse rating as part of each audit" between 2005 and 2007.

39.    The 2007 Internal Audit (produced in October 2007) gave ANZ Custodian Services "a seriously adverse rating" due to concerns that the remediation of the problems identified in the 2005 Internal Audit were not being implemented effectively.

40.    According to the 2008 Securities Lending Review, in October 2007, the Audit Committee meeting of the Board of Directors was provided with a document "specifically addressing the 2007 audit." The Audit Committee "discussed this paper at some length."

41.    The Risk Committee of the Board of Directors "was also advised of the seriously

adverse rating of the 2007 internal audit."

42.     Similar issues were also uncovered by PricewaterhouseCoopers, who were engaged by ANZ in late 2007 to review opportunities to grow the Standard Securities Lending and Equity Finance businesses.  That review "identified that there were significant control issues in relation to the businesses."

43.     During the Class Period, ANZ Lending "posed unacceptable reputational and financial risks to ANZ" and these risks "were compounded by the lack of a proper control environment."

44.     At all relevant times, ANZ management knew that its Custodian Services business "lacked an appropriate control framework," yet "[t]he deficiencies identified were not then addressed effectively or in a timely manner."

45.     Defendants' own admissions show that the processes, personnel and systems used in its Equity Finance and Standard Securities Lending businesses and the risks associated with these businesses "were not consistent with good banking practice."

46.     By Defendants own admissions, during the Class Period "[t]here was a history of procrastinating [at ANZ] on decisions to either invest in systems to remedy [the above-referenced] issues or to exit the [Custodian Services and/or Equity Finance] business."

47.     The deficiencies in ANZ's Custodian Services Unit, were never disclosed to the public, and ultimately led to ANZ to suffer massive loan losses, such as those with Opes Prime and Primebroker Securities Limited ("Primebroker") and others.

**B.     Examples of ANZ's Precarious Business Transactions**

48.     During the Class Period, one of ANZ's largest clients was brokerage firm Opes Prime. ANZ was the major secured creditor to Opes during the Class Period with a loan exposure

of approximately $650 million.  Opes Prime founder and chief executive Laurie Emini was a

former ANZ employee.

49.    At all relevant times, Opes Prime purported to be a stock brokerage and "margin

lending" company.  However, Opes Prime did not engage in traditional margin lending, where

securities are pledged as collateral for a loan.  Instead, Opes Prime's clients obtained funds to

purchase securities through Opes Prime's stock brokerage arm by transferring legal title and

beneficial ownership of their securities to Opes Prime pursuant to an arrangement wherein:

    a.  the clients retained the right to later re-acquire "equivalent securities" at the original sales price.

    b.  Opes Prime would make "margin calls" if the price of the acquired securities dropped.

50.    As explained above, Opes Prime's clients entered into sale and repurchase

agreements with regard to securities already owned by them, while agreeing to a "margin call"

on securities which they acquired with the proceeds from their securities sales/repurchase

transactions.  Due to the "margin call" feature, many of Opes Prime's clients would have been

led to believe that they had entered into traditional margin borrowing arrangements, and would

not understand that they had sold their securities to Opes Prime.

51.    Opes Prime used the securities which it obtained from its clients as collateral for

borrowings from ANZ's Institutional lending division.  The Opes Prime "margin lending"

operation was, therefore, an arbitrage business whereby Opes Prime would borrow from ANZ at

a prevailing interest rate and then lend the money to its clients at a slightly higher interest rate.

52.    Opes Prime attracted customers by acting as an ANZ intermediary offering cheap

loans to buy shares in small, penny stock, companies that fell outside Australia's benchmark

index, something larger brokerages were less inclined to do.  In substance, ANZ was lending

11

money to investors to purchase the securities of small, penny stock, companies and collateralizing its loan with these penny stock securities.

53.    Primarily because Opes Prime aggregated cash and securities which it obtained from investors to obtain funds for its investors in the wholesale finance market, Opes Prime operated as an unregistered managed investment scheme ("MIS") in violation of Australian securities law.

54.    By March 10, 2008, Opes Prime was in deep financial trouble because at least $116 million in required margin calls had not been made.  To compound matters, a week later, an Opes Prime client requested the return of $95 million worth of stock that Opes Prime had transferred to a lender as security for a loan.

55.    According to an Opes Prime director, Anthony Blumberg ("Blumberg"): "We [Opes Prime] had no available cash or securities. I knew we were in serious trouble." *See* Michael Sainsbury, *Man with a taste for fast life hits a pothole*, The Australian Business Journal, June 5, 2008.

56.    ANZ corporate portfolio management director Ben Steinberg ("Steinberg") was alerted to the situation at Opes.  At the time, ANZ was Opes Prime's largest creditor and was owed approximately $650 million. Due to ANZ's enormous loss exposure, on March 19, 2008 ANZ agreed to lend $95 million to Opes knowing that Opes required no less than $200 million to stay afloat.  The loan was not intended to keep Opes Prime afloat. It was intended to mitigate ANZ's exposure to loss.

57.    In contemplation of Opes Prime's imminent collapse, ANZ provided Opes Prime with the $95 million cash infusion in order to obtain a lien on $650 million worth of securities. In return for the $95 million, ANZ was able to take a second charge (a lien) over $650 million of

Opes Prime's assets the next day.  Before that ANZ had no charge, no lien; all it had was a standard securities lending contract.

58.    According to Blumberg, ANZ insisted on amending its contracts with Opes Prime as a condition of the $95 million deal.  Had this amendment not been made, "ANZ would have had to have cut a cheque to Opes for $300 million and stand in line with the other creditors," said Blumberg.  *See* Staff Reporter, *ANZ told of fraud risk, says Opes director*, Business Spectator, May 30, 2008.

59.    This transaction constituted a preferential transfer of rights in contemplation of receivership. It was as unethical as it was unlawful. As noted in the May 9, 2008 Business Spectator article, *ANZ knew of Opes woes in Feb: report*, "A charge [lien] can be deemed invalid if it is taken less than six months before a company collapses." ANZ's lien was subject to invalidation.

60.    In early July 2008, the Opes Prime scenario was repeated when Primebroker Securities Limited ("Primebroker") was forced into receivership.  Primebroker Securities was another margin lender that operated in a manner substantially identical to Opes Prime and, once again, ANZ was the primary financier.  However, even the liens did not serve to fully insulate ANZ from risk, because the securities which ANZ received were comprised of huge blocks of thinly traded, or non-traded, penny stocks.  Moreover, ANZ took title to these securities in a bear market.

61.    As admitted by ANZ in its August 22, 2008 Securities Lending Review report, "the damage caused to ANZ by its involvement in Equity Finance [lending to Opes Prime] include...the illiquidity of the securities acquired by ANZ."  Elaborating, the August 22, 2008 Securities Lending Review report states:

13

In February 2006, a risk model was adopted that permitted the Equity Finance business to accept any listed security and which did not limit exposures to individual securities. This resulted in ANZ acquiring many large holdings of illiquid securities in companies with small market capitalisations.

62.     The ASIC recognized ANZ's improper conduct and considered whether to pursue claims against ANZ for violations of Section 181 of the Australian Corporations Act in connection with "transactions entered into between Opes Prime and ANZ on or about 20 March 2008, shortly prior to Opes Prime's collapse." *See* Exhibit 3.  Section 181 of the Corporations Act mandates that a director or officer of a corporation must exercise their powers and discharge their duties in good faith and for a proper purpose.

63.     According to a March 6, 2009 ASIC press release, "ASIC's investigation considered whether the transactions constituted a breach of directors duties by the Opes Prime directors and whether ANZ was involved in such a contravention in breach of Section 181 of the ACT, given ANZ's state of knowledge at the time."  In addition, the investigation considered whether "the transaction had the effect of benefiting ANZ by approximately $240m to the detriment of other creditors in the context of Opes' current or imminent insolvency" and whether "ANZ was aware of Opes' significant financial difficulties at the time of entering into the transactions."

64.     The March 6, 2009 ASIC press release also stated that ASIC had also considered whether, between about July 26, 2006 and March 27, 2008:

> a.  Opes Prime operated a MIS that was required to be registered but was not.
>
> b.  the unregistered MIS could have operated without ANZ's participation.
>
> c.  ANZ had actual knowledge of Opes Prime's possible contravention of the provisions of Australian law relating to the operation of an unregistered MIS.

65.     ASIC settled with ANZ, releasing ANZ from potential claims arising from both

the managed investment scheme and the Sections 181 investigations in exchange for payment to
the injured Opes Prime clients, and an agreement to abide by the terms and provisions of an
Enforceable Undertaking.

66.     The substantial cash payments to Opes Prime's clients amounted to roughly $200
million, which is approximately 85% of the ASIC-identified benefit realized by ANZ as a result
of ANZ's obtaining its March 20, 2008 lien on $650 million of Opes Prime's securities.

C.     **The ASIC and What It Uncovered that Resulted in the Enforceable
Undertaking**

67.     The ASIC is Australia's corporate, markets and financial services regulator.  It is
an independent Australian Commonwealth government body.  ASIC is responsible for
administering the Australian Corporations Act 2001and the Australian Securities and
Investments Commission Act 2001.  The ASIC is in place to maintain Australia's economic
reputation and wellbeing by ensuring that Australia's financial markets are fair and transparent,
supported by confident and informed investors and consumers.

68.     The Australian Securities and Investments Commission Act 2001 requires the
ASIC to:  maintain, facilitate and improve the performance of the financial system and entities in
it; promote confident and informed participation by investors and consumers in the financial
system; administer the law effectively and with minimal procedural requirements; enforce and
give effect to the law; receive, process and store, efficiently and quickly, information that is
given to us; and make information about companies and other bodies available to the public as
soon as practicable.

69.     As the corporate regulator, ASIC is responsible for ensuring that company
directors and officers carry out their duties honestly, diligently and in the best interests of their

company.

70.    As the markets regulator, ASIC assesses how effectively authorized financial markets are complying with their legal obligations to operate fair, orderly and transparent markets. The ASIC also advises the Australian Minister about authorizing new markets.

71.    As the financial services regulator, ASIC licenses and monitors financial services businesses to ensure that they operate efficiently, honestly and fairly.

72.    Significant implications of fraud were surfacing around the collapse of Opes Prime. Opes Prime was suspended as a trading, settlement and clearing participant of the Australian Securities Exchange (ASX). On March 28, 2009, the ASIC announced that it had commenced an investigation into Opes Prime. ASIC formed a special team to investigate any potential breaches of the Australian Corporations Act.

73.    Information the ASIC uncovered during its investigation of the Opes Prime collapse to determine if there were any breaches of the Australian Corporations Act led the ASIC to investigate ANZ.

74.    On March 6, 2009, the ASIC announced that information uncovered by the ASIC in its investigation into whether Opes Prime had breached the Australian Corporations Act, led directly to ANZ, and an investigation by the ASIC into ANZ had ensued. In its investigation of ANZ, the ASIC uncovered several "deficiencies [that] impacted on ANZ's ability to meet its obligations as an Australian financial services licensee" and had put in place an Enforceable Undertaking from ANZ in relation to ASIC's investigation into ANZ Custodian Services (attached as Exhibit 4).[3]

---

3    An Enforceable Undertaking is a remedy available to ASIC for breaches of the legislation ASIC is responsible for enforcing. It is an administrative settlement the ASIC may accept as a

75.    The ASIC enforceable undertaking entered into by ANZ requires ANZ to remedy deficiencies in operational procedures across the ANZ Custodian Services business, including securities lending operations.

76.    In addition to the Enforceable Undertaking levied against ANZ, the ASIC identified two potential actions available to it against ANZ (*see* Exhibit 3).  The first was a claim regarding ANZ's alleged involvement in the contravention of the managed investment provisions of the Corporations Act (the Act).  The second claim was a civil penalty and compensatory action against the directors of ANZ.  The ASIC agreed, however, not to pursue these claims against ANZ also long as it complied the terms of the Enforceable Undertaking, and other conditions.  The ASIC, however, noted that it was not stopping its investigation of AZN and stated that the "ASIC is considering whether [ANZ's] conduct is in breach of criminal or civil penalty provisions of the Act… It is expected that decisions on whether to proceed with these investigations will be made by May 2009."

77.    Among other things, the enforceable undertaking sets out the ASIC's concerns that ANZ failed to account for interests in securities acquired in the course of its securities lending business for the purposes of making substantial shareholding notifications; and failed to report any of these areas of concern to ASIC on a timely basis.

78.    The ASIC exposed that, during the Class Period, there were numerous infractions in the following areas of ANZ Custodian Services:

> a.   compliance culture
>
> b.   the performance of reconciliations;
>
> c.   a breakdown in proper processes;
>
> d.   resourcing;

possible alternative to court action.

e.  risk management;

f.  responses to beneficial tracing notices;

g.  prohibited acquisitions and substantial holdings notifications; and

h.  significant breach reporting

79.  ANZ's had a poor compliance culture because ANZ Custodian Services did not take adequate steps to remedy issues in a timely manner.  Management of ANZ Custodian Services did not place sufficient focus on adverse internal audit ratings and did not take sufficient, timely and appropriate measures to remedy the underlying issues that were the cause of those adverse ratings.

80.  ANZ's deficiencies in its reconciliation processes were that reconciliation of securities lending accounts were not conducted with regularity or to the individual client level, such that ANZ was not identifying, investigating or rectifying errors.  Records of reconciliation investigations, to the extent there were any investigations, were never maintained.  There was a lack of separation of the staff responsible for conducting reconciliations form those that conducted the day to day transactions to which the reconciliations related.  There was a lack of segregated monitoring and supervision of reconciliation staff and process.  High levels of manual activity were required in the reconciliation process increasing the likelihood of errors and manipulation.  Reconciliation procedures were not fully documented.

81.  ANZ's deficiencies in proper processes was that there was a lack of documentation or understanding by relevant staff of end to end and Client account administration processes, including, in some instances, those relating to the recording of Clients' instructions, the use of Client assets, compliance with Client contractual obligations and corporate actions.  There was a failure to pay rebates in respect of two Client accounts in accordance with contractual obligations.  There was a lack of formal processes to determine

whether new Clients were retail or wholesale. There was inadequate segregation of duties

between front office and back office staff with respect to ANZ Custodian Services' securities

lending operations. There were inadequate monitoring and supervision of some staff with

respect to payment discretions and acceptance of new Clients. There were inadequate processes

for identifying, monitoring and resolving potential conflicts of interest between ANZ employees

and Clients, in the course of securities lending. There were inadequate processes to ensure that

trades settled on time and failed trades were properly investigated to determine the underlying

cause and to prevent recurrence (this was the most obvious in relation to the Opes "sell-down").

And there was a lack of adequate quality assurance processes.

82.     The systems utilized in connection with ANZ Custodian Services' securities

lending operations did not have an appropriate degree of automation or integration. An

insufficient number of appropriate staff was dedicated to quality assurance and reconciliations.

And functions of processes were susceptible to "key man risk."

83.     ANZ had inadequate risk management because ANZ Custodian Services did not

implement appropriate risk management policies and systems to manage ANZ's potential

reputational and financial exposure in connection with ANZ Custodian Services' operations, as

indentified in the ANZ Securities Lending Review. ANZ lacked a proper control environment.

ANZ had poor accountability. There was a failure by ANZ to identify and act on warning signs

that it was entering into transaction that were too risky.

84.     ANZ was not timely responding to beneficial tracing notices in April and May

2008, and, thus, violated the Australian Corporations Act. Of the 966 responses issued between

March 3, 2008 and May 22, 2008, a large portion contained inaccurate data.

85.     ANZ failed to do prohibited acquisitions and substantial holdings notifications

because from 2001 through May 12, 2008, ANZ did not account for the relevant interests in securities acquired as a result of transactions entered into in the course of its securities lending business. The ASIC believed that the limited relief instrument did not operate to disregard relevant interests in securities acquired by ANZ or its subsidiaries pursuant to ANZ's securities lending operations.

86.     ANZ had inadequate controls for significant breach reporting because ANZ did not have in place adequate procedures for determining whether a breach of likely breach of ANZ's obligations in respect of ANZ Custodian Services was significant. ANZ also did not have in place adequate controls to timely provide the ASIC with written reports once it became aware of a breach or likely breach in respect to ANZ Custodian Services.

### D.     Materially Misleading Statements

87.     In its 2006 Annual Report, circulated on or about November 1, 2006, ANZ stated: "ANZ recognises the importance of effective risk management to its business success. Management is committed to achieving strong risk control, resulting in 'no surprises' and a distinctive risk management capability."

88.     In its 2006 Annual Report ANZ stated: "Internal Audit provides independent assurance that the design and operation of the risk and control framework across the [Company] is effective. It operates under a Charter from the Audit Committee that gives it unrestricted access to review all activities of the Group. The Group General Manager Audit reports to the Chairman of the Audit Committee. The Audit Committee reviews the performance of the Group General Manager Audit."

89.     In its 2006 Annual Report ANZ stated: "The Audit Committee plays an active role in reviewing significant issues arising from the work performed by Internal Audit. There is

a robust process for ensuring prompt resolution of audit issues, which includes regular reviews

of progress by the Chief Executive Officer and the Chairman of the Audit Committee. The Audit

Committee also receives formal reports on significant issues to ensure that any remedial action is

undertaken promptly."

90.    In its 2006 Annual Report ANZ stated that in regards to the "Code of Conduct for

Financial Officers – (adopted from the Group of 100 Code of Conduct for CFOs and Senior

Financial Officers): "The Code requires that chief financial officers and other finance staff

influencing financial reporting adhere to principles of honesty and integrity, respect

confidentiality of information, declare conflicts of interest, maintain transparency in reporting,

exercise diligence and good faith, [and] ensure sound internal controls."

91.    The foregoing statements from ANZ's 2006 Annual Report were materially false

and misleading because:

> a.   The Equity Finance business lacked an appropriate control framework in particular with respect to credit limits and conditions relating to the quality and quantity of securities accepted by the Equity Finance business and management was aware of this no later than early 2005;
>
> b.   To the extent any deficiencies in internal controls for the Equity Finance business were identified between early 2005 and August 2008, they were not addressed effectively or in a timely manner;
>
> c.   The loan-to-value ("LVR") model used by Equity Lending beginning in 2006 had numerous faults including, but not limited to, the fact that it did not impose appropriate restrictions on the type of securities, or the percentage of issued shares of a particular company that could be accepted by the Equity Finance business, it accepted any listed security and did not limit exposures to individual securities resulting in ANZ acquiring many large holdings of illiquid securities in companies with small market capitalizations. An LVR model that addressed the faults with the then current system was not implemented until March 2008;
>
> d.   ANZ's Equity Finance arrangement do not provide sufficient controls with respect to reputational risk to ANZ because it could result in ANZ selling the underlying securities if a broker becomes insolvent giving the clients of the broker the impression that ANZ has acted in its own interest and to

the detriment of the Broker's clients;

e.  Equity Finance was operating under ANZ's Securities Lending Policy
which was intended to apply only with respect to Standard Securities
Lending and to exclude Equity Finance except to the extent that
amendments were added to the policy to apply to Equity Finance which
resulted in an inappropriate standard for Equity Finance;

f.  A thorough review of ANZ's Equity Finance business was not conducted
to develop an appropriate Lending Policy despite the fact that ANZ's
Equity Finance business had undergone significant growth over a three
year period in which it was operating under an inadequate policy;

g.  Although the CTR Committee approved various controls to be applied to
the Equity Finance Business in mid 2005 a number of the controls took an
unacceptably long time to be implemented, in particular controls requiring
the funding to a broker to be reduced or the types of securities to be
accepted from a Broker to be limited;

h.  Although the CTR Committee was responsible for making key decisions
with respect to Equity Finance controls between May 2005 and November
2006, it did not apply an appropriate degree of rigor to its consideration of
issues relating to the Equity Finance business and the content of the
approval being sought;

i.  In the reviews of the control environment conducted by ANZ internal
audit between 2005 and 2007 for ANZ Custodian Services, the ANZ
Securities Lending unit was given an adverse or seriously adverse rating
as part of each audit;

j.  In late 2007 PricewaterhouseCoopers which was engaged to review
opportunities to growth the Standard Securities Lending and Equity
Finance businesses identified that there were significant control issues in
relation to the business;

k.  Following the 2005 internal audit review, a remediation program was
commenced to address the issues identified that review. However,
remediation actions were not completed in a timely manner or in a way
which ensured that actions taken were embedded into process so that
weaknesses did not reappear;

l.  Management did not place sufficient focus on the adverse Internal Audit
ratings for the ANZ Securities Lending unit and did not take sufficient
timely and appropriate measures to remedy the underlying issues which
were the cause of those adverse ratings although they reported to the Audit
Committee that remedial actions were being undertaken.

92.     On January 8, 2007, ANZ filed a Form 20-F with the SEC.  This document, which

was signed by Defendant Marriott, stated:

> Institutional is in a stage of reinvigorating its business following a
> number of years of relatively flat earnings and asset growth, as a
> consequence of a comprehensive de-risking program. The focus of
> the business is now on further initiatives to deliver revenue
> growth, combined with disciplined use of capital and continuing
> strong risk management.

93.    The foregoing statement was materially false and misleading for the reasons

stated in Paragraph 91.

94.    On March 2, 2007, ANZ disseminated a press release which discussed financial

performance and ANZ's 2007 full year outlook. This press release stated the following regarding

ANZ's Institutional lending division:

> Institutional is beginning to see the benefits of a more focused
> business model, with revenue growth expected to be comfortably
> within ANZ's target range for the full year. This revenue growth is
> being supported by continued investment in people and systems.
>                         * * * * *
> Lending assets have grown modestly as we maintain a high level
> of discipline in terms of risk and balance sheet utilisation. At the
> same time, the high level of liquidity held by our customers has
> seen customer deposits grow very strongly. However, given the
> size of some transactions in the Institutional segment, growth rates
> can be quite volatile.

95.    The foregoing statement was materially false and misleading for the reasons

stated in Paragraph 91.

96.    On June 20, 2007, ANZ disseminated a press release which announced its

intention to withdraw the listing of its American Depositary Shares (American Depositary

Receipts or ADR's) and the underlying ordinary shares from the New York Stock Exchange.

This press release stated:

> After delisting from the New York Stock Exchange, ANZ intends
> to fully deregister from the US Securities and Exchange
> Commission's ongoing reporting obligations. ANZ Chief Financial
> Officer Mr Peter Marriott said: "The decision to deregister as a

> SEC registered and reporting company reduces ANZ's
> administrative burdens and costs.
>
> "ANZ continues to be committed to best practice in preparing its
> financial statements. We will maintain the strong control and
> financial governance frameworks established under Sarbanes-
> Oxley compliance, tailoring them to the Group's specific processes
> and procedures," Mr Marriott said.
>
> Following deregistration, ANZs' debt and equity securities will not
> be listed on any exchange in the United States, however it is
> expected that the ADRs will trade in the 'over-the-counter' market.
> ANZ ordinary shares will continue to be listed on the Australian
> Securities Exchange and New Zealand Stock Exchange.

97.     The foregoing statement was materially false and misleading for the reasons

stated in Paragraph 91.

98.     On September 28, 2007, ANZ held a conference call during which defendant

Smith made the following comments:

> The product range in Australia is still quite simple, quite
> straightforward, and I think as investors increase the level of
> sophistication they require, there is a huge opportunity there. And
> as I mentioned earlier, I think institutional is an area that we still
> have got a significant upside. We have a good franchise, we have a
> good customer base, and I think there is considerable opportunity
> to expand our business from there.

99.     The foregoing statement was materially false and misleading for the reasons

stated in Paragraph 91.

100.    In its 2007 Annual Report, circulated on or about November 7, 2007 and signed

by Defendants Goode and Smith, ANZ stated that in regards to the "Code of Conduct for

Financial Officers – (adopted from the Group of 100 Code of Conduct for CFOs and Senior

Financial Officers): "The Code requires that chief financial officers and other finance staff

influencing financial reporting adhere to principles of honesty and integrity, respect

24

confidentiality of information, declare conflicts of interest, maintain transparency in reporting,

exercise diligence and good faith, [and] ensure sound internal controls."

101.    In its 2007 Annual Report ANZ stated:  "Internal Audit provides independent

assurance that the design and operation of the risk and control framework across the [Company]

is effective.  It operates under a Charter from the Audit Committee that gives it unrestricted

access to review all activities of the Group.  The Group General Manager Audit reports to the

Chairman of the Audit Committee.  The Audit Committee reviews the performance of the Group

General Manager Audit."

102.    In its 2007 Annual Report ANZ stated:  "The Audit Committee receives formal

reports on significant issues to ensure that any remedial action is undertaken promptly. A robust

process exists to ensure that audit issues are resolved on a timely basis, which includes regular

reviews of progress by the Chief Executive Officer and the Chairman of the Audit Committee."

103.    The foregoing statements from the 2007 Annual Report were materially false for

the reasons stated in Paragraph 91.

104.    On December 18, 2007, at the ANZ 2007 Annual General Meeting, defendant

Smith made the following comments:

> As you heard from Charles, our Institutional Division has a strong
> franchise and excellent customer base but it has been
> underperforming. This is being addressed. There are some early
> signs of improvement. In recent months, lending growth has been
> ahead of system and deposits are growing.
>
> * * * * *
>
> You heard an assessment of where ANZ is today from Charles. I
> want to assure you that my initial priority is very clearly to restore
> the financial performance of ANZ and so returns to shareholders.
> We will be doing this in 2008 and into 2009 by increasing revenue
> faster than costs, bringing institutional back to an acceptable

25

> performance, building on the significant opportunities we have in
> our existing businesses in Australia and New Zealand and
> capturing an improved return from our investment in Asia.

105.    The foregoing statement was materially false and misleading for the reasons stated in Paragraph 91.

106.    The foregoing statements were also materially false and misleading because, at the time they were made, defendant Smith knew or recklessly failed to know and failed to disclose that (i) ANZ's Institutional Division was suffering from woefully deficient internal controls as evidenced by the fact that internal audits had given Custodian Services adverse and seriously adverse ratings; that PricewaterhouseCoopers, who were engaged by ANZ in late 2007 to review ANZ's Standard Securities Lending and Equity Finance businesses, identified significant control issues in relation to the businesses; and that (ii) bringing institutional back to an acceptable performance was impossible without eliminating its securities lending operations.

107.    In its 2007 U.S. Annual Report, circulated after the November 7, 2007 Annual Report, ANZ stated that it "will maintain the strong control and financial governance frameworks established under Sarbanes-Oxley compliance, tailoring to the Group's specific process and procedures."

108.    In its 2007 U.S. Annual Report, ANZ also stated that, in regards to internal audits: "The Audit Committee receives formal reports on significant issues to ensure that any remediation is undertaken promptly.  A robust process exists to ensure that audit issues are resolved on a timely basis, which includes regular reviews of progress by the Chief Executive Officer and the Chairman of the Audit Committee."

109.    The foregoing statements from the 2007 U.S. Annual Report were materially false and misleading for the reasons stated in Paragraph 91.

26

110.    On February 18, 2008, ANZ disseminated a press release which discussed expected growth in profit before provisions for 2008.  It stated that "In the first four months trading," there had been "a turnaround in Institutional." It stated, in relevant part:

> This requires a steady focus on growth, risk management and productivity to ensure we remain on track to meet the goals we have set. These include restoring business performance in Institutional and substantially increasing our presence in selected Asian economies.
>
> * * * * *
>
> Institutional is on track to deliver a turnaround in performance at an underlying level, with excellent revenue growth a feature supported by the substantial opportunities associated with the current market dislocation. In the first four months, Institutional lending assets have grown 17%, to be up 30% on the same period last year, while deposits are up 26% on the same basis.

111.    The foregoing statements were materially false and misleading for the reasons stated in Paragraph 91.

112.    On February 25, 2008, ANZ disseminated a press release which discussed financial performance.  It announced "strong performance" for the three months ended December 31, 2007.   It stated that there was "solid performances by the Retail and Institutional businesses."

113.    The foregoing statements were materially false and misleading for the reasons stated in Paragraph 91.

114.    On March 28, 2008, ANZ disseminated a press release which stated:

> Following the appointment of a Voluntary Administrator by the Directors of Opes Prime Group Limited and the subsequent appointment by ANZ of Receivers, ANZ today advised its lending exposure to Opes Prime was supported by security in a portfolio of Australian equities.
>
> The portfolio is diversified and at current market prices is

sufficient to cover the amount outstanding from Opes Prime.

ANZ believes that based on an orderly realisation of the security portfolio, it is unlikely to incur a material loss on this exposure.

115.    The foregoing statement was materially false and misleading for the reasons stated in Paragraph 91.

116.    On April 7, 2008, ANZ held a conference call during which defendant Smith stated:

> Yes. I mean, the Opes Prime matter is currently before the court, so I can only make broad remarks. Firstly, <u>I think we all need to remember that ANZ would still be supporting this business if irregularities had not been discovered inside the company</u>. ASIC are of course investigating this, and we are helping them with that process.
>
> While we'll continue to work with our other clients in the broker segment, as I mentioned earlier, I've asked Peter Hodgson to undertake a full review of the risks involved in the securities lending business, and that should be ready fairly soon.  In the meantime, we have to protect our commercial position and our shareholders' interests. We're doing that in a measured and in a careful way which includes working very closely with regulators to resolve some of the very complex issues which have emerged in the last few days, or the last 10 days.
>
> But it's tough for everybody, and I know that.  When irregularities of this nature occur within a company, there are no winners. <u>Although we don't expect any material losses from this, or other broker exposures</u>, I am mindful of the effects on our reputation, and on the many Opes clients who are being impacted by the fallout from the actions of Opes Prime.  But that's really all I can say at the moment, given the matter is before the court. (emphasis added).

117.    The foregoing statement was materially false and misleading for the reasons stated in Paragraph 91.

118.    On April 14, 2008, ANZ disseminated a press release which announced that defendant Smith "would lead a review of ANZ's involvement in Securities Lending and the

Opes Prime Group.  The press release quoted defendant Smith as stating:

> We will review our involvement in the Securities Lending business
> and the events surrounding the Opes Prime issue to ensure that all
> our processes and practices meet the highest ethical, risk
> management and regulatory compliance standards which our
> shareholders and the community expect of ANZ.
>
> The review will examine what has transpired, the accountability
> that ANZ and individual staff members might have for what has
> occurred, and a remedial program to swiftly address all the issues
> we identify.
>
> We will continue to work in cooperation with our regulators on
> this issue. I also intend to report publicly on the key conclusions of
> the review and any resulting remedial actions.

119.    The foregoing statement was materially false and misleading for the reasons
stated in Paragraph 91.

120.    On July 4, 2008, ANZ disseminated a press release which announced it had
appointed Paul Kirk and Stephen Longley of PricewaterhouseCoopers as Receivers and
Managers of Primebroker.

> Notwithstanding significant efforts by ANZ and Primebroker over
> recent weeks, there has been a further deterioration in
> Primebroker's position. This, combined with a lack of
> commercially acceptable proposals from Primebroker, has led to
> this unfortunate outcome. The deterioration in Primebroker's
> position has also been to ANZ's detriment. As a result, a provision
> of approximately $50 million is currently anticipated. Total
> exposure of $260 million is secured by a portfolio of equities and
> property.

121.    The foregoing statement was materially false and misleading for the reasons
stated in Paragraph 91.

**E.    The Truth Emerges Causing Plaintiffs and the Other Members of the Class
To Suffer Damages**

122.    Lacking internal controls, ANZ was no longer able to forestall the damages it

knew, or was reckless not to have known, it would suffer sooner or later. On July 28, 2008, ANZ announced that significant provisions related to bad loans were going to be taken and were expected to adversely impact the bottom line in 2008. ANZ's annual profit was set to fall by as much as $800 million to $3.1 billion after the company warned its second-half results would be hit by increased bad debts and soured loans. The bank would take a charge of about $1.2 billion for the six months to September 30, 2008 taking the total for the 2008 financial year to almost $2.2 billion.

123. In the same July 28, 2008 announcement, Defendant Michael Roger Pearson Smith, ANZ's CEO, stated that: "Disappointingly though, it is very apparent that in the past ANZ had allowed the development of small areas of non-core activity in Institutional [the division that oversees Custodian Services]. We are addressing these issues at an operating level and I will also have the review into securities lending completed next month. While I cannot pre-empt the findings of the review, I do intend to take all the necessary actions to ensure these issues are put behind us once and for all."

124. In the same July 28, 2008 announcement, in its July 28 Conference Call, and as widely reported elsewhere, ANZ announced significant loss provisions, which were expected to adversely impact ANZ's bottom line in 2008. These loss provisions included no less than $270 million and as much as $350 million related to ANZ's business dealings with Opes Prime and Primebroker.

125. In the same July 28, 2008 announcement, Defendant Michael Roger Pearson Smith, ANZ's CEO, stated that: "Disappointingly though, it is very apparent that in the past ANZ had allowed the development of small areas of non-core activity in Institutional [the division that oversees Custodial Services]. We are addressing these issues at an operating level

and I will also have the review into securities lending completed next month. While I cannot pre-empt the findings of the review, I do intend to take all the necessary actions to ensure these issues are put behind us once and for all."

126.    A July 29, 2008 article in *The Brisbane Times* ("ANZ stock savaged after $1.2b hit" by Danny John, July 29, 2008) memorialized the impact of ANZ's July 28, 2008 announcement on the market:

> ANZ BANK'S annual profit is set fall by as much as $800 million to $3.1 billion after the company warned its second-half results would be hit by increased bad debts and soured loans.
>
> The bank will take a charge of about $1.2 billion for the six months to September 30, taking the total for the 2008 financial year to almost $2.2 billion. This is after it raised its first-half provisions to $980 million.
>
> The bulk of yesterday's shock increase was accounted for by ANZ's troublesome institutional division, which has repeatedly tripped over with its loans to hard-pressed parts of the business sector and marginal financial services players.
>
> The latest provisions - much higher than expected - will translate into a fall of 20 to 25 per cent in cash earnings per share. That, in turn, will slash last year's $3.9 billion cash profit to between $3.11 billion and $3.32 billion, on ANZ's estimates.
>
> Stunned investors responded by slashing the bank's share price by 11 per cent to just $15.81 - its lowest level for five years.
>
> The bank sought to soften the blow by declaring it would maintain the full-year dividend at $1.36 a share, with the second-half payout coming in 74c, the same as last time.
>
> That is against an expected 8 per cent growth in underlying profit and revenue - thanks to a continuing strong performance by the retail banking arm and its expanding Asia-Pacific division. But all of the increase in earnings will effectively be wiped away by the higher provisions.
>
> ANZ's bad news comes just three days after National Australia

Bank revealed its exposure to mortgage-backed securities linked to the US subprime housing crisis had cost it $830 million in additional bad debt charges.

That provision will lop about $600 million off NAB's expected 2008 profits, which are likely to fall below $4 billion as a result.

**ANZ's difficulties are different as they cover an extra $850 million for soured loans to companies in the deteriorating property market, including ailing stockbrokers like Opes Prime and Primebroker and the collapsed payments company Bill Express.**

But it has also set aside another $375 million - the same amount as in the first half - to cover growing customer problems as a result of the credit crisis and the economic downturn in Australia and New Zealand.

A further $160 million provision has been made for potential losses against exposure to monoline insurers in the US, which provide credit protection for a complex series of specialised trading instruments taken out by major companies. ANZ took a $226 million hit for the same problem in its first half.

In all, the bank has put in place charges to cover the possibility of about 1 per cent of its $249 billion worth of risk-associated assets going bad - said to be the highest figure of all the major Australian banks.

Mike Smith, ANZ's chief executive, who took on the job just 10 months ago, said part of the blame for higher provisions related to what he described as "legacy" issues - a reference to loose lending practices - in the bank's institutional division.

This, he said, was "beyond disappointing" and meant it would take longer than expected to turn around the underperforming business.

Mr Smith admitted overall ANZ had not performed well over the past year. But he said there was no change to his five-year target to double the bank's profits by 2012.

"If we have two to three bad years, then so be it, but we are positioning the business to move forward," he said.

127.    The price of ANZ's ADR's, which closed at $17.24 on the day before this

announcement closed at $14.57 after the announcement, constituting a 15.5% drop.  The price of the ANZ's ADR's has not recovered.

### F.     Additional Scienter Allegations

128.     Defendant Smith was a member of the CTR Committee during the Class Period, and, thus, had knowledge of or was reckless in not knowing about the lack of control in ANZ's Equity Finance Unit and the risks it was taking, and was also, in large part, responsible for it.

129.     Defendant Charles B. Goode, a member of ANZ's Audit, Risk and Governance Committees during the Class Period, and, thus, knew or was reckless in not knowing about the deficiencies identified in the internal audits at ANZ, the "seriously adverse rating" the Audit gave to ANZ regarding the unjustifiably risky lending practices ANZ employed.

130.     According to ANZ's 2007 U.S. Annual Report, "the Audit Committee of the Board oversees ANZ's financial reporting policies and controls, the integrity of ANZ's financial statements, the relationship with the external auditor, [and] the work of Internal Audit."

131.     The 2006 Annual Report shows that "[t]he Chief Executive Officer and the Chief Financial Officer [] state[d] to the Board in writing that the company's risk management and internal compliance and control system is operating effectively and efficiently in all material respects."  Scienter can be inferred by the fact that the CEO and CFO made such statements in writing despite the facts the 2005 audit issues were not resolved and the 2007 Internal Audit gave ANZ Custodian Services "a seriously adverse rating" due to concerns that the remediation of the problems identified in the 2005 Internal Audit were not being implemented effectively.

132.     Scienter can be inferred by, among other things, the fact that the August 22, 2008 Securities Lending Review report admitted that:

    a.   "papers presented to the Board and the Risk and Audit Committees included references to the Securities Lending business."

    b.   ANZ's securities lending Equity Finance business was known by management after March 2005 because, in  March 2005, a credit risk review of the business was undertaken by an ANZ risk officer, resulting in the production of a "Securities Lending Review" report.  After this report was prepared, the existence of Equity Finance within ANZ was widely known and understood by ANZ management.

    c.   ANZ maintained a Securities Lending Policy which was amended in May 2006, October 2006 and March 2007.

    d.   in 2005, an internal audit of internal controls of the ANZ gave "a seriously adverse rating for the ANZ Securities Lending unit." The Audit Committee was provided with a summary of issues.  A follow-up internal audit report noted an adverse rating for "Custody, including Securities Lending."

    e.   a 2007 internal audit report (produced in October 2007) gave Custodian Services "a seriously adverse rating."

    f.   in February 2008, "serious concerns with some of the Brokers became apparent."

133.    Scienter is also inferred by the fact that Blumberg stated that:

    a.   in March 19, 2008, Steinberg was "made aware of the situation at Opes."

    b.   on March 19, 2008, ANZ agreed to lend $95 million to Opes knowing that Opes required no less than $200 million to stay afloat, in order to obtain a lien on Opes Prime assets and, thus, mitigate ANZ's exposure to loss.

134.    Scienter is also inferred by the fact that, in order to conceal the magnitude of its

improper receipt of securities from Opes Prime:

    a.   ANZ failed to file substantial shareholding notices (similar to Scuedules 13-D's filed with the SEC under Rule 13D) upon the acquisition of 5% or more of a company's stock.

    b.   ANZ took possession of more than 20 per cent of a company's capital stock without first making a takeover bid to all shareholders. Indeed, when challenged on this issue Australia's Takeover Panel ruled that ANZ fell afoul of the law when it failed to lodge a substantial shareholder notice after it took control of 26% of biotech company BioProspect.

## V.    CLASS ACTION ALLEGATIONS

135.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased ANZ ADRs between November 1, 2006 and July 27, 2008 inclusive (the "Class Period"), and who were damaged thereby.  Excluded from the Class are defendants, members of the immediate family of each of the Individual Defendants or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

136.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States. As of December 4, 2006, there were 4,537,675 ANZ ADRs representing 22,688,375 of ANZ ordinary shares were outstanding. During the Class Period, ANZ ADRs were actively traded on the New York Stock Exchange ("NYSE").  As of May 31, 2007, the average daily trading volume of ANZ's ADRs was 5,294,414.55 on a worldwide basis.  ANZ was delisted from the New York Stock Exchange ("NYSE") on July 12, 2007.  The Company's ADRs were revalued changing from a ratio of five shares of ANZ ordinary shares for each ADR to one share of ANZ ordinary shares for each ADR.  The Company's ADRs continued to trade on the OTC Bulletin Board, an open and efficient market, under the symbol "ANZBY.PK."  Record owners and other members of the Class may be identified from records maintained by ANZ and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

137.    Plaintiff's claim is typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

138.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

139.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, internal controls, financial condition and prospects of ANZ;

d.    whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of ANZ;

e.    whether the market price of ANZ ADRs during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.    the extent to which the members of the Class have sustained damages and the proper measure of damages.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a

class action.

## VI.   CAUSES OF ACTION

### COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER

141.    Plaintiff repeats and re-allege each and every allegation contained above as if fully set forth herein.

142.    Each of the defendants: (a) knew or recklessly disregarded material adverse nonpublic information about ANZ's practices, internal controls, and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about ANZ.

143.    During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were materially misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.    Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of ANZ stock during the Class Period.  This claim was brought within the applicable statute of limitations.

145.    Plaintiff and the other members of the Class have suffered damage in that, in

reliance on the integrity of the market, they paid artificially inflated prices for ANZ ADRs. Plaintiff and the other members of the Class would not have purchased ANZ ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

<u>**COUNT II**</u>

**AGAINST THE INDIVIDUAL DEFENDANTS FOR
<u>VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT</u>**

146.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

147.    The Individual Defendants Goode, Smith and Marriott acted as controlling persons of Australia and New Zealand Banking Group Limited within the meaning of Section 20(a) of the Exchange Act.  By reason of their senior executive and/or board positions they had the power and authority to cause Australia and New Zealand Banking Group Limited to engage in the wrongful conduct complained of herein.

148.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of ANZ stock during the Class Period.

**VII.    <u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Class counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

       (c)    Awarding Plaintiff and the other members of the Class their reasonable

costs and expenses incurred in this action, including counsel fees and expert fees; and

       (d)    Such other and further relief as the Court may deem just and proper.

## VIII.  **JURY TRIAL DEMANDED**

    Plaintiff hereby demands a trial by jury.

Dated: October 28, 2009

                       Respectfully submitted,

                       **STULL, STULL & BRODY**

                       James Henry Glavin IV (JG-2188)
                       Patrick K. Slyne
                       6 East 45th Street
                       New York, New York 10017
                       Tel:    (212) 687-7230
                       Fax:   (212) 490-2022

                       ***Lead Counsel for Plaintiff***

# EXHIBIT 1

## PLAINTIFF CERTIFICATION

Legacy Solutions Inc _____ ("Plaintiff") hereby states that:

1.    Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.    Plaintiff did not purchase any securities of Australia and New Zealand Banking Group Limited at the direction of his/her counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Plaintiff Certification. I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action.

4.    The following includes all of Plaintiff's transactions in Australia and New Zealand Banking Group Limited securities during the class period specified in the complaint:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| ANZBY | Pur | 5/16/07 | 123.25 | 300 |
| | | | | |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.    Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this  27  day of  January , 2009.

_____
Signature
DAVID CUTLER
CEO Legacy Solutions Inc.

# **EXHIBIT 2**



# Securities Lending Review

22 August 2008

# Securities Lending Review

i

This review of Australia and New Zealand Banking Group Limited's involvement in Securities Lending was conducted by Chief Executive Officer, Michael Smith assisted by David Crawford together with David Hisco, Managing Director Esanda; Chris Page, Head of Risk ANZ Asia Pacific and Bob Santamaria, Group General Counsel ANZ.

The report examines the development and management of Securities Lending within ANZ and its relationship with Brokers including the Opes Prime group.

The aim of the review is to address the legitimate expectations of ANZ's shareholders, its customers and the wider community, that the way in which ANZ conducts its business should meet the highest standards of ethics and business practice.

The report delivers on a commitment to provide an open and transparent account of the Bank's involvement in Securities Lending, to examine accountabilities within ANZ and to identify and undertake all necessary remedial actions.

ANZ recognises however that there remain broader legal issues to be resolved, particularly those associated with the losses incurred by the clients of the Opes Prime group. There are also significant impacts stemming from the failures of the Opes Prime group and Primebroker Securities on the lives of their clients and their families.

ANZ continues to believe its Equity Finance relationships with Brokers were undertaken on a strong legal foundation and in good faith, and this report does not seek to address these relationship issues directly.

ANZ does however recognise that the legacy of its involvement in Equity Finance may well be with the Bank for many years through legal cases that it will continue to defend and also the impact of these issues on its reputation.

This report has been presented to the ANZ Board, which has accepted the findings and fully supports the remediation program described within it. This report has also been provided to the Australian Prudential Regulation Authority (APRA) and the Australian Securities and Investments Commission (ASIC).

22 August 2008

ii

## Glossary of terms

**AMSLA** – Australian Master Securities Lending Agreement. This is a standardised agreement that is commonly used in Australia to document Securities Lending and Equity Finance arrangements.

**ANZ** – Australia and New Zealand Banking Group Limited.

**Broker** – in this Report, this term refers to a company to whom ANZ provided an Equity Finance facility, and which offered Equity Finance facilities to its clients. These companies include Opes and Primebroker.

**CTC** – Credit and Trading Risk Committee. This is an ANZ committee consisting of selected senior executives and is responsible for oversight and control of credit and market risk.

**Equity Finance** – a form of Securities Lending. The principal distinctions between Equity Finance and Standard Securities Lending are that the lender of securities is generally motivated by the desire to obtain cash financing by lending out securities that it holds and that, in practice, the collateral provided by the borrower to the lender under this form of transaction is generally less than the value of the securities borrowed.

**LVR or loan-to-value ratio** – in relation to an Equity Finance transaction, refers to the ratio of the collateral provided by the borrower of securities to the value of securities provided by the lender of those securities.

**Primebroker** – Primebroker Securities Ltd (Administrators appointed) (Receivers and Managers appointed).

**Opes** – refers to Opes Prime Stockbroking Limited (Administrators appointed) (Receivers and Managers appointed) or Leveraged Capital Pty Ltd (Administrators appointed) (Receivers and Managers appointed).

**Securities Lending** – a financial product that involves the temporary transfer of securities from one party (the lender) to another (the borrower) in return for cash or other securities (referred to as collateral). Under a Securities Lending facility the borrower is generally obliged to return borrowed securities (or equivalent securities) either on demand or at the end of any agreed term. The two principal forms of Securities Lending at ANZ were Standard Securities Lending and Equity Finance.

**SLORC** – Securities Lending Oversight Risk Committee. This was an ANZ committee that was established by the line and risk management officers responsible for the ANZ Securities Lending unit to oversee risk controls relating to Equity Finance and Standard Securities Lending.

**Standard Securities Lending** – a form of Securities Lending in which the borrower of securities is generally motivated by the desire to acquire particular securities on a short term basis (e.g. to settle 'short' sales). In practice, the collateral provided by the borrower to the lender under this form of transaction is more than the value of the securities borrowed.

# Contents

| 1 | **Executive Summary** | 1 |
|---|---|---|
| 2 | **Introduction and overview of Securities Lending** | 4 |
| 3 | **The Review** | 5 |
| 3.1 | Background | 5 |
| 3.2 | Scope of the Review | 5 |
| 3.3 | Process of the Review | 5 |
| 3.4 | ANZ's relationship with Brokers | 6 |
| 3.5 | Legal issues | 6 |
| 4 | **ANZ's credit and risk governance structures** | 7 |
| 4.1 | Board and Board committees | 7 |
| 4.2 | Line and risk management | 7 |
| 4.3 | Management committees | 8 |
| 5 | **Securities Lending and Equity Finance – commencement and development** | 9 |
| 5.1 | History of Securities Lending at ANZ | 9 |
| 5.2 | Where does the ANZ Securities Lending unit fit within ANZ? | 9 |
| 5.3 | Equity Finance in the ANZ Securities Lending unit | 10 |
| 5.4 | Approvals for Equity Finance | 10 |
| 5.5 | Encouragement for Equity Finance | 11 |
| 5.6 | Risk review of Equity Finance in 2005 | 11 |
| 6 | **Risks associated with ANZ's Equity Finance operations** | 12 |
| 6.1 | Classification of credit limits | 12 |
| 6.2 | LVR models | 13 |
| 6.3 | Nature of Brokers' business | 14 |
| 7 | **Operation, governance and oversight of Equity Finance – opinions** | 15 |
| 7.1 | Distinction between Equity Finance and Standard Securities Lending | 15 |
| 7.2 | Deficiencies in the Securities Lending Policy | 15 |
| 7.3 | Lack of compliance with approvals and policies | 16 |
| 7.4 | Credit limit calculation reduced visibility of Equity Finance | 16 |
| 7.5 | Deficiencies in the LVR models in Equity Finance | 16 |
| 7.6 | Limitations of CTC | 17 |
| 7.7 | Inappropriate role of SLORC | 17 |
| 7.8 | Failure to identify warning signs | 18 |
| 7.9 | Strategy and costs | 18 |
| 7.10 | Knowledge of the Board | 19 |
| 7.11 | Role of external auditors | 20 |
| 8 | **Investigation of breaches of ANZ employee conduct policies** | 21 |
| 8.1 | About the code of conduct investigation | 21 |
| 8.2 | Was there any fraud by ANZ employees? | 21 |
| 8.3 | ANZ employee accounts with Opes | 21 |
| 8.4 | Trading by employees | 22 |
| 9 | **Accountability and Remediation** | 23 |
| 9.1 | Themes | 23 |
| 9.2 | Accountability | 23 |
| 9.3 | Remediation actions | 23 |
| 9.4 | Next steps | 25 |

1

# 1    Executive Summary

### Introduction

This Review examined ANZ's involvement in Securities Lending, and in particular the development and management of ANZ's Equity Finance activities.

The Review was commissioned by the Chief Executive Officer of ANZ, Michael Smith, on 14 April 2008 following the collapse of the Opes Prime group, and was supported by the Board of ANZ.

ANZ's Securities Lending unit has operated since 1999 and the Equity Finance activities had evolved within that unit by 2001.

It is clear now that the differences between Equity Finance and other types of Securities Lending were not fully understood and appreciated by most ANZ staff involved in those products.

The Review Committee considers that, in hindsight, ANZ's Equity Finance business should not have operated in an environment where all the risks were not fully understood and managed. The business posed unacceptable reputational and financial risks to ANZ and these were not properly identified. These risks were compounded by the lack of a proper control environment with respect to the Equity Finance business.

### Background

Securities Lending involves the transfer of legal and beneficial title to securities from one person to another in return for cash or other securities. The contractual terms between the parties enable the securities to be dealt with without restriction.

The recipient of the securities has an obligation to transfer an equivalent number of securities in exchange for repayment of the cash or securities originally provided.

Equity Finance is a form of Securities Lending where the value of the transferred securities is more than the value of the cash received in exchange. In this report, 'Equity Finance' is distinguished from 'Standard Securities Lending'.

From 2001, ANZ entered into Equity Finance and Standard Securities Lending arrangements with a number of 'Brokers', including Opes Prime Stockbroking Limited and Leveraged Capital Pty Ltd (referred to collectively as Opes) and Primebroker Securities Limited (Primebroker).

In this report, the term 'Broker' refers to a company to whom ANZ provided an Equity Finance facility, where that company offered Equity Finance facilities to its clients.

The securities lent to ANZ by Brokers were generally obtained as a result of the Equity Finance arrangements between the Brokers and their clients. That is, clients of a Broker would transfer securities to that Broker in exchange for cash collateral (or a right to draw down cash collateral when required). As the Brokers could deal with these securities without restriction, they could transfer them to other parties in return for other securities, or transfer the securities to banks, such as ANZ, in exchange for cash collateral.

The fact that Brokers sourced the securities from their clients was a key distinction between the Brokers and other parties with whom ANZ entered into similar arrangements. The particular consequences to ANZ of this distinction were demonstrated following the appointment of administrators to Opes and Primebroker in March and July 2008 respectively. These consequences were both financial and reputational.

The financial consequences include a provision, now sitting at approximately $70 million, that ANZ has made in relation to its exposure to Primebroker. Additionally there have been significant and ongoing costs in dealing with litigation and regulator requirements arising out of the Broker insolvencies. Provisions related to Securities Lending exposures were disclosed as part of ANZ's Trading Update on 28 July 2008.

The reputational consequences for ANZ arose primarily as a result of the position in which the Brokers' clients found themselves. Upon the appointment of administrators to Opes and Primebroker, clients lost the ability to recall securities that they had transferred to the Brokers, and instead became (or will become) unsecured creditors for any 'netted' amounts owed to them under the Equity Finance arrangements they had with the Brokers.

While clients of Brokers are understood to have signed agreements providing for the transfer of ownership of securities, when the Broker becomes insolvent, ANZ is seen to be, and in fact is, holding the securities that the Broker's clients may have expected would be returned to them. In realising these securities to protect its position, ANZ is regarded by some (including clients of the Brokers) as acting in its own interests and at the expense of the clients of the Broker.

Other issues that have compounded the damage caused to ANZ by its involvement in Equity Finance include:

- the amount of ANZ's financial exposure in respect of the Equity Finance business and the illiquidity of the securities acquired by ANZ to effectively hedge that exposure;
- the fact that five ANZ staff held, or had access to, trading accounts with Opes and some staff traded on those accounts immediately prior to the appointment of receivers.

## Key findings and opinions

The Review Committee considers that there were a number of failures and deficiencies in relation to ANZ's Equity Finance business, as summarised below.

*Lack of understanding of the distinction between Equity Finance and Standard Securities Lending* – Line and risk management did not appear to fully understand the nature of Equity Finance and the differences between Equity Finance and Standard Securities Lending, including the different risks associated with Equity Finance (such as the reputational risk to ANZ arising from the financial standing and nature of the businesses of the Brokers that accounted for the majority of the Equity Finance business). This finding was a contributing factor to most of the other key findings.

*Growth in initial business not widely known* – There was limited understanding of the existence or significant scale of the Equity Finance business outside ANZ Custodian Services (within which the business resided) before March 2005.

*Lack of a proper control environment* – The Equity Finance business lacked an appropriate control framework, in particular with respect to credit limits and conditions relating to the quality and quantity of securities accepted by the Equity Finance business and the loan-to-value ratios applied to those securities. The lack of an appropriate framework was not identified by management until early 2005. The deficiencies identified were not then addressed effectively or in a timely manner. There was poor implementation of, and compliance with, the controls that were established.

*Poor accountability and 'management by committee'* – There was a lack of individual accountability within the line and risk management responsible for the Equity Finance business, with responsibility for many decisions resting with committees. This was compounded by deficiencies in the structure and management of the relevant committees.

*Failure to identify and act on warning signs* – Various concerns relating to the processes, personnel and systems utilised in the Equity Finance and Securities Lending businesses and the risks associated with these businesses were identified by various staff and in the course of internal audit reviews. However, they were not addressed in a timely or effective manner. There was a history of procrastinating on decisions to either invest in systems to remedy issues or to exit the business.

*Failure to report relevant issues to the Chief Executive Officer and Board* – The gravity of the issues relating to the Equity Finance business should have been, but were not, properly brought to the attention of the Chief Executive Officer and Board.

*Breaches of ANZ employee conduct policies* – There were breaches by some members of the ANZ Securities Lending unit of ANZ employee conduct policies.

3

## Remediation actions

The Review Committee has identified 13 remediation actions to be undertaken by ANZ to address the findings contained in this report.

1. *Exit Equity Finance* – The Chief Executive Officer has directed that ANZ withdraw from the Equity Finance business in an orderly manner and rationalise Standard Securities Lending to a few key multinational institutional relationships.

2. *Disciplinary Actions* – There will be disciplinary actions involving a number of employees ranging from written warnings through to termination of employment.

3. *Code of Conduct and Ethics Policies* – ANZ will refresh all of its employee code of conduct, ethics and conflict of interest policies. This will be supported by additional awareness and training programs.

4. *Reputation Risk Framework* – ANZ will implement a new reputation risk framework to establish formal policy and accountability across ANZ for management of reputation risk.

5. *Performance Management Framework* – ANZ will create a new Performance Management framework to better reinforce accountability and compliance.

6. *Training for ANZ Senior Executives* – There will be training including problem escalation, the new Code of Conduct and ANZ's values and people management policies.

7. *Change the fundamentals of committees* – The structure and reporting lines of management committees (including the Credit and Trading Risk Committee or CTC) will be reviewed. This will ensure all committees have clear authority, guidelines, mandates to perform specific functions and accountabilities for performance and failures to perform. This review will also include the form of submissions and the process for recording follow up actions and decisions.

8. *Internal Audits and significant operational control issues* – ANZ will introduce more rigorous management of businesses with adverse Internal Audit ratings and operational control issues identified as 'high'.

9. *Product Management* – There will be a full review of the product approval process in ANZ.

10. *Review classification of facilities* – ANZ will develop an annually reviewed central register of the credit limit classification of all Institutional division products.

11. *Customer exposure reporting* – ANZ will improve exposure reporting to its senior risk and line management that monitors both size and movements in customer activity.

12. *Exposures without limits* – Business unit Managing Directors will undertake reviews to confirm there are no other areas with processes and systems which might permit potential drawdowns without proper arrangements in place.

13. *Wholesale Credit Risk Policy* – There will be a full review of the development and dissemination of the ANZ Wholesale Credit Risk Policy.

## 2    Introduction and overview of Securities Lending

Securities Lending involves the temporary transfer of securities from one party (the lender) to another (the borrower) in return for cash or other securities (referred to as collateral).

Under a Securities Lending transaction, the borrower can deal with borrowed securities without restriction. This is because full legal and beneficial ownership of the relevant securities are transferred from the lender to the borrower. However, the borrower is obliged to transfer an equivalent number of the same securities to those borrowed either upon demand by the lender or at the end of an agreed term, subject to repayment of the cash or other collateral originally provided by the borrower to the lender.

Securities Lending at ANZ took two principal forms, in this report referred to as 'Standard Securities Lending' and 'Equity Finance'.

The borrower in a Standard Securities Lending transaction is generally motivated by the desire to acquire particular securities on a short term basis (e.g. to settle 'short' sales). The lender is generally a financial institution such as a bank that holds large volumes of securities and wishes to generate fees, income or otherwise have access to liquidity by lending out those securities. In practice, the collateral provided by the borrower to the lender under this form of transaction is more than the value of the securities borrowed.

Under an Equity Finance transaction, the lender of securities is generally motivated by the desire to obtain cash financing by lending out securities that it holds. The borrower is generally motivated by the desire to earn interest on the cash it provides as collateral for the securities and to generate fees from on-lending the securities borrowed. In practice, the collateral provided by the borrower to the lender under this form of transaction will be less than the value of the securities borrowed.

In an Equity Finance transaction, the amount of collateral provided by the borrower is determined by reference to a loan-to-value ratio (LVR), which generally reflects the borrower's assessment of the quality of the securities being lent. For example, a borrower might apply an LVR of 30 per cent to a low quality security. The borrower would then pay cash equal to 30 per cent of the market value of the security as collateral.

The Securities Lending market uses standard documentation. The Australian standard is called the Australian Master Securities Lending Agreement (AMSLA). The AMSLA is based on agreements produced by the UK based International Securities Lending Association. There are standard securities lending agreements and industry associations in major financial markets throughout the world. The Australian industry association is the Australian Securities Lending Association (ASLA) (www.asla.com.au).

Under an AMSLA, where an event of default occurs, the parties' obligations to return borrowed securities and collateral ceases. Instead, the AMSLA provides for a monetary value to be attributed to each party's former obligation to return borrowed securities or collateral, and for those obligations to be netted off against each other.

5

# 3  The Review

## 3.1  Background

On 14 April 2008, ANZ Chief Executive Officer Michael Smith announced a review into ANZ's involvement in Securities Lending, and in particular the development and management of ANZ's Equity Finance activities including ANZ's involvement with Opes.

Mr Smith appointed a Review Committee consisting of himself and:

David Crawford, one of Australia's most experienced company directors with an extensive background in financial services and insolvency administration. Mr Crawford was appointed to ensure the rigour of the Review.

David Hisco, Managing Director Esanda. Mr Hisco joined ANZ in 1980 and has held a number of senior executive positions and has been a member of the Management Board of ANZ.

Christopher Page, Head of Risk Asia Pacific ANZ. Mr Page joined ANZ in January 2008 after a 34 year career with HSBC where he was most recently the Chief Credit Officer, Asia Pacific in which position he had responsibility for risk management activities across more than 20 countries.

Bob Santamaria, Group General Counsel ANZ. Mr Santamaria joined ANZ in August 2007 from Allens Arthur Robinson where he was the Executive Partner of the Corporate department.

The Review Committee was extensively supported in its work by a team of over 20 people, including senior ANZ staff and representatives of PPB Financial Advisors, PricewaterhouseCoopers and Allens Arthur Robinson.

## 3.2  Scope of the Review

The terms of reference of the Review were to examine:

- oversight and control of ANZ's involvement in Securities Lending and the development and management of ANZ's client relationships including with Opes;
- whether any employee had breached ANZ's internal policies, procedures and ethical standards in Securities Lending and in dealings associated with clients including Opes;
- compliance with Australian law and regulation in relation to Securities Lending;
- all necessary remedial actions to address the issues identified in the Review.

In conducting the Review, it became clear to the Review Committee that relevant issues of concern related primarily to the provision of Equity Finance by ANZ to Brokers (such as Opes and Primebroker). Therefore, the Review did not focus on ANZ's Standard Securities Lending operations (except to the extent that this product was offered to Brokers) or its involvement in the provision of Equity Finance to parties other than Brokers.

## 3.3  Process of the Review

The findings of the Review are based on facts and, where appropriate, opinions. Over the four months of the Review, the Review Committee had access to, and analysed:

- internal reports;
- customer files;
- internal and external correspondence;
- submission papers and minutes for various committees;
- reports generated by the ANZ Securities Lending unit;
- other records, including internal and external audit reports;
- interviews and discussions with directors, employees and former employees.

### 3.4    ANZ's relationship with Brokers

The Review Committee conducted extensive investigations into the relationship between ANZ and Opes and other Brokers. This included interviews with those ANZ employees who had business and personal dealings with Opes.

The Review Committee did not identify any evidence to suggest that any personal relationships between ANZ staff and specific Brokers contributed to the issues of concern relating to the Equity Finance business. This was the case notwithstanding that one of the principals of Opes, Lirim Emini, had previously been employed by ANZ and had worked with, and was a friend of, some members of ANZ's Securities Lending unit. Rather, the issues of concern appeared to be principally referable to the nature of the business, operational and governance matters.

Accordingly, relationships between ANZ and the Brokers are not addressed in detail in this report except where relevant to the holding of trading accounts with Opes by some of ANZ's employees.

### 3.5    Legal issues

The operation of ANZ's Securities Lending unit has given rise to a number of legal issues.

For example, there are a number of outstanding court proceedings and claims against ANZ. These include claims by Opes' administrators that a re-organisation of the Equity Finance and security arrangements between ANZ and Opes that occurred shortly prior to the appointment of administrators to Opes is voidable.

As part of its ongoing investigation of Opes, ASIC has required ANZ to produce various documents and it has conducted formal examinations of some ANZ employees. ASIC also requested that ANZ lodge substantial holding notices in respect of 'relevant interests' arising pursuant to certain AMSLAs. Whilst ANZ did not accept ASIC's view that notices were required, they were lodged (on the assumption that ASIC's view applied). In addition to complying with ASIC's request, ANZ also gave certain undertakings to the Takeovers Panel as a result of an application brought against ANZ.

All current legal issues are the subject of separate consideration by ANZ and its legal advisers. As these issues are or may become the subject of litigation, it is inappropriate at this time to provide any further information on them in this report.

# 4 ANZ's credit and risk governance structures

There are various levels of governance within ANZ.

## 4.1 Board and Board committees

### 4.1.1 Board

The Board is responsible to ANZ's shareholders for the governance of ANZ, and oversees its operations and financial performance.

The Board may delegate any of its powers and responsibilities to Committees of the Board. For the purposes of this report, the most relevant Board Committees are the Risk Committee and the Audit Committee.

### 4.1.2 Risk Committee

The Risk Committee approves risk management principles, policies, strategies, processes and control frameworks for the management of business, market, credit, operational, liquidity, and reputation risk. It may sub-delegate its powers to executives of ANZ. The Chief Risk Officer is the executive responsible for assisting the Chairman of the Risk Committee. The Risk Committee also approves facilities recommended by CTC which are above CTC's approval authorities.

### 4.1.3 Audit Committee

The Audit Committee is responsible, among other things, for overseeing and monitoring the work of ANZ's Internal Audit function. The Group General Manager Internal Audit reports directly to the Chairman of the Audit Committee.

## 4.2 Line and risk management

The Board delegates to the Chief Executive Officer, who delegates further to other senior management, the authority and responsibility for managing the everyday affairs of ANZ.

Various aspects of risk management are managed by different risk functions within ANZ (including market risk, credit risk and operating risk and compliance). ANZ operates its business through various divisions and subdivisions. Each division has a managing director or head of business unit. The reporting line through each level of management to the Chief Executive Officer is known as line management.

## 4.3     Management committees

There are various management level committees in ANZ. These include various risk, project specific and other committees. There are two such committees which are central to the focus of this report, being CTC and the Securities Lending Oversight Risk Committee (SLORC).

### 4.3.1     Credit and Trading Risk Committee

CTC is a senior executive committee which operates pursuant to discretions delegated to it by the Board and the Risk Committee. It comprises selected senior Risk Executives, senior Executives and Business Unit Managing Directors and is chaired by the Chief Risk Officer. The Chief Executive Officer is a member of the committee and may attend as necessary, but will not normally be expected to do so. In this regard the Chief Executive Officer did not attend the CTC meetings referred to in this report.

CTC's mandate is to approve credit and market risk control frameworks for ANZ's business. In November 2005, its mandate was extended to also cover reputational risk to ANZ. As part of its mandate, CTC is authorised to make general credit decisions and specific credit decisions for ANZ's larger or higher risk customers, and to approve credit, trading risk and non-traded market risk controls and each business unit's asset writing strategy.

CTC played a pivotal role in relation to the control framework established with respect to Equity Finance. It was asked to consider and approve key parts of the framework developed and recommended by senior line and risk management personnel.

### 4.3.2     Securities Lending Oversight Risk Committee

SLORC was established in April 2006 by line and risk management representatives responsible for the oversight of the ANZ Securities Lending unit for the purpose of providing oversight in the management of credit and market risk of the Securities Lending business (including the Equity Finance business).

9

## 5    Securities Lending and Equity Finance – commencement and development

### Summary points

The Equity Finance business evolved out of ANZ's Standard Securities Lending business and was established without formal product approval. The differences between the Standard Securities Lending and Equity Finance businesses were not properly recognised, and the Equity Finance business was not widely known by management outside ANZ Custodian Services until March 2005.

The Equity Finance business grew rapidly with the encouragement of ANZ Custodian Services. By March 2005, when the first credit risk review of the business was undertaken, ANZ's financial exposure in respect of the business was $771 million.

There were deficiencies in the control framework for the Equity Finance business, including a failure to impose credit limits on customers. These deficiencies were identified in the above credit risk review but remedial actions were not implemented in a timely or effective manner.

### 5.1    History of Securities Lending at ANZ

ANZ has been involved in Securities Lending since the 1980s. In the 1990s, Securities Lending was conducted in different parts of ANZ including ANZ's retail stockbroking business (conducted by ANZ Securities Limited, then known as ANZ McCaughan Securities Limited) and ANZ Investment Bank (a division of ANZ).

In 1999, ANZ Securities Limited sold its retail stockbroking business. The Securities Lending activities were, at that time, discontinued by ANZ Securities Limited and adopted by ANZ Custodian Services. A dedicated team was created for this purpose (the ANZ Securities Lending unit).

### 5.2    Where does the ANZ Securities Lending unit fit within ANZ?

As shown in the following diagram, the ANZ Securities Lending unit is a part of ANZ Custodian Services which is a business within the Working Capital unit (formerly Trade and Transaction Services) in ANZ's Institutional division. The unit reports through to the Group Managing Director, Institutional and ultimately the Chief Executive Officer.

The diagram describes the current divisions and subdivisions. Over time, there have been several reorganizations and divisional name changes. However, the relative position of the ANZ Securities Lending unit within the hierarchy has remained fairly consistent over the years and the diagram provides an accurate reflection of its historical position within ANZ.

Assets held by the ANZ Custodian Services business are usually held by ANZ Nominees Limited (a wholly owned subsidiary of ANZ) as nominee or sub-custodian for ANZ. Securities transferred to ANZ in the course of Securities Lending or Equity Finance transactions were transferred to ANZ Nominees Limited as the nominee of ANZ.

## 5.3   Equity Finance in the ANZ Securities Lending unit

The ANZ Securities Lending unit was involved in Standard Securities Lending since inception.

It appears that the unit first became involved in Equity Finance on a small scale, but by late 2001, the product had grown to the point where it was considered to constitute a distinct offering and was referred to as 'Equity Finance'.

The terms 'equity finance' and 'equity financing' had been used in ANZ before 1999 although not necessarily for the form of Securities Lending now known as Equity Finance.

## 5.4   Approvals for Equity Finance

There is no record that any initial product approval was sought or obtained with respect to the Equity Finance product.

Within the ANZ Securities Lending unit, Equity Finance was often characterised as a part of Standard Securities Lending (or 'reverse stock lending') and not as a separate product.

ANZ's Wholesale Credit Risk unit (which sits within the Institutional Risk area) developed a Securities Lending Policy which was published in June 2002. The policy applied only to Standard Securities Lending and excluded Equity Finance. However, it did not exclude Equity Finance clearly, and was interpreted by ANZ Custodian Services and the ANZ Securities Lending unit as permitting Equity Finance.

Amendments to the Securities Lending Policy were published in May 2006 (with updates in October 2006 and March 2007). As part of the amendments, the policy was broadened to accommodate Equity Finance.



11

### 5.5    Encouragement for Equity Finance

At the same time as publication of the initial Securities Lending Policy, management within ANZ Custodian Services issued a set of brief 'guidelines' in relation to the Equity Finance business. The extent to which these guidelines were used in the day to day operations of the ANZ Securities Lending unit is unclear. The guidelines:

- did not limit ANZ's exposure to individual Brokers;
- did not restrict the types and concentrations of securities acceptable to ANZ;
- set a flat LVR without reference to the quality of securities accepted by ANZ.

In general, the ANZ Securities Lending unit was given freedom and encouragement by management of ANZ Custodian Services to grow the Equity Finance business.

From June 2002 (when the Securities Lending Policy was interpreted to permit Equity Finance) until March 2005 (when the first full review into Equity Finance by an ANZ risk officer was produced), ANZ's total financial exposure in relation to the Equity Finance business grew from $33 million to $771 million across a number of Brokers.

### 5.6    Risk review of Equity Finance in 2005

A credit risk assessment of the Equity Finance business was conducted in March 2005 by an ANZ risk officer, resulting in the production of a 'Securities Lending Review' report. Until this time, the existence of Equity Finance within ANZ was not widely known about or understood by management outside ANZ Custodian Services.

The Securities Lending Review report found that:

- while ANZ's Equity Finance product had similarities to ANZ's retail margin lending product, higher LVRs were applied and a much wider range of securities was accepted by ANZ;
- as at March 2005, ANZ had advanced $771 million to Brokers through the Equity Finance business;
- no credit limits had been established with respect to Brokers participating in the Equity Finance business and no process had been established to assess or manage counterparty credit risk.

The report was provided to relevant senior line and risk management. It recommended that no further expansion of ANZ's Equity Finance activities be undertaken and that credit limits be imposed with respect to the Brokers with whom ANZ had existing Equity Finance arrangements. Both of these recommendations were supported by a senior risk officer.

The recommendation to impose credit limits was also a requirement of CTC when the matter was raised in a submission in May 2005 seeking a credit limit for the largest Broker exposure.

Following the report, the Equity Finance business did not accept any new customers. However, exposures to existing customers were not capped at then current levels pending formal determination of credit limits for those customers.

There was a substantial delay in determining these credit limits. A limit was approved for only one Broker during 2005. Limits for the other Brokers were not approved until mid 2006. ANZ's financial exposure to these other Brokers more than doubled between the date of the Securities Lending Review report and the date on which credit limits were eventually imposed.

# 6    Risks associated with ANZ's Equity Finance operations

The level of risk associated with ANZ's Equity Finance business was firstly a function of the lack of credit limits and, when credit limits were applied, the classification of those limits. It was also a function of the LVR models applied, including the quality and concentrations of securities accepted by ANZ. A further risk emerged with respect to the financial standing of, and nature of the businesses operated by, Brokers to whom ANZ provided Equity Finance facilities.

## 6.1    Classification of credit limits

### Summary points

For internal reporting purposes, the Brokers' Equity Finance exposures were recorded at 10 per cent of the face value of funds made available to them. This was on the basis that ownership of the collateral by ANZ reduced the risk of loss of those funds. Recording the exposures at 10 per cent of the face value meant that the exposures were not as visible as they would have been had they been recorded on a fully funded basis.

In normal circumstances, ANZ sets credit limits with respect to the various products that it agrees to provide each customer. In determining credit limits for a particular customer, ANZ will have regard to the nature of its exposure to that customer. That exposure will, in turn, vary depending upon the nature of the product offered to the customer.

In the case of standard lending facilities such as overdrafts, loans and financial guarantees ANZ agrees to provide actual (or contingent) funding to its customers and potentially has exposure to the full amount provided. As such, credit limits for these products are determined and recorded in internal reports on a 'fully funded' basis by reference to 100 per cent of the funds available.

Under other types of facilities such as swaps, derivatives and Standard Securities Lending, ANZ does not have exposure to the full face value of the relevant transaction. In the event of customer default, ANZ will normally manage its potential exposure under the transaction by entering into a compensating transaction with another counterparty. In accordance with accepted banking practices, ANZ records limits for such transactions at a percentage of the face value of the transactions reflecting their assessed 'potential exposure risk'.

In April 2006, and following the 2005 Securities Lending Review, a senior risk officer decided that credit limits for Equity Finance should, for internal reporting purposes, be classified on the basis of potential exposure risk, as was the case for Standard Securities Lending facilities. The exposure was calculated at 10 per cent of the face value of funds made available.

This had the effect of reducing the visibility of the Equity Finance business within ANZ (although the Review Committee considers that this was not the intended result of the decision to adopt the potential exposure risk approach). For example, if ANZ imposed a credit limit of $50 million in respect of a particular Broker, the ANZ Securities Lending unit could enter into transactions with that Broker to the value of $500 million of cash or securities. However, the limit of $50 million would be shown for the purposes of internal reporting of large exposures to senior management, Risk Committee and the Board.

The amount of cash and securities advanced by ANZ to Brokers peaked at approximately $2 billion in August 2007, although classification of credit limits on the basis of potential exposure risk meant that the recorded exposures would have been calculated at around $200 million.

## 6.2   LVR models

### Summary points

In February 2006, a risk model was adopted that permitted the Equity Finance business to accept any listed security and which did not limit exposures to individual securities. This resulted in ANZ acquiring many large holdings of illiquid securities in companies with small market capitalisations.

Implementation of an improved risk model which addressed these issues was significantly delayed.

In late 2005, ANZ Market Risk began to design an LVR model for Equity Finance. The model that was developed permitted any listed security to be accepted regardless of its liquidity or the market capitalisation of the relevant company. In contrast, the securities that were approved at that time for the purposes of ANZ's Retail Margin Lending operations were restricted to a list of approximately 300 securities.

Further, the model did not impose limits on the percentage of issued shares of a particular company that could be accepted. This allowed the Equity Finance business to acquire high concentrations of securities in companies with a small market capitalization.

Finally, the model did not apply effectively where ANZ provided both Standard Securities Lending and Equity Finance products to a Broker on the one portfolio (ie where the Broker provided securities to ANZ and in return received a combination of cash under an Equity Finance facility and securities under a Standard Securities Lending facility). In these circumstances, the model calculated LVRs on each security and provided a value for the entire portfolio of securities provided by the Broker. The model did not match particular securities provided by the Broker against the cash provided to the Broker under the Equity Finance facility on the one hand or the securities provided to the Broker under the Standard Securities Lending facility on the other. This resulted in higher quality securities provided to the Brokers (under a Standard Securities Lending facility) effectively being supported by lower quality securities in the portfolio of securities provided by the Broker.

ANZ Market Risk developed a second LVR model from July 2006 which addressed the abovementioned faults. However, there were significant delays in implementing the second LVR model, with final implementation occurring in March 2008. This was too late to have an improving effect on the portfolio of securities provided by Opes and Primebroker.

### 6.3   Nature of Brokers' business

**Summary points**

ANZ's Equity Finance arrangement with a Broker gives rise to a potentially significant reputational risk in addition to financial risk. This arises because securities transferred by the Brokers to ANZ are primarily obtained as a result of Equity Finance transactions between the Brokers and their clients. Should the Broker become insolvent, ANZ in protecting its position by selling those securities, may be seen to have acted in its own interests and to the detriment of the Broker's clients.

While ANZ provided Equity Finance facilities to a small number of non-Broker companies, the majority of the Equity Finance business was conducted with Brokers.

The securities transferred by the Brokers to ANZ were primarily obtained by the Brokers as a result of Equity Finance transactions between the Brokers and their clients. That is, clients of a Broker would transfer securities to that Broker in exchange for cash collateral (or a right to draw down cash collateral when required). A Broker could then in turn, and in many cases did, transfer those securities to banks like ANZ in exchange for cash collateral.

Under an AMSLA, where an event of default occurs, the parties' obligations to return borrowed securities and collateral end. Instead, the AMSLA provides for a monetary value to be attributed to each party's former obligation to return borrowed securities or collateral, and for those obligations to be netted off against each other.

If a Broker becomes insolvent, there will be two netting off events: a netting off between ANZ and the Broker, and a netting off between the Broker and its clients.

If the netting off between the Broker and its clients results in payments being due to the clients from the Broker, the clients may not receive full payment as a result of the insolvency of the Broker.

As such, in entering into Equity Finance arrangements with Brokers, ANZ was incurring significant reputational risk. If a Broker becomes insolvent, ANZ is seen to be, and in fact is, holding the securities that the Broker's clients expected in normal circumstances would be returned to them. In realising these securities to protect its position, ANZ could be regarded by the clients of the Broker as acting in ANZ's interests and at the expense of the clients of the Broker.

Equity Finance arrangements expose ANZ to financial risk, reputational risk and the risk of potential litigation. These risks have been demonstrated in the case of Opes. While Opes' clients are understood to have signed agreements providing for the transfer of ownership of securities, many of those clients assert that they regarded their arrangements with Opes as a form of margin lending. Some claim that they did not understand that there was a full transfer of legal and beneficial title in securities to Opes, and that Opes was then free to deal with those securities without restriction, including by transferring them to ANZ.

15

# 7 Operation, governance and oversight of Equity Finance business – opinions

The Review Committee's conclusions regarding the operation, governance and oversight of the Equity Finance business are set out below.

## 7.1 There was a lack of understanding of the distinction between Equity Finance and Standard Securities Lending

The Review Committee considers that line and risk management did not appear to fully understand the nature of Equity Finance and the differences between Equity Finance and Standard Securities Lending. They did not undertake sufficient enquiries to understand fully the business and were often reliant on the views of the ANZ Securities Lending unit.

The lack of recognition of the distinction between Equity Finance and Standard Securities Lending initially resulted in the Equity Finance business being established without any product approval or oversight.

Subsequently, the lack of understanding led to errors and omissions in upward reporting of relevant issues. In some instances, incorrect information was provided.

In particular, CTC was not provided with all information required by it to properly consider the matters submitted to it in relation to the Equity Finance business.

The Review Committee does not consider that submissions to CTC regarding Equity Finance were deliberately inaccurate or misleading. Nonetheless, the errors and omissions in the submissions to CTC were unacceptable.

## 7.2 There were deficiencies in the Securities Lending Policy

ANZ's Securities Lending Policy was issued in June 2002. The policy was intended to apply only with respect to Standard Securities Lending and to exclude Equity Finance. Amendments to the Securities Lending Policy were published in May 2006 (with updates in October 2006 and March 2007). Amongst other things, those amendments expanded the Securities Lending Policy to cover Equity Finance.

The Review Committee considers that the amended Securities Lending Policy is not of an appropriate standard. It is not structured in a logical manner and does not apply relevant principles in a systematic way to the various Securities Lending products offered by ANZ.

The initial Securities Lending Policy was not updated for almost three years, during which period there had been significant growth in ANZ's Equity Finance business. This growth should have prompted a thorough review of the risks associated with the business and the adequacy of the policy. Instead, later policies simply built upon the earlier policies on a piecemeal basis.

### 7.3    There was lack of compliance with approvals and policies

In mid-2005, CTC approved various controls to be applied to the Equity Finance business.

A number of these controls took an unacceptably long time to be implemented, in particular controls requiring the funding to a Broker to be reduced or the types of securities to be accepted from a Broker to be limited. For example, where a new credit limit was less than the current exposure to the Broker, the ANZ Securities Lending unit did not stop accepting securities and continued to provide funding. These excesses were generally only brought under control when higher credit limits were approved for the Brokers.

Where a control imposed a new procedure (such as stress testing of the portfolios), implementation would often be delayed. Further, controls on the overall size of the business were often exceeded in the apparent belief by relevant line and risk management that retrospective approvals could be easily sought and obtained.

The Review Committee believes that, in general, ANZ Custodian Services sought to grow the Equity Finance business without sufficient reference to the controls approved for the business by ANZ's risk functions. This was exacerbated by the absence of processes to measure compliance with relevant controls and the fact that no disciplinary measures were imposed if a policy or approval was not followed.

### 7.4    Credit limits were calculated on a basis that reduced the visibility of the Equity Finance business

The credit limits (as described in section 6.1) that were eventually applied to Equity Finance facilities were calculated on the basis of a potential exposure risk of 10 per cent of funding made available by ANZ. One effect of calculating the limits on this basis was to reduce the visibility of the Equity Finance business within ANZ.

The basis on which the credit limits should be calculated can be a matter of judgement, and there are arguments which support the election of a potential exposure risk based limit in this case. However, the Review Committee considers that:

- given the complexity and potential significance of the issue, the decision to adopt the potential exposure risk model should have been brought to the attention of CTC, and by way of a hindsight review, to the Chief Risk Officer;
- the decision to adopt the potential exposure risk model should only have been made once confirmation had been received that credit limits were being observed and that the Equity Finance business was being restricted to a list of acceptable securities;
- there was insufficient rigour in relation to the decision to calculate the exposure at 10 per cent of ANZ's potential gross exposure.

### 7.5    There were deficiencies in the LVR models applied in the Equity Finance business

The Review Committee considers that the LVR model for Equity Finance developed in late 2005 had several key deficiencies. In particular, the model did not impose appropriate restrictions on the types of securities, or the percentage of issued shares of a particular company, that could be accepted by the Equity Finance business.

Although development of a second LVR model was commenced in July 2006 which addressed these issues, there were substantial delays in implementing the new model.

17

## 7.6    Limitations of CTC

Key decisions relating to Equity Finance were presented to and approved or ratified by CTC in the period from May 2005 to November 2006. CTC makes decisions based on information and recommendations submitted to it by key senior line and risk management personnel.

The Review Committee considers that CTC was not provided with all relevant information that would have allowed it to make informed decisions as to the appropriate controls that should have been implemented. Accordingly, the approvals provided by CTC were inadequate in that CTC was not expressly alerted to the fact that:

- the LVR model they were asked to approve did not adopt CTC's previous instructions regarding restrictions on acceptable securities and on concentration in individual securities;
- the credit limits for Equity Finance were to be calculated on a potential exposure risk basis, rather than a fully funded basis (as CTC had previously been advised would be the case).

Although CTC was not provided with complete and accurate information, the Review Committee considers, CTC did not apply an appropriate degree of rigour to its consideration of issues relating to the Equity Finance business and the content of the approvals being sought. Further, CTC did not discuss or make enquiries regarding any reputational risk to ANZ associated with the Equity Finance business as was required under their mandate.

The Review Committee considers that CTC should have applied greater rigour:

- in monitoring whether conditions attaching to prior approvals given by CTC had been satisfied;
- in enforcing deadlines for the provision of further submissions, where prior approvals were given on a provisional basis pending delivery of such further submissions.

With the increasing scale of ANZ's business and growing product complexity, particularly in areas of new and non-traditional Institutional banking such as Securities Lending, it is now apparent that CTC needs access to additional capability and resources to analyse critically the proposals put to it and inform its members of the nature of those proposals. This should be supported by further expanding its systems for recording action items and ensuring that there is follow up and review by CTC of action items.

## 7.7    Inappropriate role of SLORC

SLORC did not have a clearly defined role within ANZ's risk framework. Its charter stated that it derived its authority from CTC. Although CTC had been advised of the proposal to establish SLORC, no formal delegations had been made. SLORC was held out in written submissions to CTC to be the key control body for the Securities Lending business. It did not report back to CTC or to any other committee or person in ANZ. SLORC was chaired by the Head of ANZ Custodian Services.

The Review Committee considers that clearly established lines of responsibility, accountability and reporting are essential to the effective operation of any committee, and that SLORC lacked these characteristics.

In practice, SLORC discussed and considered a wide range of risk and other matters relating to the ANZ Securities Lending unit, but did not proactively manage issues raised with it.

The Review Committee considers that reliance by the line and risk management responsible for the ANZ Securities Lending unit upon SLORC constituted an abdication of individual responsibility by the persons with whom that responsibility should properly reside. That is, responsibility for credit risk should reside with ANZ's Credit Executives, responsibility for market risk should reside with ANZ's Market Risk area and responsibility for day to day management of the business should reside within ANZ's line management structure. While it may be appropriate to have a forum to co-ordinate these responsibilities, ultimate responsibility and decision making authority should remain with the various line and risk management positions.

Finally, the Review Committee considers that SLORC was not effective in fulfilling its self-appointed functions due to a range of factors, including:

18

- the fact that attendance was weighted in favour of representatives of ANZ Custodian Services;
- inappropriate delegation of attendance by senior market and operational risk representatives to more junior employees;
- poor record keeping and failure to action matters in a timely way.

## 7.8    Failure to identify warning signs

Various concerns were raised on an ad hoc basis by line and risk managers, generally with their peers and immediate superiors within the Institutional division and with credit risk and market risk managers. These concerns related to the processes, personnel and systems used in the Equity Finance and Standard Securities Lending businesses and the risks associated with these businesses.

The issues that were identified were not consistent with good banking practice and should have prompted further investigation and scrutiny.

The Review Committee considers that line and risk management treated each issue raised on a separate basis and did not consider the cumulative impact of the various issues.

Similar issues were also identified:

- in three reviews of the control environment conducted by ANZ internal audit between 2005 and 2007 for ANZ Custodian Services. The ANZ Securities Lending unit (which formed part of ANZ Custodian Services) was given an adverse or seriously adverse rating as part of each audit;
- by PricewaterhouseCoopers, who were engaged by ANZ in late 2007 to review opportunities to grow the Standard Securities Lending and Equity Finance businesses. That review identified that there were significant control issues in relation to the businesses.

Following the 2005 internal audit review, a remediation program was commenced to address the issues identified in that review. However, relevant remediation actions were not completed in a timely manner, or in a way which ensured that actions taken were embedded into processes so that weaknesses did not reappear (as illustrated by the adverse ratings given in subsequent internal audit reviews).

The Review Committee considers that management did not appear to place sufficient focus on the adverse Internal Audit ratings for the ANZ Securities Lending unit and did not take sufficient, timely and appropriate measures to remedy the underlying issues which were the cause of those adverse ratings although they reported to the Audit Committee that remedial actions were being undertaken.

## 7.9    Strategy and costs

The Standard Securities Lending and Equity Finance businesses were initially modest in scope but over time grew to become an important source of revenue and profit for ANZ Custodian Services. For this reason, further expansion of these businesses was encouraged or was proposed by the management of those businesses.

However, the Internal Audit reviews of ANZ Custodian Services and other internal ANZ strategy documents identified a need to invest in new technology and other systems to enable the ANZ Securities Lending unit to address existing issues and to accommodate further growth. Decisions to invest were delayed by management or were made with respect to only a portion of the expenditure required.

The Review Committee considers that a decision should have been made to either commit the expenditure required to address existing issues within the ANZ Securities Lending unit or, alternatively, to curtail its operations. It was inappropriate to maintain the business on a growth path without committing sufficient funds on a timely basis to address relevant issues, merely because the business was profitable.

### 7.10  Knowledge of the Board

#### 7.10.1  Knowledge regarding existence of the Equity Finance business and relevant financial exposures

Between 1999 and February 2008 (ie when serious concerns with some of the Brokers became apparent), papers presented to the Board and the Risk and Audit Committees included only occasional references to the Securities Lending business. There were also a small number of references that included the words 'equity finance' or 'equity financing'. The references could not reasonably have been expected to identify the fact that ANZ conducted an Equity Finance business that was distinct from its Standard Securities Lending business. The Review Committee is not aware of any evidence that this fact was brought to the attention of the Board, relevant Board committees or the Chief Executive Officer in any other manner.

The Review Committee considers that the Board, relevant Board committees and the Chief Executive Officer were not provided with a clear understanding of ANZ's potential exposures in respect of the Equity Finance business. This was primarily due to the fact that the Equity Finance business initially did not apply credit limits to its customers, and when credit limits were eventually applied they were calculated on a potential exposure risk basis (ie at 10 per cent of the value of relevant transactions). Nor were there adequate reporting lines in place to ensure that potential gross exposures of significant amounts were identified. With two exceptions, the exposures were not identified in reports provided to the Risk Committee.

The exceptions relate to the October 2005 and April 2006 reports to the Risk Committee relating to customers with credit limits greater than those permitted for their internal customer risk grades. These reports noted that one of the Brokers had a credit limit of several hundred million dollars (at this time the limit was shown at 100 per cent of ANZ's potential gross exposure, as the decision had not yet been taken to classify these limits on a potential exposure risk basis). The Broker was included in a list of 28 customers in the October 2005 report and in a list of 20 customers in the April 2006 report. These excesses were described as resulting from custody 'stock borrowing' activities.

These reports were presented in tabular manner which did not draw specific attention to the Broker, and they did not identify the correct nature of the facility to which the exposure related.

#### 7.10.2  Internal Audit Reports

In 2005, an internal audit of internal controls of the ANZ Custodian Services division gave an adverse rating for ANZ Custodian Services generally and a seriously adverse rating for the ANZ Securities Lending unit in particular. The Audit Committee was made aware of the overall rating for ANZ Custodian Services and was provided with a summary of issues. Subsequent updates to the Audit Committee emphasised that remediation of issues identified was progressing. The Board was made aware of these audit findings, but not provided with any detail. For example the Internal Audit segment report to the Board in October 2005 had one line which noted a new adverse rating for 'Custody, including Securities Lending'.

In the follow-up 2006 internal audit, ANZ Custodian Services was given a satisfactory rating based on the perceived progress made in implementing the remediation program.

In the 2007 internal audit (produced in October 2007) ANZ Custodian Services was given a seriously adverse rating due to concerns that the remediation program was not being implemented as effectively as had been understood during the 2006 Internal Audit. Within this 2007 internal audit, the 'front office' of the ANZ Securities Lending unit was given a satisfactory rating and the 'back office' was given a seriously adverse rating. In October 2007, the Audit Committee meeting was provided with a paper specifically addressing this audit and was advised that management responsible for ANZ Custodian Services had implemented a remediation program (including the use of external consultants) with respect to the issues raised in the 2007 internal audit. The Audit Committee discussed this paper at some length. The Risk Committee was also advised of the seriously adverse rating of the 2007 internal audit.

The Review Committee considers that the Audit Committee and the Risk Committee were only aware of long-term unresolved issues in ANZ Custodian Services and ANZ Securities Lending unit following the seriously adverse internal audit result in October 2007. Even as late as September 2007, Institutional executives provided comfort in a written report to the Risk Committee about the control environment in certain parts of the Institutional division, including ANZ Custodian Services.

Rectification of the issues identified in the October 2007 internal audit report was superseded in early 2008 by problems crystallising within the Equity Finance business. However, the Review Committee considers that a more structured notification and action system for adverse internal audits should be established in the future.

### 7.10.3  General matters

The 2005 Securities Lending Review found that the Equity Finance business had not previously been recognised or understood outside ANZ Custodian Services and that, at the time of the review, had an exposure of $771 million and an inadequate control framework. These findings should have been specifically brought to the attention of the Chief Executive Officer and the Board. The Board was made aware of the review, but not any details of the key findings.

However, the Review Committee is not aware of any evidence which suggests that there was a deliberate attempt to suppress adverse information. In other cases, such information was circulated as part of general reporting to appropriate levels within ANZ. Nevertheless, the Review Committee considers that the failure to escalate the issues relating to Equity Finance was, of itself, a significant oversight and requires additional focus to be given to upward reporting practices within ANZ.

## 7.11  Role of external auditors

ANZ's external auditors, KPMG[1], did not conduct detailed audits of the ANZ Custodian Services business (including the ANZ Securities Lending unit) in the course of their annual audit as these businesses did not fall within the materiality criteria applicable to those external audits.

From 2002, KPMG were specifically engaged by ANZ to prepare a semi-annual statement known as a 1026 statement to review certain ANZ management assurances to the auditors of external funds whose assets are managed by ANZ Custodian Services. Within the limited scope of a 1026 statement, KPMG were only required to consider the extent to which these assertions affected the external funds (not how they affected ANZ). As part of the 1026 statement process KPMG separately advised management of any issues that came to their attention. These included some ANZ Securities Lending unit systems issues which were the same as, or similar to, issues raised in the internal audits.

The Review Committee did not find any evidence that KPMG performed their duties inconsistently with what was reasonably expected.

---

[1]    Mr Crawford was a former partner of KPMG and, for this reason, was not involved in deliberations of the Review Committee regarding the role of KPMG.

21

# 8    Investigation of breaches of ANZ employee conduct policies

### Summary points

No evidence of fraud or other unlawful conduct by ANZ employees was identified.

Five ANZ employees had access to trading accounts with Opes.

The accounts of two ANZ employees had been permitted to remain out of order and, accordingly, the subject of a margin call, for a significant period. These employees breached the ANZ Code of Conduct.

Share trading by two other ANZ employees immediately prior to Opes being placed into receivership did not breach relevant ANZ policies and did not appear to have been conducted for illegitimate or unlawful purposes.

## 8.1    About the code of conduct investigation

The investigation into Code of Conduct breaches was headed by the ANZ Group Head of Workplace Relations and ANZ Deputy General Counsel for Employment Law together with the ANZ Head of Group Investigations.

## 8.2    Was there any fraud by ANZ employees?

The investigation did not find any fraud or criminal behaviour on the part of any ANZ employees.

## 8.3    ANZ employee accounts with Opes

The investigation found that four ANZ employees involved with the Equity Finance business held trading accounts with Opes (as defined in section 1.2). Additionally, one employee's spouse held an account with Opes on which the employee was authorised to trade. The investigation did not identify any other ANZ employees as holding accounts with Opes.

Of these five employees, only one had disclosed the existence of their account to their line manager. Although ANZ's Code of Conduct at that time did not require disclosure by the employees regarding their Opes accounts, the Review Committee considers that it would have been prudent for each of the employees to have disclosed their accounts in the circumstances.

Of the five employee accounts, two were not properly maintained. One employee's account had been out of order and, accordingly, subject to a margin call, since October 2005 with $293,000 owing as at 28 March 2008. The employee had been allowed to trade and increase the account even though it was subject to a margin call. The investigation found no evidence that there had been any follow up action by Opes in respect of the margin call and no attempt was made by that employee to pay the margin call. This employee conducted daily Securities Lending trades with Opes.

The other account had been subject to a margin call since October 2007 with $13,000 owing as at 28 March 2008. The employee had been called on by Opes to bring that account to order in October 2007, but had not done so. No further margin calls were made by Opes, nor did the employee make any attempt to bring the account into order.

The investigation concluded that the two employees with accounts with Opes which remained out of order and subject to margin calls breached the conflict of interest requirements of the ANZ Code of Conduct. They received a benefit from a customer with whom they had an ongoing business relationship, and were in a position to treat that customer favourably (whether or not they did so).

The investigation concluded that these two employees further breached the ANZ Code of Conduct by 'failing to at all times act in the interests of ANZ'. These employees did not bring to ANZ's attention the fact that Opes was not making or enforcing margin calls on clients whose accounts were in margin and allowing clients whose accounts were in margin to continue trading.

As a result of the investigation, these two employees will end their employment with ANZ.

## 8.4   Trading by employees

Two other employees gave instructions to trade on their Opes accounts on 27 March 2008, the day before Opes was placed into receivership. These instructions were examined and no evidence was found that they were pursued for illegitimate reasons or that the relevant employees were in possession of any relevant confidential or inside information.

The investigation found that:

- The first employee gave instructions to sell ANZ securities immediately prior to the normal half-yearly 'blackout' period during which ANZ employees are prevented from trading in ANZ securities. The instructions provided that unless the transaction could be completed on that day at the specified price it should not be completed until after the expiry of the blackout period. The transaction was not completed.
- The trade by the second employee involved the sale of a small proportion of the total number of a particular security held in the account. The investigation concluded that the fact that the employee gave instructions to sell only a small proportion of their holdings of the relevant security suggests that the employee was not acting on any inside information.

# 9    Accountability and Remediation

## 9.1    Themes

The Review has highlighted a need for ANZ to sharpen its focus on business practices and risk management procedures in areas of non-traditional banking within its Institutional division. The remediation actions are directed at reinforcing the following values:

• Encouraging individual accountability;
• Improving risk culture;
• Enhancing the importance of ethics in decisions and actions;
• Acting consistently with strategy.

The remediation actions described below include actions which ANZ has already taken as a result of issues arising out of Securities Lending and additional recommendations proposed following the Review.

## 9.2    Accountability

This report has identified significant issues within ANZ both in respect of the Equity Finance business and other aspects of ANZ's operations (such as those of CTC). The Review Committee considered the question of accountability. As noted above, none of the Board or Board committees were properly informed of the relevant issues notwithstanding the existence of processes which, if followed, should have led to escalation of the issues to them.

The Review Committee considers that the issues identified in this report were, in essence, a failing of management, both 'line management' and 'risk management'.

The issues concerning the operation of CTC over the years covered in this report ultimately rest with senior management who either participated in CTC or who would have been necessarily concerned with its deliberations (as noted below and in the Executive Summary, the Review Committee believes that CTC should be strengthened with appropriate resourcing to ensure proper follow up and escalation).

The report's findings have led to a series of sanctions in respect of ANZ employees. These sanctions reflect the levels of culpability and seniority of each of the persons affected. The sanctions include formal notes placed on staff employment records, adverse bonus impacts and the departure from the Bank of several managers and executives. Where appropriate, these are the subject of a separate public announcement by ANZ.

## 9.3    Remediation actions

The remediation actions to be taken by ANZ are set out below.

### 9.3.1    Exit Equity Finance

The Chief Executive Officer has already directed that ANZ withdraw from all Equity Finance business in an orderly manner and rationalise all Standard Securities Lending business to a few key multinational institutional relationships.

### 9.3.2    Disciplinary Actions

As a result of the Review a number of disciplinary actions will be implemented. The employees involved range throughout many levels of ANZ. Some former employees would also have been subject to these actions if they were still at ANZ.

### 9.3.3    Code of Conduct and Ethics Policies

ANZ is refreshing all of its employee code of conduct, ethics and conflict of interest policies. This includes development of a new computer based training module covering key areas such as Privacy and Conflict of Interest and implementing an annual attestation for each employee that they understand the key policies and have complied with them. ANZ will also place a prominent link to the above policies on the front page of ANZ's staff intranet and ensure the issue is reinforced through line management communications.

### 9.3.4   Reputation Risk Framework

ANZ Group Compliance is implementing a new reputation risk framework to clarify what reputation risk is at ANZ, confirm ANZ's reputation risk policy and set clear accountability across ANZ for management of reputation risk.

### 9.3.5   Performance Management Framework

ANZ Human Resources is creating a new Performance Management framework which will reinforce individual accountability through better role clarification and will take into account any compliance or control breaches in determining final ranking and subsequent bonus allocation.

### 9.3.6   Training for ANZ Senior Executives

All ANZ senior executives will attend a training session covering areas such as escalation of problems, the new Code of Conduct and case studies that emphasise ANZ's values and people management policies.

### 9.3.7   Change the fundamentals of committees

The structure and reporting lines of management committees (including CTC) will be reviewed. This will ensure all committees have clear authority, guidelines, mandates to perform specific functions and accountabilities for performance and failures to perform. This review will also include the form of submissions and the process for recording follow up actions and decisions.

### 9.3.8   Internal Audits and significant operational control issues

ANZ will introduce more rigorous management of businesses with adverse Internal Audit ratings and operational control issues identified as 'high' including:

- additional responsibility for ANZ Management Board to oversee remediation and ensure that there are procedures in place to implement follow-up and provide incentives for good governance;
- the manager of a unit subject to a seriously adverse rating or repeated significant operational control issues will present to the ANZ Management Board meeting and Audit Committee meeting on proposed actions;
- the Group General Manager for Internal Audit, and an External Audit firm representative will attend every Audit Committee and Risk Committee meeting;
- continual reporting of audit issues to the ANZ Management Board, Audit Committee and Risk Committee and highlighting adverse audits and their remediation and poor remediation of other audits.

### 9.3.9   Product Management

There will be a full review of the product approval process in ANZ.

### 9.3.10  Review classification of facilities

ANZ will develop an annually reviewed central register of the credit limit classification of all Institutional division products. The methodology for the percentage applied to potential exposure risk facilities should be included on the register. Any changes to classifications are to be hindsight reviewed by the Chief Risk Officer or his delegate.

### 9.3.11  Customer exposure reporting

ANZ will improve exposure reporting for its senior risk and line management that monitors both size and movements in customer activity.

### 9.3.12  Exposures without limits

Business unit Managing Directors (and their relevant IT support areas) will review their businesses to confirm there are no other areas with processes and systems which might permit potential drawdowns without proper arrangements in place. Any weaknesses are to be reported back to Chief Risk Officer with details of mitigating controls in place.

25

### 9.3.13  Wholesale Credit Risk Policy

There will be a full review of the development and dissemination of the ANZ Wholesale Credit Risk Policy.

## 9.4    Next steps

ANZ will fully co-operate with its regulators in relation to a detailed program to implement the remediation actions mentioned above including the responsible persons and timeframes. We will also keep our regulators regularly informed of progress of such actions.

# EXHIBIT 3

 

**Publications** > **Media Centre** > Opes Prime: proposed settlement and ANZ enforceable undertaking

# MR09-37 Opes Prime: proposed settlement and ANZ enforceable undertaking

*Friday 6 March 2009*

ASIC said today that it would provide the necessary releases to allow a settlement offer to be put to Opes Prime investors. This settlement offer is subject to both the approval by Opes Prime creditors and court approval of a creditors scheme of arrangement giving effect to the offer.

Based on estimates provided by the liquidator, the settlement, if approved by creditors and the court, is expected to deliver a sum of $253 million and a return of around 40 cents in the dollar to creditors of Opes Prime, which includes investors. This return is based on the value of potential creditors claims as at 27 March 2008 when Opes Prime went into administration.

The proposed settlement follows mediation initiated by ASIC between it, the ANZ Banking Group Ltd, Merrill Lynch (International) Australia Pty Ltd and the liquidator of Opes Prime Stockbroking Limited. These mediation processes have been progressed by the liquidator and the banks.

ASIC's major objective in encouraging the mediation was to recover compensation for investors without the need for costly litigation and multiple actions. ASIC identified two potential actions available to it. The first was a potential claim for compensation due to an alleged contravention of the managed investment provisions of the Corporations Act (the Act) by Opes Prime and alleged involvement in the contravention by ANZ and Merrill Lynch. The second potential claim was a civil penalty and compensatory action against the directors of Opes Prime, and the ANZ bank.

Under the terms of the mediated settlement, ASIC has agreed, if the offer is approved by Opes Prime creditors and the Court, not to pursue these actions against ANZ and Merrill Lynch, who are parties to the settlement offer.

**Opes Prime and the managed investment provisions**
ASIC noted that the securities lending and equity financing business operated by Opes Prime was based on a model traditionally used in the wholesale market in which the participants are more sophisticated and have a clear understanding of their rights and obligations. Of concern to ASIC was that Opes took this model to the retail market where some retail investors may not have been aware of their rights and obligations.

ASIC's view is that between about 26 July 2006 and 27 March 2008 Opes Prime may have operated a managed investment scheme (MIS) that was required to be registered but was not.

ASIC believed the Opes Prime business model may have been a MIS because it involved:

- The provision of equity finance and stock lending services to investors;

- The aggregation of cash and securities obtained from investors; and

- The obtaining of collateral in the wholesale market by reference to that aggregated pool of assets for the purpose of the investors.

ASIC's investigation into the Opes Prime business model considered two issues: being whether both ANZ and Merrill Lynch had actual knowledge of Opes Prime's possible contravention of the provisions relating to the operation of unregistered schemes; and whether the MIS could have operated without ANZ and Merrill

Lynch's participation.

ASIC believed that bringing this claim, if it succeeded, had the potential to provide compensation for the investors. ASIC also considered that there was a public interest in testing the managed investment scheme provisions, which provide legal protections for retail investors, where a wholesale product was sold or bought into the retail market for retail investors.

**Section 181 action**
ASIC's potential civil penalty and compensation claim against Opes Prime directors and ANZ bank relates to a number of transactions entered into between Opes Prime and ANZ on or about 20 March 2008, shortly prior to Opes Prime's collapse.

ASIC's investigation considered whether the transactions constituted a breach of directors duties by the Opes Prime directors and whether ANZ was involved in such a contravention in breach of section 181 of the Act, given ANZ's state of knowledge at the time.

ASIC's investigation covered whether:

- the transaction had the effect of benefiting ANZ by approximately $240m to the detriment of other creditors in the context of Opes' current or imminent insolvency; and

- ANZ was aware of Opes' significant financial difficulties at the time of entering into the transactions.

**ASIC releases granted under proposed settlement agreement**
As part of the settlement process, ASIC was requested, and has agreed:

- to release ANZ from potential claims arising from both the managed investment scheme and s181 investigations; and

- to release Merrill Lynch from the potential claim arising from the managed investment investigation.

ASIC's agreement to release ANZ and Merrill Lynch is subject to ASIC being satisfied with the content of the scheme documentation which will give effect to the proposed settlement, the proposed settlement being accepted by the Opes Prime creditors at a scheme meeting and approval of the scheme by the Court.

Tony D'Aloisio, Chairman of ASIC said that in litigation of this nature, there are significant risks and costs for all sides.

'Weighing up the benefits of litigation against those risks, ASIC believes that a compromise settlement which is acceptable to Opes Prime creditors and approved by the Court makes commercial sense and hence ASIC will provide the necessary releases to allow the settlement to move forward and be considered by creditors and the Court,' he said.

ANZ and Merrill Lynch have agreed to the terms of the releases to be provided by ASIC but have made no admissions in respect to ASIC's concerns.

ASIC acknowledges the co-operation of ANZ and Merrill Lynch throughout its investigations and the mediation process.

'In the event that creditors or the Court do not approve the settlement, the releases do not apply and ASIC will reassess its position and weigh up public interest and other considerations to determine if it will commence any civil proceedings', Mr D'Aloisio said.

**Enforceable undertaking**
ASIC also announced that it has put in place an Enforceable Undertaking (EU) from the ANZ in relation to ASIC's investigation into ANZ Custodial Services, a division of the ANZ Group.

The EU will require ANZ to complete a program to remedy deficiencies in operational procedures across the ANZ Custodian Services business, including its securities lending operations. The program will be thoroughly

reviewed by an expert who will regularly report to ASIC over the next year.

ANZ has agreed to improve compliance in various areas addressed in the EU, including to review, and where necessary, remedy:

- poor reconciliation processes;

- a breakdown in proper compliance processes;

- inadequate resourcing and risk management;

- inaccurate and delayed responses to beneficial tracing notices; and

- a poor compliance culture, meaning that deficiencies in processes were not identified, escalated or remedied in an appropriate or timely manner.

In addition, the EU sets out ASIC's concerns that ANZ:

- failed to account for interests in securities acquired in the course of its securities lending business for the purpose of making substantial shareholding notifications; and

- failed to report any of these areas of concern to ASIC on a timely basis.

ANZ do not concede that these particular concerns give rise to a contravention of any law or obligation by ANZ.

ASIC considered that the deficiencies impacted on ANZ's ability to meet its obligations as an Australian financial services licensee under the Act. ANZ Nominees Limited, a wholly owned subsidiary and authorised representative of ANZ that holds assets on behalf of ANZ and its clients, is also a party to the EU.

In the event that ANZ fails to comply with the requirements of the EU or the expert determines that ANZ has failed to complete the remediation program, and such failures are significant, ASIC will assess whether it should take action to vary the conditions of ANZ's AFSL.

ANZ Custodian Services provides custodial and asset services to ANZ's clients and conducts settlements and trade processing, investment accounting and securities lending. ANZ's securities lending business has been the subject of significant scrutiny in the aftermath of the collapse of Opes Prime.

ASIC believes that an enforceable undertaking is the most effective way to improve compliance within ANZ Custodian Services given the nature and breadth of ASIC's concerns and ANZ's willingness to both acknowledge ASIC's concerns and to cooperate with ASIC in its investigation.

Mr D'Aloisio said the arrangements announced today should send a strong signal that robust compliance procedures are imperative both in times of strong economic growth and, importantly, during periods of volatility.

'ASIC is encouraged by the measures taken by ANZ to date in order to address the issues within its Custodian Services business. ASIC considers that the EU is the right mechanism in this situation for formalising the balance of the work to be done', he said.

'ASIC has moved quickly since the collapse of Opes Prime in March 2008 and this in large measure has been due to its new approach and resources devoted to major investigations and its preparedness to use all regulatory tools at its disposal.'

**Download a copy of the enforceable undertaking**.

**Ongoing Investigations**

ASIC's investigations arising from the collapse of Opes Prime are ongoing. These investigations include consideration of the conduct of directors and officers of Opes Prime, both in relation to the operation of the business and in the period immediately prior to the collapse.

ASIC is considering whether such conduct is in breach of criminal or civil penalty provisions of the Act.

ASIC is also considering whether any third parties may have engaged in market misconduct, either at the time of the Opes Prime collapse or when the company was placed into liquidation and, if so, whether such conduct is in breach of criminal or civil penalty provisions of the Act.

It is expected that decisions on whether to proceed with these investigations will be made by May 2009.

**ASIC Website: Printed 04/21/2009**

# EXHIBIT 4

AUSTRALIAN SECURITIES
& INVESTMENTS COMMISSION

017029232

## ENFORCEABLE UNDERTAKING

The commitments in this enforceable undertaking are offered to the

Australian Securities and Investments Commission (**ASIC**)

by

Australia and New Zealand Banking Group Limited ACN 005 357 522

and

ANZ Nominees Limited ACN 005 357 568

(**Companies**)

### Definitions

1.  The following definitions are used:

    a.  "ANZ" means Australia and New Zealand Banking Group Limited ACN 005 357 522;

    b.  "ANZ Custodian Services" means the business unit of ANZ that provides custodial services, settlements and trade processing, asset services, equity finance, securities lending and investment accounting services;

    c.  "ANZ Nominees" means ANZ Nominees Limited ACN 005 357 568;

    d.  "ANZ Remediation Plan" means the draft ANZ Remediation Plan as amended in accordance with paragraph 43;

    e.  "ANZ Securities Lending Review" means the document titled ANZ Securities Lending Review dated 22 August 2008 regarding the review of ANZ's involvement in securities lending and equity financing;

    f.  "APRA" means the Australian Prudential Regulatory Authority;

    g.  "ASIC" means the Australian Securities and Investments Commission;

    h.  "ASIC Act" means the *Australian Securities and Investments Commission Act 2001* (Cth);

    i.  "ASIC's Concerns" means the concerns referred to in paragraphs 10 to 19;

2

j.    "Assess" means evaluate the ability or quality of the thing or person;

k.    "Assessment" is the process of evaluating the ability or quality of the thing or person;

l.    "ASTC" means the ASX Settlement and Transfer Corporation Pty Ltd;

m.    "ASX" means the Australian Securities Exchange Ltd;

n.    "books" has the meaning in section 5(1) of the ASIC Act;

o.    "Claim Form" means a form allowing a person to provide information to the Companies and claim compensation from the Companies;

p.    "Client" means a client of ANZ Custodian Services;

q.    "Commencement Date" means 1 April 2009;

r.    "Compensation Report" means a report as referred to in paragraph 66;

s.    "Corporations Act" means the *Corporations Act 2001* (Cth);

t.    "date of this enforceable undertaking" means the date on which it is accepted by ASIC;

u.    "document" has the meaning in section 25 of the *Acts Interpretation Act 1901* (Cth);

v.    "draft ANZ Remediation Plan" means the report referred to in paragraph 41;

w.    "Expert Report" means any expert report required to be prepared pursuant to this enforceable undertaking;

x.    "Final Expert Report" means the report referred to in paragraph 55.3;

y.    "Final Response" means the plan referred to in paragraph 56 or as modified in accordance with paragraph 57;

z.    "First Expert Report" means the report referred to in paragraph 45.3;

3

aa.   "First Response" means the plan referred to in paragraph 46 or as modified in accordance with paragraph 47;

bb.   "Further Compensation Report" means a report as referred to in paragraph 67;

cc.   "Independent Expert" means an expert required to be appointed pursuant to this enforceable undertaking as referred to in paragraph 34;

dd.   "limited relief instrument" means the ASIC Declaration applying to ANZ and each of its wholly owned subsidiaries dated 3 October 2000;

ee.   "Remediation Assessment" means the report referred to in paragraph 42.2;

ff.   "Response" means the First Response, Second Response or Final Response;

gg.   "Second Expert Report" means the report referred to in paragraph 49.3;

hh.   "Second Response" means the plan referred to in paragraph 50 or as modified in accordance with paragraph 51.

## Background

2.   Under section 1 of the ASIC Act, ASIC is charged with a statutory responsibility to perform its functions and to exercise its powers so as to promote the confident and informed participation of investors and consumers in the financial system.

3.   Pursuant to section 13 of the ASIC Act, ASIC has been investigating the management of the affairs of ANZ, ANZ Nominees and the ANZ Custodian Services business operated by those entities in the period from 1 January 2007 to the date of this enforceable undertaking. ASIC's investigation arose out of, among other things, information that emerged in the context of its investigations into the collapse of Opes Prime Stockbroking Limited.

## ANZ and ANZ Nominees

4.   ANZ is the ultimate holding company of ANZ Nominees. ANZ Nominees has no employees. All staff are employed by ANZ.

4

5.    ANZ holds Australian Financial Services Licence (**AFSL**) number 234527 and is licensed to provide advice in relation to, deal in, make a market for and provide, a custodial or depositary service for a broad range of financial products. ANZ Nominees is an authorised representative of ANZ under the AFSL.    ANZ Nominees' authorisation is restricted to dealing in financial products and providing a custodial or depository service.    ANZ Nominees holds legal and / or beneficial title to assets, such as securities, acquired by, or deposited with, ANZ in the course of its business.

**ANZ Custodian Services**

6.    ANZ and ANZ Nominees are involved in the operation of a business unit within 'Transaction Banking' (formerly known as 'Working Capital' which is within a broader business unit known as 'Institutional') of ANZ, known as 'ANZ Custodian Services'.

7.    ANZ Custodian Services provides the following services:

7.1    Custodial Services – the holding of assets as bare trustee on behalf of ANZ's clients and entities within the ANZ group;

7.2    Settlements and Trade Processing – the facilitation of trade instructions and settlements for domestic, global and managed fund clients;

7.3    Asset Services – the facilitation of corporate actions, instruction handling, entitlement posting, tax processing, reconciliation and proxy voting services;

7.4    Standard Securities Lending – loan of securities to institutional borrowers, collateralised by cash or securities.  The collateral is usually more than the value of the securities lent.    ANZ acquires the securities lent to institutional borrowers from certain of its custody clients pursuant to Australian Master Securities Lending Agreements entered into between ANZ and those clients;

7.5    Equity Finance – functionally similar to Standard Securities Lending, involving the provision of collateral to clients under a securities lending



5

facility, the extent of which is determined by reference to the value of listed securities transferred by the client to ANZ and a loan to valuation ratio. The collateral is usually less than the value of the securities borrowed, where those securities are borrowed by ANZ. ANZ has advised ASIC that Equity Finance has been wound down and ANZ Custodian Services ceased to offer this product in July 2008;

7.6 Investment Accounting – tailored portfolio/investment administration services that encompass reporting, administration and accounting functions.

8. ANZ provides custody services to a range of clients, including managed investment schemes and other investment managers, superannuation funds, financial institutions, private clients and other business units operated by other parts of ANZ.

9. The provision of custodian services carries inherent risks principally as a result of the extremely large volume of transactions involved in conducting such a business. Transaction risk and compliance risk are two of the most prominent risks faced by a custody business:

9.1 Transaction risk includes the risk of loss arising from fraud, error, the inability to deliver products or services and the inability to properly manage information. In a custody business, transaction risk is most evident in corporate actions, settlement, foreign exchange and operating account processing. Transaction risk can be controlled by efficient identification of risks, strong policies and procedures, a strong control environment, efficient use of technology and meaningful and accurate reporting to management;

9.2 Compliance risk is the risk of loss arising from non-compliance with the custodian's legal obligations, internal policies or procedures and contractual obligations to its clients. Non-standard products and services increase compliance risk. Compliance risk is controlled by efficient monitoring of the custodian's legal and contractual obligations and the

6

efficient detection, reporting and rectification of any contraventions of internal procedure, policy and the law.

## ASIC's Concerns

10. In the course of the investigation referred to in paragraph 3 ASIC has identified a number of areas of concern within ANZ Custodian Services as set out in paragraphs 11 to 19 that relate to:

   10.1   the performance of reconciliations;

   10.2   a breakdown in proper processes;

   10.3   resourcing;

   10.4   risk management;

   10.5   responses to beneficial tracing notices,

   10.6   prohibited acquisitions and substantial holdings notifications;

   10.7   significant breach reporting; and

   10.8   compliance culture.

## Reconciliations

11. Deficiencies existed in ANZ Custodian Services' reconciliation processes, including:

   11.1   Reconciliation of accounts relating to ANZ Custodian Services' securities lending operations were not conducted:

      a.   with adequate regularity; or

      b.   to the individual Client level, such that

      reconciliation errors were not identified, investigated and rectified in a timely manner;

7

11.2  Records in respect of reconciliation investigations and rectification were not maintained;

11.3  Lack of separation of the staff responsible for conducting reconciliations from those that conducted the day to day transactions to which the reconciliations related;

11.4  Lack of segregated monitoring and supervision of reconciliation staff and processes;

11.5  High levels of manual activity were required in the reconciliation process increasing the likelihood of errors and manipulation; and

11.6  Reconciliation procedures were not fully documented.

Breakdown in proper processes

12.  The following deficiencies existed in ANZ Custodian Services' general processes:

12.1  Lack of documentation or understanding by relevant staff of end to end and Client account administration processes, including, in some instances, those relating to the recording of Clients' instructions, the use of Client assets, compliance with Client contractual obligations and corporate actions;

12.2  Failure to pay rebates in respect of two Client accounts in accordance with contractual obligations;

12.3  Lack of formal processes to determine whether new Clients were retail or wholesale;

12.4  Inadequate segregation of duties between front office and back office staff with respect to ANZ Custodian Services' securities lending operations;

12.5  Inadequate monitoring and supervision of some staff with respect to payment discretions and acceptance of new Clients;

8

12.6    Inadequate processes for identifying, monitoring and resolving potential conflicts of interest between ANZ employees and Clients, in the course of securities lending.

12.7    Inadequate processes to ensure that trades settled on time and failed trades were properly investigated to determine the underlying cause and to prevent recurrence. This was most obvious in relation to the 'Opes Prime sell-down'; and

12.8    Lack of adequate quality assurance processes.

Inadequate resources

13.    ANZ Custodian Services' human and technological resources were not optimal having regard to the nature and complexity of the particular business it conducted. In particular:

13.1    The systems utilised in connection with ANZ Custodian Services' securities lending operations did not have an appropriate degree of automation or integration;

13.2    An insufficient number of appropriate staff were dedicated to quality assurance and reconciliations; and

13.3    Some functions and processes were susceptible to key man risk.

Inadequate risk management

14.    ANZ Custodian Services did not implement appropriate risk management policies and systems to manage ANZ's potential reputational and financial exposure in connection with ANZ Custodian Services' operations, as identified in the ANZ Securities Lending Review, including:

14.1    Lack of a proper control environment;

14.2    Poor accountability;

14.3    Failure to identify and act on warning signs;

9

14.4   Failure to report relevant issues to the Chief Executive Officer and the Board of ANZ.

## Responses to beneficial tracing notices

15.   The Companies did not comply with their obligations under section 672B of the Corporations Act in that:

15.1   Delays were experienced in responding to notices in April and May 2008 (recognising that as at 24 April 2008 ANZ Custodian Services was in receipt of 252 notices that were not responded to within two business days, and of those over 100 had not been responded to in over 10 days); and

15.2   Of the 966 responses issued between 3 March 2008 and 22 May 2008, a large proportion contained inaccurate data as a result of issues arising from the introduction of a new IT system. These inaccurate responses may have mislead recipients of the response.

## Prohibited acquisitions and substantial holdings notifications

16.   Between 2001 and 12 May 2008 ANZ did not account for relevant interests in securities acquired as a result of transactions entered into in the course of its securities lending business. ASIC is of the view that the limited relief instrument did not operate to disregard relevant interests in securities acquired by ANZ or its subsidiaries pursuant to their securities lending operations. If ASIC's view was correct (which ANZ does not concede) ANZ would:

16.1   have acquired relevant interests in issued voting shares in a number of companies such that ANZ had more than 20% of the voting power in those companies; and/or

16.2   not have made relevant notifications, as required, when it began or ceased to have a substantial holding, or there was a movement of at least 1% in its holding, in companies whose securities it acquired in the course of its securities lending business. The omission to make such notifications may have mislead the public.

10

Significant breach reporting

17.  ASIC considers that ANZ may have failed to report significant breaches of its obligations under section 912A of the Corporations Act and/or the financial services laws to ASIC in respect of ANZ Custodian Services in accordance with section 912D of the Corporations Act.

18.  ASIC further considers that ANZ did not have in place adequate procedures for determining whether a breach or likely breach of ANZ's obligations in respect of ANZ Custodian Services was significant.  ANZ also did not have in place adequate procedures to provide ASIC with written reports within 10 business days of becoming aware of a breach or likely breach in respect of ANZ Custodian Services.

**Poor compliance culture**

19.  ASIC considers that ANZ Custodian Services demonstrated a poor compliance culture.  In particular:

19.1    ANZ Custodian Services did not take adequate steps to remedy issues identified in a timely manner;

19.2    management within ANZ Custodian Services dismissed or explained away issues and failed to escalate them as necessary;

19.3    management of ANZ Custodian Services did not place sufficient focus on adverse internal audit ratings and did not take sufficient, timely and appropriate measures to remedy the underlying issues that were the cause of those adverse ratings;

19.4    progress of steps taken to remedy deficiencies were initially slow with lack of sufficiently skilled resources and the existence of competing priorities consistently stated as reasons for the slow progress.

20.  ASIC acknowledges that in early 2008, the Companies commenced a remediation program to address the problems identified within ANZ Custodian Services. External consultants have been engaged to assist ANZ Custodian Services with

11

the structure and implementation of the remediation program.   While the Companies consider that the remediation program has been substantially implemented, and that many of the deficiencies referred to in this enforceable undertaking are now of an historical nature, ASIC and the Companies consider that it is appropriate for the Independent Expert to assess the degree to which the remediation program has been satisfactorily implemented, in accordance with the procedures described in paragraphs 42 to 67.

### Acknowledgments by the Companies of ASIC's Concerns

21.    The Companies acknowledge ASIC's Concerns and have offered this enforceable undertaking in the terms outlined below.

22.    The Companies acknowledge that deficiencies existed since at least October 2007 in ANZ Custodian Services' operations as outlined in ASIC's Concerns in respect of reconciliations, proper processes, resources, risk management, responses to beneficial tracing notices and compliance culture.

23.    The Companies acknowledge that, in aggregate, the deficiencies referred to in paragraph 22 may have resulted in the Companies' failing to satisfy the following obligations so far as they relate to the relevant aspects of ANZ Custodian Services' business:

23.1    section 912A(1)(a) -- the obligation to do all things necessary to ensure that financial services are provided efficiently, honestly and fairly;

23.2    section 912A(1)(aa) -- the obligation to have in place adequate arrangements for the management of conflicts of interest;

23.3    section 912A(1)(b) -- the obligation to comply with the conditions on the licence, namely the requirement to maintain proper records in relation to the financial products held in the course of providing custodial services;

23.4    section 912A(1)(c) -- the obligation to comply with the financial services laws;

12

23.5   section 912A(1)(ca) – the obligation to take reasonable steps to ensure that ANZ's authorised representatives comply with the financial services laws;

23.6   section 912A(1)(e) – the obligation to maintain the competence to provide the financial services being provided;

23.7   section 912A(1)(f) – the obligation to ensure that representatives are adequately trained and are competent to provide the financial services being provided; and

23.8   section 672B – the obligation to provide accurate information in response to a beneficial tracing notice within two business days after receiving the notice.

24.   The Companies do not concede that the deficiencies referred to in paragraph 22, whether separately or in aggregate, impair the title of ANZ or its related bodies corporate to securities acquired by them pursuant to their Standard Securities Lending or Equity Finance operations.

25.   The Companies do not concede that ASIC's Concerns in relation to prohibited acquisitions and substantial holding notifications, significant breach reporting or concerns relating to the use of clients funds or the maintenance of proper books and records have given rise to a contravention of any law or obligation by the Companies, including:

25.1   Sections 606(1) and 606(2) of the Corporations Act – prohibition on certain acquisitions of relevant interests in companies;

25.2   Sections 671B(1)(a) and 671B(1)(b) Corporations Act – requirement to provide information about substantial holdings;

25.3   Section 912D of the Corporations Act – the requirement to provide ASIC with a written report within 10 business days of becoming aware of a breach or likely significant breach of statutory obligations or the financial services laws;



13

25.4    Sections 981C, 984B, 988A and 988E of the Corporations Act — various obligations in relation to dealing with Client's money and property and the keeping of financial records.

Further, the Companies do not concede that any other of ASIC's Concerns have given rise to a contravention of the provisions referred to in paragraphs 25.1 to 25.4.

26.    In respect of ASIC's Concerns in relation to ANZ Custodian Services' human and technological resourcing, risk management and compliance culture, ANZ acknowledges that it is working with APRA to resolve, amongst other things, these concerns.

**Undertakings**

27.    Under section 93AA of the ASIC Act, the Companies have offered, and ASIC has agreed to accept as an alternative to commencing civil proceedings or pursuing administrative action, undertakings as set out in paragraphs 28 to 77 inclusive.

28.    The Companies undertake that they will pay the costs of their compliance with this enforceable undertaking including the remuneration and costs associated with the engagement of any independent expert.

29.    The Companies undertake that they will not seek reimbursement of, contribution towards or otherwise to directly or indirectly pass on their costs of compliance with this enforceable undertaking or any proportion of those costs to clients of the ANZ business unit known as Institutional, which includes ANZ Custodian Services.

30.    The Companies will, within a reasonable period of time after receiving a request from ASIC, provide all documents and information requested by ASIC from time to time for the purpose of assessing the Companies' compliance with the terms of this enforceable undertaking.  For the avoidance of doubt, the Companies are not required to provide ASIC with documents or information that is the subject of legal professional privilege.

14

31. The Companies undertake that they will pay within 14 days of the date of the enforceable undertaking the costs of ASIC's investigation referred to in paragraph 3 fixed in the amount of $50,000.00.

**Acknowledgements - Operation of Enforceable Undertaking**

32. The Companies acknowledge that:

32.1 This enforceable undertaking has no operative force until accepted by ASIC, and the Companies and ASIC acknowledge that the date of the enforceable undertaking is the date on which it is accepted by ASIC;

32.2 ASIC's acceptance of this enforceable undertaking does not affect ASIC's power to investigate, conduct surveillance, pursue a criminal prosecution or seek a pecuniary civil order in relation to:

a. Fraud, misappropriation or misuse of money by the Companies or any person or entity associated with the Companies, whether or not based on information currently in its possession or derived from such information;

b. Any contravention not the subject of ASIC's Concerns; or

c. Arising from future conduct occurring after the date of this enforceable undertaking (including any matters disclosed to ASIC by the Companies or any independent expert in the course of compliance with this enforceable undertaking) whether or not the future conduct arises from the conduct described in ASIC's Concerns;

d. Any person, other than the Companies and their related bodies corporate or the officers and employees thereof, in respect of any matter, whether or not arising from future conduct or relating to matters or contraventions the subject of ASIC's Concerns;



15

32.3   ASIC's acceptance of this enforceable undertaking does not affect ASIC's power to intervene in or become a party to any proceeding in relation to the interpretation of the limited relief instrument or the Corporations Act.

32.4   This enforceable undertaking in no way derogates from the rights and remedies available to any other person or entity arising from any conduct described in ASIC's Concerns or arising from future conduct;

32.5   ASIC may issue a media release on execution of this enforceable undertaking referring to its terms and to ASIC's Concerns that led to its execution;

32.6   ASIC may from time to time publicly refer to this enforceable undertaking; and

32.7   ASIC will make this enforceable undertaking available for public inspection.

33.   By accepting this enforceable undertaking ASIC concludes the investigation referred to in paragraph 3 giving rise to ASIC's Concerns and, subject to paragraph 32.2 and compliance with this enforceable undertaking, ASIC will not take any other action against the Companies (or their past or present officers) or any related entity (or their past or present officers) in relation to matters the subject of ASIC's Concerns.

**Independent Expert**

34.   Where the appointment of an independent expert is required pursuant to any paragraph of this enforceable undertaking the Companies must appoint a person who is independent of the Companies and its officers and has the necessary expertise, experience and operational capacity to complete the terms of engagement (**Independent Expert**).

35.   The Companies must:

35.1   Engage the Independent Expert to perform the tasks necessary to fulfil the obligations imposed by this enforceable undertaking;

16

35.2    Permit the Independent Expert, subject to any claim of legal professional privilege, and to the extent that is reasonable having regard to the requirements of this enforceable undertaking, to have access to their books, to interview any past or present employee and to consult with ASIC and disclose to ASIC any information obtained by the Independent Expert in the course of carrying out their assessments;

35.3    Give the Independent Expert any information or explanation reasonably requested by the Independent Expert of any matter in any way connected with the reports required to be prepared by the Independent Expert under this enforceable undertaking;

35.4    Otherwise reasonably assist the Independent Expert in conducting the assessments and producing Expert Reports.

36.    The Companies will ensure that the terms of engagement of the relevant Independent Expert will include a requirement that the Expert Reports will:

36.1    Set out the steps that the Independent Expert has taken to fulfil their task, including but not limited to:

a.    The people that have assisted the Independent Expert and in what way;

b.    The personnel that have been interviewed; and

c.    The documents that have been assessed;

36.2    Set out any limitations or qualifications to the Expert Report;

36.3    List those documents or extracts of documents most relevant (in the view of the Independent Expert) in producing the Expert Report;

36.4    Otherwise comply (to the extent applicable) with those paragraphs of the Federal Court of Australia Practice Direction 'Guidelines for Expert Witnesses in proceedings in the Federal Court of Australia', that fall under the sub-heading 'The form of the expert evidence' (see Annexure A);

17

37.  Paragraphs 34 to 36 apply to every appointment of an Independent Expert by the Companies required pursuant to this enforceable undertaking.

38.  The Independent Expert and the Independent Expert's terms of engagement must be approved in writing by ASIC before the Independent Expert is engaged. The Companies must advise ASIC of the expertise and prior association of the proposed Independent Expert with the Companies and its related bodies corporate and officers at the time approval is sought from ASIC. ASIC must be given the draft terms of engagement by no later than 7 days from the Commencement Date.

39.  The Independent Expert must be engaged within 2 weeks of the Commencement Date.

40.  The Companies must seek written approval from ASIC to vary the terms of engagement of the Independent Expert once those terms of engagement are approved by ASIC in accordance with paragraph 38.

**Remediation Plan**

41.  Within 2 weeks of the Commencement Date the Companies must submit a plan to ASIC and the Independent Expert (**draft ANZ Remediation Plan**) incorporating each of the matters identified in sub-paragraphs 41.1, 41.2 and 41.3 below. For the avoidance of doubt, the draft ANZ Remediation Plan will include matters that the Companies consider have already been addressed as part of the remediation program referred to in paragraph 20, in order to enable the Independent Expert to independently assess whether those matters have been satisfactorily addressed.

41.1  For each of the issues identified in paragraph 41.2 and 41.3 below, the draft ANZ Remediation Plan must provide details of:

a.  Whether or not action has been taken to remediate the issue;

b.  If not, the action proposed to be taken and timeframes for that action;

c.  If so, a description of the action taken to date and the progress;

18

    d.    Whether or not any procedure, process or system implemented has been validated and tested for effectiveness and if so the organisation or team that conducted the validation and testing.

41.2    The draft ANZ Remediation Plan must include a description of each of the issues requiring remediation (or which has required remediation) as agreed with ASIC.

41.3    The draft ANZ Remediation Plan must include the following forms of remediation for ANZ Custodian Services that have or will be taken:

<u>Reconciliations</u>

    a.    All outstanding uncleared items within the ANZ Custodian Services' suspense or holding accounts as at the Commencement Date (including but not limited to cash, stock, tax credits and rebates)   must be reconciled within 4 months of the Commencement Date;

    b.    Such reconciliations to be cleared appropriately and in accordance with relevant accounting standards;

    c.    An audit trail be clearly visible to justify the appropriateness of cleared items within the ANZ Custodian Services' suspense or holding accounts since 1 January 2008;

    d.    An explanation as to the reason (including considerations of materiality) for any unreconciled item referred to above as at 4 months of the Commencement Date;

    e.    A new procedure for proper reconciliations is implemented;

    f.    Training of all relevant staff in proper reconciliation procedures is conducted within 2 months of the Commencement Date;

    g.    A process is implemented for identifying all Clients adversely affected by reconciliation issues in relation to the items referred to above and where appropriate for Clients to be notified and compensated in accordance with the procedure outlined in paragraphs 60 to 67;

19

h.  Where reconciliation items cannot be validly cleared, a process be implemented for:

    i.  Client moneys and/or assets to be held in a specific purpose trust account; and

    ii.  those moneys and/or assets to be dealt with as appropriate (including, where feasible, by notifying current or former Clients in accordance with Annexure B that they have an entitlement or interest in the money or asset and providing a mechanism for dealing with unclaimed money or assets);

Breakdown in processes (such as supervision and segregation of staff, Client account administration and failed trades)

i.  Satisfactory end to end processes and Client administration processes (including recording of Clients' instructions, use of Client assets, compliance with Client contractual obligations and corporate actions) to be implemented;

j.  ANZ must, to the extent considered reasonable by the Independent Expert, implement a process to identify instances in which a Client has been adversely affected by any failures in respect of Client account administration processes (including recording of Client's instructions, use of Client assets contrary to instructions, compliance with Client contractual obligations and corporate actions) occurring on or after 1 January 2007. In determining what is reasonable in this respect, the Independent Expert must have regard to the likelihood of a Client having been materially adversely affected by such failures (having regard to the status of reconciliations referred to in paragraphs 41.3a to 41.3h above), the internal and external costs to ANZ in identifying such failures and all other relevant matters. ANZ Custodian Services must, where appropriate, notify (including making all relevant disclosure) and compensate relevant Clients in accordance with the procedure outlined in paragraphs 60 to 67;

20

k.    The employee code of conduct, ethics and conflict of interest policies within ANZ Custodian Services are satisfactory and training conducted for all current and new employees is up to date;

l.    Any retail Clients within ANZ Custodian Services are identified and adequate processes are implemented for identifying new Clients as retail Clients where applicable;

m.    A review of all securities lending Client rebate accounts as at the Commencement Date and where appropriate for Clients to be notified and compensated in accordance with the procedure outlined in paragraphs 60 to 67;

n.    Satisfactory procedures are implemented to limit the incidents of failed trades;

o.    Satisfactory procedures are implemented for the detection, investigation and remediation of failed trades, such remediation to include the payment of compensation to Clients where appropriate;

Disclosure of relevant interests

p.    There is current compliance with the Companies' obligations regarding prohibited acquisitions and substantial holding notifications on the basis that the limited relief instrument does not apply to relevant interests acquired by ANZ pursuant to its securities lending operations;

q.    Any instances of non-compliance with disclosure of relevant interests obligations, on the basis that the limited relief instrument does not apply to relevant interests acquired by ANZ pursuant to its securities lending operations, occurring on or after 12 May 2008, have been appropriately remedied;

r.    A process is implemented for addressing any breaches, occurring after 1 June 2008, of obligations relating to substantial holdings, determined on the basis that the limited relief instrument does not apply to relevant interests acquired by ANZ pursuant to its securities lending operations, that requires:

21

i.   immediate compliance with the Companies' obligations under the Corporations Act upon the Companies becoming aware of any breach, including the provision of required information in the appropriate form if there had been a failure to do so and, where appropriate, the provision of updated and accurate information;

ii.   nomination of a specified contact at the Companies with appropriate skills and seniority, to receive, assess and escalate as necessary any complaints received as a result of any breach of an obligation relating to substantial holdings;

iii.   in the period from the Commencement Date to the Second Expert Report, alternatively the Final Expert Report (if ASIC provides notification in accordance with paragraph 54) the Companies must notify ASIC and the Independent Expert of any complaints received as a result of any breach of an obligation relating to substantial holdings including details of the nature of the complaint and the Companies' response to the complaint;

s.   There is current compliance with the Companies' obligations regarding responses to beneficial tracing notices;

t.   A process is implemented for addressing any breaches by the Companies, occurring after 1 June 2008, of obligations relating to beneficial tracing notices that requires:

i.   as soon as reasonably practicable on detection of any breach, identification of the recipients of a response to a direction pursuant to section 672A of the Corporations Act that were affected by the breach of obligation (**affected recipients**);

ii.   as soon as reasonably practicable on detection of any breach notification in writing to the affected recipients of:

(A)   the fact and nature of the breach of obligation;

(B)   where appropriate, provision of updated and accurate information;

22

    (C)   the fact of the statutory right to compensation where a breach has caused loss or damage; and

    (D)   a contact point at the companies for receipt of complaints or requests for compensation;

iii.    nomination of a specified contact at the Companies with appropriate skills and seniority, to receive, assess and escalate as necessary any complaints and requests for compensation received by the Companies;

iv.    in addition to ANZ's obligations under section 912D of the Corporations Act, for the period from the Commencement Date to the Second Expert Report, alternatively the Final Expert Report (if ASIC provides notification in accordance with paragraph 54) the Companies must notify ASIC and the Independent Expert of any complaints or requests for compensation received as a result of a breach of an obligation relating to beneficial tracing notices, including details of the nature of the complaint and the Companies' response;

### Significant breach reporting

u.    Satisfactory procedures are documented and implemented for the identification, escalation, remediation and notification of breaches of the Companies' obligations as the holder of an AFSL and as an authorised representative;

v.    Training for all staff, including senior executives, in ANZ Custodian Services in respect of the procedures referred to in sub-paragraph 41.3u;

w.    Register of breaches of the Companies' obligations in respect of ANZ Custodian Services to be provided to the Independent Expert at the end of every month for 8 months commencing two months after the Commencement Date.

### Remediation Assessment

42.    Within 4 weeks of the Commencement Date the Independent Expert must: 

23

42.1 Conduct an assessment of the draft ANZ Remediation Plan to determine whether it adequately addresses the matters raised in paragraph 41;

42.2 Provide a written report (**Remediation Assessment**) to ASIC and the Companies with the Independent Expert's recommendations regarding the draft ANZ Remediation Plan.

43. Within 6 weeks of the Commencement Date, ANZ must amend the draft ANZ Remediation Plan as reasonably recommended by the Independent Expert and resubmit the ANZ Remediation Plan, as amended (**ANZ Remediation Plan**) to the Independent Expert and ASIC.

44. ANZ must implement the ANZ Remediation Plan.

**First Expert Report**

45. Within 3 months of the Commencement Date, the Independent Expert must:

45.1 Conduct an assessment of the implementation of the ANZ Remediation Plan, including:

a. An assessment of the progress of the implementation of the ANZ Remediation Plan;

b. An assessment of the effectiveness of those remediation items in the ANZ Remediation Plan that have been implemented;

c. An assessment of compliance with procedures, processes and systems implemented in accordance with the ANZ Remediation Plan;

d. Whether newly employed and ongoing employees of the Companies are appropriately trained in respect of any new processes, procedures and policies;

45.2 Identify deficiencies from the assessment referred to in paragraph 45.1.

45.3 Provide a written report to the Companies and ASIC (**First Expert Report**) that sets out:

24

   a.   Details of its findings in respect of the matters referred to in paragraph 45.1;

   b.   Details of:

      i.   the deficiencies identified in paragraph 45.2

      ii.   recommendations on how to rectify the deficiencies; and

      iii.   a reasonable time for a rectification program to be commenced and implemented.

**First Response**

46.   Within 4 months of the Commencement Date, the Companies must consider the First Expert Report and provide to the Independent Expert and ASIC a plan (**First Response**) setting out the action the Companies propose to take to complete the implementation of the ANZ Remediation Plan and rectify the deficiencies identified in the First Expert Report, specifying the reasonable time in which this action will be taken.

47.   If ASIC or the Independent Expert require any reasonable modifications to the First Response, ASIC or the Independent Expert must notify the Companies in writing within 4½ months of the Commencement Date. The Companies must make such modifications to the First Response.

48.   The Companies must implement the First Response within the time specified.

**Second Expert Report**

49.   Within 9 months after the Commencement Date, the Independent Expert must:

   49.1   Conduct an assessment of the implementation of the ANZ Remediation Plan, having regard to the First Response, including:

      a.   An assessment of the progress of the implementation of the ANZ Remediation Plan;

25

b.   An assessment of the effectiveness of those remediation items in the ANZ Remediation Plan that have been implemented;

c.   An assessment of compliance with procedures, processes and systems implemented in accordance with the ANZ Remediation Plan;

d.   An assessment of the implementation of the First Response;

e.   Whether newly employed and ongoing employees of the Companies are appropriately trained in respect of any new processes, procedures and policies;

49.2   Identify deficiencies from the assessment referred to in paragraph 49.1;

49.3   Provide a written report to the Companies and ASIC (**Second Expert Report**) that sets out:

a.   Details of its findings in respect of the matters referred to in paragraph 49.1;

b.   Details of:

i.    the deficiencies identified in paragraph 49.2;

ii.   recommendations on how to rectify the deficiencies; and

iii.  a reasonable time for a rectification program to be commenced and implemented.

**Second Response**

50.   Within 10 months of the Commencement Date, the Companies must consider the Second Expert Report and provide to the Independent Expert and ASIC a plan (**Second Response**) setting out the action the Companies propose to take to complete the implementation of the ANZ Remediation Plan and the First Response as well as to rectify the deficiencies identified in the Second Expert Report, specifying the reasonable time in which this action will be taken.

26

51.    If ASIC or the Independent Expert require any reasonable modifications to the Second Response, ASIC or the Expert must notify the Companies in writing within 10½ months of the Commencement Date. The Companies must make such modifications to the Second Response.

52.    The Companies must implement the Second Response within the time specified.

53.    If ASIC does not provide notification in accordance with paragraph 54, the Companies must provide to ASIC a written report detailing the implementation of the ANZ Remediation Plan and the Second Response within 14 days of the final step in the ANZ Remediation Plan and the Second Response being completed. ASIC may at its discretion consult with the Independent Expert in relation to the adequacy of the implementation by the Companies of the ANZ Remediation Plan and the Second Response.

**Final Assessment**

54.    In the event ASIC considers that a further assessment should be conducted by the Independent Expert, ASIC must notify the Companies and the Independent Expert within 11 months of the Commencement Date.

55.    In the event notice is provided by ASIC pursuant to paragraph 54, within 13 months of the Commencement Date, the Independent Expert must:

55.1    Conduct an assessment of the implementation of the ANZ Remediation Plan, having regard to the First Response and Second Response, including:

a.    An assessment of the progress of the implementation of the ANZ Remediation Plan;

b.    An assessment of the effectiveness of those remediation items in the ANZ Remediation Plan that have been implemented;

c.    An assessment of compliance with procedures, processes and systems implemented in accordance with the ANZ Remediation Plan;

d.    An assessment of the implementation of the Second Response;

27

    c.    Consideration of whether newly employed and ongoing employees of the Companies are appropriately trained in respect of any new processes, procedures and policies;

55.2    Identify deficiencies from the assessment referred to in paragraph 55.1;

55.3    Provide a written report to the Companies and ASIC (**Final Expert Report**) that sets out:

    a.    Details of its findings in respect of the matters referred to in paragraph 55.1;

    b.    Details of:

        (a)    the deficiencies identified in paragraph 55.2;

        (b)    recommendations on how to rectify the deficiencies; and

        (c)    a reasonable time for a rectification program to be commenced and implemented.

**Final Response**

56.    Within 14 months of the Commencement Date, the Companies must consider the Final Expert Report and provide to the Independent Expert and ASIC a plan (**Final Response**) setting out the action the Companies propose to take to complete the implementation of the ANZ Remediation Plan and the Second Response as well as to rectify the deficiencies identified in the Final Expert Report, specifying the reasonable time in which this action will be taken.

57.    If ASIC or the Independent Expert require any reasonable modifications to the Final Response, ASIC or the Independent Expert must notify the Companies in writing within 14½ months of the Commencement Date. The Companies must make such modifications to the Final Response.

58.    The Companies must implement the Final Response within the time specified.

59.    The Companies must provide to ASIC a written report detailing the implementation of the ANZ Remediation Plan and the Final Response within 14

28

days of the final step in the ANZ Remediation Plan and the Final Response being completed. ASIC may at its discretion consult with the Independent Expert in relation to the adequacy of the implementation by the Companies of the ANZ Remediation Plan and the Final Response.

**Disclosure and Compensation**

60.    Within 45 days of receipt of the First Expert Report the Companies must submit to ASIC and the Independent Expert:

    60.1    A document setting out the relevant conduct requiring disclosure or compensation arising from sub-paragraphs 41.3g, 41.3j or 41.3m and each person or entity that has been or might have been affected by that conduct;

    60.2    A draft letter or other form of disclosure and Claim Form (if appropriate) to be approved by ASIC and the Independent Expert to be sent to persons or entities referred to in paragraph 60.1;

    60.3    A list of persons or entities identified in paragraph 60.1 to whom it is proposed the letter, disclosure and Claim Form will be sent;

    60.4    If the Companies do not propose to send the letter to any person or entity identified in paragraph 60.1, an explanation as to the basis for this decision.

61.    If ASIC or the Independent Expert require any reasonable modifications to the documents referred to in paragraph 60.2 or to the list identified in paragraph 60.3, ASIC or the Independent Expert must notify the Companies in writing within 14 days of receiving those documents.

62.    The Companies must make any reasonable modifications to the documents referred to in paragraph 60.2 and to the list identified in paragraph 60.3 as required by ASIC or the Independent Expert.

63.    Within 7 days of receipt by the Companies from ASIC and the Independent Expert of details of modifications pursuant to paragraph 61, the Companies must send the documents to each of the persons and entities in the list, as modified

29

pursuant to paragraph 62. If an address cannot be obtained from the Companies' records or the letter is returned, the Companies must follow the procedure in Annexure B.

64.   Within 14 days of the Companies receiving a completed Claim Form, the Companies must send a letter to those persons and entities to acknowledge receipt of the Claim Form.

65.   The Companies must:

65.1   Within 28 days of receipt of all relevant information assess any claim for compensation made by a person or entity;

65.2   Pay such claims within 14 days of assessment in whole or in part unless ANZ reasonably believes that there are legitimate grounds for rejection of the claim.

66.   Within 30 days of sending letters and Claim Forms to persons or entities in accordance with paragraph 63 the Companies must provide a report (**Compensation Report**) to ASIC and the Independent Expert containing the following information concerning the status of claims made:

66.1   the number of claims that have been received since the Commencement Date of this enforceable undertaking;

66.2   the number of claims that have been paid in full;

66.3   the number of claims rejected wholly or partially, and the grounds for the rejection of each such claim; and

66.4   the number of claims that are under assessment at the date of the report.

67.   If there are claims that are under assessment as at the date of the Compensation Report the Companies must provide a further compensation report setting out the matters referred to in paragraph 66 within 30 days of the Compensation Report (**Further Compensation Report**).

30

### Provision of documents to ASX, ASTC or APRA

68.  Upon receiving a request from the ASX, ASTC or APRA the Companies must
     provide a copy of the ANZ Remediation Plan, the Remediation Assessment, any
     Expert Report, any Response, the Compensation Report, the Further
     Compensation Report or any other document prepared further to this enforceable
     undertaking to those entities within 7 days of receiving the request.

### Provision of documents to ASIC

69.  The address for providing ASIC with any document, including but not limited to
     any plan or report, which this enforceable undertaking requires to be provided to
     ASIC is:

>        Senior Manager, Investment Banks
>        Australian Securities and Investments Commission
>        GPO Box 9827
>        MELBOURNE VIC 3001

70.  The address for providing the Companies with any document or response,
     including but not limited to any plan or report, which this enforceable undertaking
     requires to be provided to the Companies is:

| For ANZ | Anthony Cahill |
|---|---|
| | Global Head of Product, Payments and Cash Management |
| | – Financial Institutions |
| | Transaction Banking |
| | Australia and New Zealand Banking Group Ltd |
| | Level 25 |
| | 530 Collins Street |
| | Melbourne VIC 3000 |

| For ANZ Nominees | Anthony Cahill |
|---|---|
| | Director |
| | ANZ Nominees Limited |
| | Level 25 |
| | 530 Collins Street |
| | Melbourne VIC 3000 |



31

**Provision of documents to the Boards of ANZ and ANZ Nominees**

71.    Every report (including the ANZ Remediation Plan, the Remediation Assessment, any Expert Report, any Response, the Compensation Report and the Further Compensation Report) prepared pursuant to this enforceable undertaking must be tabled at the next scheduled meeting, after the date of the report, of the Board of ANZ and ANZ Nominees. If no such Board meeting is scheduled as at the date of the report a meeting must be scheduled within one month of the date of the report.

**Default**

72.    The Companies must seek ASIC's written consent to vary the time by which any of the requirements of this enforceable undertaking must be completed. The Companies must provide ASIC with written reasons for the variation sought prior to the expiry of the time required by this enforceable undertaking for completion of the requirement and the time is not varied until ASIC has provided its written consent. ASIC's consent will not be unreasonably withheld.

73.    If the Companies fail to perform any of the requirements of this enforceable undertaking in the time required by this enforceable undertaking or as varied under paragraph 72, the Companies must immediately notify ASIC in writing of the failure to perform the relevant requirement and when compliance with the relevant requirement of the enforceable undertaking will occur.

74.    In the event of:

74.1    a material breach of the enforceable undertakings; or

74.2    a determination by the Independent Expert that ANZ has not completed a material aspect of the ANZ Remediation Plan;

ANZ must provide to ASIC written submissions setting out why ASIC should not take action to vary ANZ's AFSL to revoke ANZ's authorisation to operate and/or provide, to retail or wholesale Clients, custodial or depository services, other than investor directed portfolio services. ANZ's submissions must be provided to ASIC within 14 days of notification by ASIC to ANZ of a requirement to do so.

32

75.   Paragraph 74 does not limit ASIC's powers to take additional or alternative action.

76.   ANZ does not concede that a variation of its AFSL is necessarily an appropriate remedy in the event of a default by the Companies under this enforceable undertaking.

**Conclusion of this enforceable undertaking**

77.   Notwithstanding anything else in this enforceable undertaking, ASIC may expressly in writing waive any of the obligations contained in this enforceable undertaking, or (with the consent of ANZ) amend the date by which any such obligation is to be satisfied.

78.   ASIC and the Companies acknowledge that this enforceable undertaking ends on the completion of all of the requirements under this enforceable undertaking.

**Signed** for Australia and New Zealand
Banking Group Limited ACN 005 357
522 by its duly authorised representative
in the presence of:

_____
Witness Signature

_____
Representative's Signature

_GUY    GAUDION_____
Print Name

_RICHARD  B  SANTAMARIA_____
Print Name

**Signed** for ANZ Nominees Limited
ACN 005 357 568 by its duly authorised
representative in the presence of:

_____
Witness Signature

_____
Representative's Signature

_GUY    GAUDION_____
Print Name

_RICHARD B  SANTAMARIA_____
Print Name

33

Accepted by the Australian Securities and Investments Commission under section
93AA of the *Australian Securities and Investments Commission Act 2001* (Cth) by its
duly authorised delegate:

........................................................................

Anthony Michael D'Aloisio

Chairman and Delegate of Australian Securities and Investments Commission

6  MARCH 2009

34

## Annexure A

### The Form of the Expert Reports

Adapted from the Federal Court of Australia Practice Direction
'Guidelines for Expert Witnesses in proceedings in the Federal Court of Australia'

1. An expert's written report must give details of the expert's qualifications, and of the literature or other material used in making the report.

2. All assumptions of fact made by the expert should be clearly and fully stated.

3. The report should identify who carried out any tests or experiments upon which the expert relied in compiling the report, and state the qualifications of the person who carried out any such test or experiment.

4. Where several opinions are provided in the report, the expert should summarise them.

5. The expert should give reasons for each opinion.

6. At the end of the report the expert should declare that '[the expert] has made all the inquiries which [the expert] believes are desirable and appropriate and that no matters of significance which [the expert] regards as relevant have, to [the expert's] knowledge, been withheld from ASIC.'

7. There should be included in or attached to the report (i) a statement of the questions or issues that the expert was asked to address; (ii) the factual premises upon which the report proceeds; and (iii) the documents and other materials which the expert has been instructed to consider.

8. If an expert changes a material opinion for any reason, the change should be communicated in a timely manner to ASIC and the Companies.

9. If an expert's opinion is not fully researched because the expert considers that insufficient data are available, or for any other reason, this must be stated with an indication that the opinion is no more than a provisional one. Where an expert witness who has prepared a report believes that it may be incomplete or inaccurate without some qualification, that qualification must be stated in the report.[1]

10. The expert should make it clear when a particular question or issue falls outside the relevant field of expertise.

---

[1] The "Ikarian Reefer" [1993] 20 FSR 563 at 565.

35

## Annexure B

**Procedure for contacting persons**

1.  In accordance with paragraph 63 of this enforceable undertaking, the Company must send the letters referred to in those paragraphs by ordinary pre-paid post to the most recent address the Companies have recorded for each relevant person or entity.

2.  If the letter is returned, the Companies must attempt to ascertain a current address for those persons or entities by using the 'Change of Address' database provided by Australia Post. If Australia Post's 'Change of Address' database reveals a different address for any such persons or entities, the Companies will send the letter by ordinary pre-paid post to that different address.

3.  If Australia Post notifies the Companies that a person or entity has changed address but has not given their consent to Australia Post to release their new details, the Companies will use the 'Re-Connect' service provided by Australia Post to seek to obtain that new address.

    Note: Australia Post's 'Re-Connect' service is a service whereby Australia Post writes to relevant persons advising them that the Companies are trying to contact them, and asking for their consent to the release of their new address.

    (a)  Before using Australia Post's 'Re-Connect' service, the Companies will consult with ASIC and Australia Post on the content of any correspondence to be sent to persons using the 'Re-Connect' service.

    (b)  When using the 'Re-Connect' service, the Companies must ask Australia Post to notify the person that the proposed communication relates to 'possible compensation payable to you arising from an undertaking made to the Australian Securities and Investments Commission'.

    (c)  If the person:

    (i)  consents to the release of their new address to the Companies, the Companies will send the letters by ordinary pre-paid post to that different address; or

    (ii)  does not consent to the release of their new address to the Companies, the Companies must follow the procedure in paragraph 4.

4.  (a)  The Companies will carry out an Internet search of the Telstra White Pages On-Line at www.whitepages.com.au if:

    (i)  Australia Post's 'Change of Address' database and 'Re-Connect' service reveal no different addresses for those persons or entities whose letter is returned; or

36

    (ii)   a letter has been sent to an address revealed by the 'Change of Address' or 'Re-connect' service and has again been returned.

(b)   If:

    (i)   an entry which includes an address is found and that entry appears on reasonable grounds to correspond with the person or entity sought, the Companies must send the letter by ordinary pre-paid post to that address; or

    (ii)   no entry which includes an address is found which appears on reasonable grounds to correspond with the person or entity sought, the Companies are not required to send the letter to that person or entity, subject to paragraph 4(c).

(c)   The Companies must send the letter by ordinary pre-paid post to the person or entity if at any time within 18 months from the Commencement Date:

    (i)   a person or entity for whom no address has been found contacts the Companies; or

    (ii)   the Companies otherwise become aware of an address which they has reasonable grounds to suspect is the current address of the person or entity.

37

**Annexure C**
**Due dates for compliance with Enforceable Undertaking**

| Event | Party with responsibility | Date |
|---|---|---|
| Commencement Date | N/A | 1 April 2009 |
| Draft engagement letter for IE to be submitted to ASIC | Companies | 8 April 2009 |
| Expert engaged | Companies | 15 April 2009 |
| Draft ANZ Remediation Plan | Companies | 15 April 2009 |
| Remediation Assessment | IE | 29 April 2009 |
| ANZ Remediation Plan | Companies | 13 May 2009 |
| First Expert Report | IE | 1 July 2009 |
| First Response | Companies | 3 August 2009 |
| Notification of modifications to First Response | ASIC and IE | 17 August 2009 |
| Second Expert Report | IE | 4 January 2010 |
| Second Response | Companies | 1 February 2010 |
| Notification of modifications to Second Response | ASIC and IE | 15 February 2010 |
| Notification of implementation of Second Response (if applicable) | Companies | Within 14 days of the final step in the ANZ Remediation Plan and the Second Response being completed (paragraph 53) |
| Notification of Final Assessment (if applicable) | ASIC | 1 March 2010 |
| Final Expert Report (if applicable) | IE | 3 May 2010 |
| Final Response (if applicable) | Companies | 1 June 2010 |
| Notification of modifications to Final Response (if applicable) | ASIC and IE | 15 June 2010 |
| Notification of implementation of Final Response (if applicable) | Companies | Within 14 days of the final step in the ANZ Remediation Plan and the Final Response being completed (paragraph 59) |

38

| Proposal re disclosure and compensation | Companies | 17 August 2009 |
|---|---|---|
| Notification of modifications to proposal re disclosure and compensation | ASIC and IE | 31 August 2009 |
| Postal of letter, disclosure and Claim Form | Companies | 7 September 2009 |
| Acknowledgement of receipt of completed Claim Form | Companies | Within 14 days of receiving a completed Claim Form (paragraph 64) |
| Assessment of claims received | Companies | Within 28 days of receipt of all relevant information relating to a completed Claim Form (paragraph 65.1) |
| Payment of claims, unless legitimately rejected | Companies | Within 14 days of assessment of Claim Forms (paragraph 65.2) |
| Compensation Report | Companies | 7 October 2009 |
| Further Compensation Report | Companies | 6 November 2009 |
| Provision of register of breaches to IE | Companies | 1 June 2009<br>1 July 2009<br>3 August 2009<br>1 September 2009<br>1 October 2009<br>2 November 2009<br>1 December 2009<br>4 January 2010 |