UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE AUSTRALIA AND NEW ZEALAND BANKING :    08 Civ. 11278 (DLC)
GROUP LIMITED SECURITIES LITIGATION     :
                                        :    OPINION & ORDER
----------------------------------------X

Appearances:

For Plaintiff:
James Henry Glavin IV
Patrick Slyne
Stull Stull & Brody
6 East 45th Street
5th Floor
New York, NY 10017

For Defendants:
Penny Shane
Samuel W. Seymour
Daniel R. Margolis
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

DENISE COTE, District Judge:

       Plaintiff Legacy Solutions Inc. ("Legacy") brings this

action on behalf of a putative class of all persons who

purchased or acquired American Depository Receipts ("ADRs") in

Australia & New Zealand Banking Group Limited ("ANZ") during a

class period spanning from November 1, 2006 through July 27,

2008 (the "Class Period").  Plaintiff brings claims against ANZ

and three ANZ officers and directors under § 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act") and

Securities and Exchange Commission ("SEC") Rule 10b-5 and

against the three individual defendants under § 20(a) of the Exchange Act.

Plaintiff alleges that ANZ "made numerous materially false and misleading public statements" concerning the quality of its risk management controls with respect to its Equity Finance business.  Defendants have moved to dismiss plaintiff's claims pursuant to Rule 12(b)(6) and on the grounds that plaintiff has failed to plead fraud with particularity as required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). For the following reasons, defendants' motion to dismiss is granted.

<u>BACKGROUND</u>

The following facts are taken from the plaintiff's October 28, 2009 Revised Amended Class Action Complaint (the "Complaint") and the documents upon which it relies, including ANZ's public filings with the SEC and the Australian Securities Investments Commission ("ASIC") as well as press releases and media reports about ANZ and its senior directors and officers. The core of the Complaint's allegations are taken from a securities lending review that ANZ published in 2008 (the "2008 SLR").  The 2008 SLR was undertaken to examine ANZ's Equity Finance business in the aftermath of the failure of two brokerage businesses for whom ANZ had provided financing.  The

2008 SLR explained that ANZ had failed to address effectively deficiencies identified in prior internal audits of its Equity Finance business.  Based on this finding, the Complaint principally accuses ANZ of failing to disclose in its public statements from 2006 to 2008 that it had inadequate internal controls for its Equity Finance unit.

## I.  The Defendants

Defendant ANZ is a "major international banking and financial services group" headquartered in Melbourne, Australia. ANZ offers a range of banking and financial services products to individual, small business, corporate, and institutional customers in Australia, New Zealand, and the Asia-Pacific region.  As of September 30, 2007, ANZ had 1,327 points of representation worldwide, including in the United States.  Among the products offered by ANZ during the Class Period was "Equity Finance," a line of business that the plaintiff alleges to have "posed unacceptable reputational and financial risks" to ANZ.

Plaintiff also names as defendants three corporate officers and directors of ANZ: Charles B. Goode ("Goode"), Michael Roger Pearson Smith ("Smith"), and Peter Marriott ("Marriott") (collectively, the "Individual Defendants").[1]  Goode was, at all

---

[1] A fourth individual, Ian J. Macfarlane, was named as a defendant in the May 21, 2009 consolidated amended complaint,

relevant times, the Chairman of the Board of Directors and a
member of the Audit Committee, the Risk Committee, and the
Governance Committee.  Smith was, since October 1, 2007, the
Chief Executive Officer, the Executive Director of the Board of
Directors, and a member of the Credit and Trading Risk Committee
(the "CTR Committee").  Marriott was, at all relevant times, the
Chief Financial Officer and Company Secretary.

## II.  ANZ's ADR Securities

From the beginning of the Class Period through July 2007,
ordinary shares of ANZ stock traded on the New York Stock
Exchange ("NYSE") in the form of ADRs.  An ADR is a security
denominated in U.S. dollars that represents a certain number of
shares, or fraction of shares, of ordinary stock in a foreign
corporation.  The market price of an ADR depends not only upon
the market value of the underlying shares of ordinary stock that
the ADR represents, but also upon the exchange rate between U.S.
dollars and the currency in which the ADR's underlying stock is
valued.

In June 2007, ANZ announced its intention to withdraw the
listing of its ADRs from the NYSE, and the ADRs were delisted as
of July 12.  ANZ also applied for deregistration from the SEC as
a Foreign Private Issuer of Securities, and this deregistration

but was dismissed without prejudice by stipulation of the
parties on October 27, 2009.

became effective in October 2007.  Thereafter, ANZ's ADRs
continued to trade in the United States in the over-the-counter
securities market.  Addressing ADR holders in its 2007 Annual
Report, ANZ asserted that it would "maintain the strong control
and financial governance frameworks established under Sarbanes-
Oxley compliance."

### III.  ANZ's Equity Finance Unit

ANZ's Equity Finance unit is a part of "ANZ Custodian
Services," which in turn resides within "Working Capital"
(formerly known as "Trade and Transaction Services"), which in
turn is a subdivision of the "Institutional" Division, one of
five divisions of ANZ.  ANZ's Equity Finance business was
"functionally similar" to "Standard Securities Lending," another
product offered by ANZ Custodian Services.  Both products
involved the lending of securities from one party to another,
with cash or other securities serving as collateral, under terms
in which legal and beneficial title to the borrowed securities
formally changed hands.  ANZ engaged in both Equity Finance and
Standard Securities Lending with various institutional clients,
including managed investment schemes, superannuation funds,
financial institutions, and investment managers, among others.

The Equity Finance product began to be offered in late 2001 and was targeted for sale to securities brokers.[2]  ANZ's securities broker customers in fact engaged in two sets of equity finance transactions: one with ANZ (through which brokers lent securities to ANZ in exchange for cash financing) and another with their own clients (through which brokers obtained title to the clients' securities in exchange for financing their clients' margin securities purchases).

From 2001 onward, ANZ's Equity Finance business grew steadily.  A Securities Lending Review conducted in March 2005 ("the March 2005 SLR") revealed that ANZ had amassed a total financial exposure of $771 million through outstanding Equity Finance loans.  The March 2005 SLR revealed that ANZ had not established any credit limits on cash borrowing by its Equity Finance clients, however, nor had ANZ developed any internal process to assess or manage counterparty credit risk.  The March 2005 SLR recommended that credit limits be imposed on ANZ's lending relationships with existing Equity Finance customers and also advised that no further expansion of the Equity Finance business be undertaken.

Thereafter, ANZ did not accept new customers in its Equity Finance business.  Contrary to the other recommendation of the

---

[2] The 2008 SLR notes that "[t]here is no record that any initial product approval was sought or obtained with respect to the Equity Finance product."

March 2005 SLR, however, "exposures to existing customers were not capped at their current levels and there was [a] substantial delay [in] formally imposing new credit limits on existing customers."  Indeed, in February 2006, ANZ began permitting the Equity Finance business to borrow any listed security from its broker clients, without regard to a security's quality or market liquidity; moreover, ANZ did not attempt to cap its borrowing exposure to any individual security.  The plaintiff alleges that this relaxation in lending policy "led to ANZ acquiring as loan collateral many large holdings of illiquid securities with small market capitalizations."  By August 2007, the amount of cash and securities "loaned by [sic] ANZ Equity Finance customers" peaked at approximately $2 billion.  In May 2006, ANZ updated its existing securities lending policy to recognize officially its Equity Finance business, and in July 2006, ANZ developed a lending model that addressed existing "credit risk issues" in Equity Finance.  This lending model was not fully implemented until March 2008, however, which according to the plaintiff was "too late for ANZ to avoid massive financial losses on bad Equity Finance loans."

During the Class Period and the years immediately prior, a series of internal audits were conducted into ANZ's Custodian Services group, the unit containing both the Equity Finance and Standard Securities Lending businesses.  The plaintiff alleges

that, between 2005 and 2007, a series of "three reviews of the
control environment conducted by ANZ internal audits" into ANZ
Custodian Services resulted in an "adverse or seriously adverse
rating as part of each audit" for the ANZ Securities Lending
unit.  The first internal audit in 2005 (the "2005 Internal
Audit") gave "an adverse rating to ANZ Custodian Services and a
seriously adverse rating for the ANZ Lending unit in
particular."  The Audit Committee was made aware of these audit
findings in October 2005, and a 2005 "segment report" based on
the 2005 Internal Audit was presented to the Board of Directors
noting a "new adverse rating" for "Custody, including Securities
Lending."  In a "follow-up" 2006 internal audit (the "2006
Internal Audit"), ANZ Custodian Services was given a
"satisfactory" rating, "based on the perceived progress made in
implementing the remediation program" developed after the 2005
Internal Audit.

   The following year, however, another internal audit (the
"2007 Internal Audit") gave ANZ Custodian Services a "seriously
adverse rating," concluding that the program to remediate the
problems identified in the 2005 Internal Audit had not been
implemented "as effectively as had been understood during the
2006 Internal Audit."[3]  An Audit Committee meeting held in

---

[3] Specifically, within the 2007 Internal Audit, "the 'front
office' of the ANZ Securities Lending unit was given a

October 2007 "discussed . . . at some length" a paper that
"specifically address[ed]" the 2007 Internal Audit and that
noted that 'management responsible for ANZ Custodian Services
had implemented a remediation program (including the use of
external consultants) with respect to the issues raised in the
2007 [I]nternal [A]udit." The Risk Committee was also "advised
of the seriously adverse rating" from that audit. Pricewater-
houseCoopers, the external consultants, conducted a review in
late 2007 "identif[ying] that there were significant control
issues in relation to the [Standard Securities Lending and
Equity Finance] businesses." Nevertheless, the 2007 Annual
Report reported "a solid [firm-wide] result based on solid
business performance" for the year ending September 30, 2007,
"with more subdued growth in Institutional," the division in
which Equity Finance resided, than in its other divisions.

According to the Complaint, ANZ's Equity Finance business
"began to unravel" about March 17, 2008, when one of ANZ's
Equity Finance customers -- Australian brokerage and "margin
lending" firm Opes Prime Group Limited ("Opes Prime") -- advised
ANZ of serious financial difficulties. Specifically, Opes Prime
informed ANZ that an Opes Prime customer had exercised its
contractual right to request the return of $95 million of stock

---

satisfactory rating and the 'back office' was given a seriously
adverse rating."

that the customer had transferred to Opes Prime.  Opes Prime,
however, had subsequently lent the stock to ANZ in an Equity
Finance transaction, and "Opes Prime had none of the cash or
securities needed to accommodate its customer's request."  At
the time, Opes Prime owed ANZ, its largest creditor,
approximately $650 million.  Thereafter, on or about March 19,
ANZ agreed to loan $95 million to Opes Prime to cover the
customer's stock return request and, in exchange, ANZ obtained a
lien on $650 million worth of securities held by Opes Prime.
Plaintiff alleges that, by making this cash infusion -- even
while "Opes required no less than $200 million to stay afloat"
-- ANZ knowingly engaged in a "preferential transfer of rights
in contemplation of [Opes Prime's] receivership" for the sole
purpose of mitigating ANZ's loan losses.  Plaintiff alleges
that, "had the [$95 million loan] deal not been made[,] ANZ
would have had to pay Opes Prime $300 million and wait in line
with other Opes Prime creditors."[4]  Opes Prime entered into
receivership on or about March 27, 2008.

     Plaintiff maintains that "the Opes Prime scenario was
repeated" in early July 2008 when another of ANZ's Equity
Finance customers, a margin lending company called Primebroker
Securities Limited ("Primebroker") that was similar in operation

---

[4] Plaintiff does not explain why ANZ would have had to pay Opes
Prime $300 million had it not made the $95 million loan.

to Opes Prime, ran out of funds and entered into receivership. As with Opes Prime, ANZ was Primebroker's "primary financier," and ANZ once again sought to obtain liens over its debts with Primebroker.  Primebroker entered into receivership on or about July 4, 2008.

On July 28, 2008, the day following the end of the Class Period, ANZ announced in a "Trading Update" that, among other developments, ANZ planned to take significant loss provisions related to soured loans.  Specifically, the Trading Update disclosed that ANZ expected loss provisions of about $1.2 billion for the six months ending September 30, 2008, including $375 million as a "Collective Provision" and $850 million in "Group Individual Provisions."[5]  Of these Individual Provisions, the plaintiff alleges that "no less than $270 million and as much as $350 million related to ANZ's business dealings with Opes Prime and Primebroker."

As a result of these loss provisions, the Trading Update reported that ANZ's anticipated profits for the fiscal year 2008 would fall as much as $800 million, from an estimated $3.9

---

[5] According to the 2008 Annual Report, ANZ made $1.9 billion in provisions for credit impairment for the entire fiscal year ending September 30, 2008.  The provision for credit impairment for the previous fiscal year, as reported in the 2007 Annual Report, was $567 million.

billion to an estimated $3.1 billion.[6]  With respect to the need
for these loan provisions, the Trading Update quoted Smith as
stating, in pertinent part:

> . . . We are . . . systematically working to
> reinvigorate our risk management culture and
> capabilities.
>
> Disappointingly though, it is very apparent that in
> the past ANZ had allowed the development of small
> areas of non-core activity in Institutional.  We are
> addressing these issues at an operating level and I
> will also have the review into securities lending
> completed next month.  While I cannot pre-empt the
> findings of the review, I do intend to take all the
> necessary actions to ensure these issues are put
> behind us once and for all.
>
> While these issues are a priority to fix, the
> turnaround of Institutional is going to take time.
> Meanwhile, we are getting on with business.  That
> includes continuing to focus on the opportunities the
> current market environment is providing including to
> re-price risk.  We will also be investing in our
> processes, technology and staff.

In a conference call held with investors the same day,
Smith explained further that "the main issue we continue to
deal with comes from our [I]nstitutional business,"
including "[a] small number of previously identified
exposures . . . including some commercial property clients
and provisions for Prime Broker and Bill Express which are
well known," and that "[w]hile we are turning around

---

[6] Although the Complaint alleges that "ANZ's 2008 profits were
expected to fall as much as $800 million" from "losses on soured
loans," the Complaint does not allege that these "expected"
losses materialized.

[I]nstitutional, we still have to deal with a number of
legacy issues and this is a challenge that is going to take
some time to fix."

That same day, July 28, the market price of ANZ ADRs fell
from US$17.24 to US$14.57, a 15.5% loss from the prior day's
closing price.[7]  Since then, the U.S. market price of ANZ ADRs
has not recovered.

A few weeks later, on August 22, ANZ published the 2008 SLR
conducted by Smith and other senior ANZ personnel, upon which
plaintiff relies as the primary source for many of the
Complaint's factual allegations.  The purpose of the 2008 SLR
was to "examine[] the development and management of Securities
Lending within ANZ and its relationship with Brokers including
the Opes Prime group."  The 2008 SLR disclosed that "there were
a number of failures and deficiencies in relation to ANZ's
Equity Finance business," and concluded that the Equity Finance
business "posed unacceptable reputational and financial risks to
ANZ."  Moreover, these risks "were compounded by the lack of a

---

[7] A news article on July 29 in <u>The Brisbane Times</u> explained that
"[t]he bulk of yesterday's shock increase [in loss provisions]
was accounted for by ANZ's troublesome [I]nstitutional
[D]ivision, which has repeatedly tripped over with its loans to
hard-pressed parts of the business sector and marginal financial
services players."  These companies were identified as including
"ailing stockbrokers like Opes Prime and Primebroker and the
collapsed payments company Bill Express."  The article explained
that "[s]tunned investors responded by slashing the bank's share
price by 11 per cent to just [AU] $ 15.81 -- its lowest level
for five years."

proper control environment" and by the failure of "most ANZ
staff" to understand and appreciate "the differences between
Equity Finance and other types of Securities Lending," such as
the reputational risk to ANZ arising from the fact that a
broker's insolvency would likely result in ANZ keeping title to
the brokers' clients' securities.  The 2008 SLR further
disclosed that "[t]he deficiencies identified" in Equity Finance
by ANZ's earlier internal audits "were not then addressed
effectively or in a timely manner" and, more specifically, that
"[t]here was a history of procrastinating on decisions to either
invest in systems to remedy issues or to exit the business."
Although the 2008 SLR concluded that ANZ's Equity Finance
activity in recent years was "not consistent with good banking
practice," the 2008 SLR nevertheless concluded that ANZ's
"Equity Finance relationships with Brokers were undertaken on a
strong legal foundation and in good faith" and that the lending
unit's prior reports to senior management had not been
"deliberately inaccurate or misleading."  The 2008 SLR also
disclosed that, as of the previous month (July 2008), ANZ
terminated operations of its Equity Finance unit.

     Thereafter, in the course of investigating possible legal
malfeasance during the collapse of Opes Prime, Australia's
securities regulator, ASIC, undertook a separate investigation
into ANZ to consider whether to pursue claims against ANZ for

violations of the Australian Corporations Act.   ASIC

subsequently reached a settlement with ANZ known as an

"Enforceable Undertaking," releasing ANZ from potential legal

claims in exchange for ANZ paying roughly $200 million to Opes

Prime's former clients.[8]

PROCEDURAL HISTORY

On December 29, 2008, Linda Levine filed this lawsuit as a

putative class action.  The case was reassigned to this Court on

January 14, 2009.  On March 27, 2009, a conference was held to

consider Legacy's motion to be appointed as lead plaintiff, and

Legacy was so appointed on April 1.  Legacy filed its

consolidated amended complaint on May 21.  Defendants' motion to

dismiss the complaint was filed on July 2, and became fully

submitted on August 7.  A stipulation and order amending the

Complaint was executed on October 27, and Legacy's revised

amended class action complaint (the "Complaint") was filed on

October 29.[9]

---

[8] The Complaint enters into considerable detail concerning ASIC's
investigation and the resulting Enforceable Undertaking.
Because these facts do not concern the alleged misrepresen-
tations made by the defendants, however, they are not set out in
detail here.

[9] The parties agree that the July 2 motion to dismiss may be
addressed to the later-filed Complaint.  The plaintiff has been
offered a final opportunity to amend its pleading and has
declined to make any further amendments.

DISCUSSION

A court considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party."  Connecticut v. Am. Elec. Power Co., Inc., 582 F.3d 309, 320 (2d Cir. 2009) (citation omitted); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  In evaluating a motion to dismiss in a securities class action suit, the court may review not only the complaint, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) ("ATSI").  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI, 493 F.3d at 98 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); see also

S. Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 103-04
(2d Cir. 2009) (applying the Iqbal standard to the securities
fraud context).

Claims of securities fraud under the Exchange Act are also
subject to heightened pleading requirements under Federal Rule
of Civil Procedure 9(b).  See ECA & Local 134 IBEW Joint Pension
Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir.
2009) ("ECA").  Rule 9(b) states that "[i]n alleging fraud or
mistake, a party must state with particularity the circumstances
constituting fraud or mistake."  Fed. R. Civ. P. 9(b).
Specifically, the Rule requires that a complaint "(1) specify
the statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the statements
were made, and (4) explain why the statements were fraudulent."
ATSI, 493 F.3d at 99.  "Allegations that are conclusory or
unsupported by factual assertions are insufficient."  Id.

The PSLRA imposes additional pleading requirements on
plaintiffs bringing securities fraud actions.  First, where a
plaintiff's claims depend upon allegations that the defendant
made an untrue statement of material fact or that the defendant
omitted to state a material fact necessary in order to make the
statements not misleading, the plaintiff

> shall specify each statement alleged to have been
> misleading, the reason or reasons why the statement is
> misleading, and, if an allegation regarding the

> statement or omission is made on information and
> belief, the complaint shall state with particularity
> all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  Thus, in order to plead a claim of

securities fraud, plaintiffs "must do more than say that the

statements . . . were false and misleading; they must

demonstrate with specificity why and how that is so." Rombach

v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).  Second, a plaintiff

pleading scienter in a securities fraud action "shall, with

respect to each act or omission alleged to violate this chapter,

state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind."  15

U.S.C. § 78u-4(b)(2).  "For an inference of scienter to be

strong, 'a reasonable person must deem it cogent and at least as

compelling as any opposing inference one could draw from the

facts alleged.'"  ATSI, 493 F.3d at 99 (citing Tellabs, 551 U.S.

at 324) (alteration omitted).

Plaintiff brings its principal claim against all defendants

pursuant to Exchange Act § 10(b), which makes it unlawful to

"use or employ, in connection with the purchase or sale of any

security . . . any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as

the Commission may prescribe."  15 U.S.C. § 78j(b).  The SEC

rule implementing the statute, Rule 10b-5, declares it unlawful

"[t]o make any untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b) (2008).  The courts have implied from § 10(b) and Rule 10b-5 a private damages action.  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341 (2005).  "In order to succeed on a [§ 10(b)] claim, a plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."  ECA, 553 F.3d at 197 (citation omitted); see also Dura Pharms., 544 U.S. at 341-42 (enumerating the elements of a securities fraud claim).  The defendants assert that the Complaint fails with respect to three of these elements: the existence of a material misstatement or omission; scienter; and loss causation.[10]

> I.   Materially False Statements or Omissions

In order to satisfy the first prong of plaintiff's Rule 10(b) claim, which requires plaintiff to plead "a materially false statement or omis[sion of] a material fact," the plaintiff must establish both the existence of a false statement or

---

[10] Because it is unnecessary to do so, the Court does not reach defendants' arguments concerning scienter or loss causation.

omission and the materiality of that false statement or
omission.  ECA, 553 F.3d at 197 (citation omitted).  For nearly
all of the statements it identifies as false, Legacy purports to
satisfy its statutory burden under the PSLRA of "specify[ing] .
. . why the statement[s] [are] misleading" by citing a single
paragraph in the Complaint which lists, seriatim, twelve
separate reasons.[11]  This list follows a description of
statements in ANZ's 2006 Annual Report and appears designed to
address that document's description of ANZ's risk management and
internal audit processes.  These twelve reasons are of three
general types.  First, ANZ's public statements are alleged to be
materially misleading because ANZ's Equity Finance business
"lacked an appropriate control framework," including ineffective
loan-to-value models, insufficient attention to "reputational
risk," and a lack of regard for the differences between Standard
Securities Lending and Equity Finance.  Second, the plaintiff
maintains that the statements were materially misleading because
the "deficiencies in internal controls . . . identified between
early 2005 and August 2008 . . . were not addressed effectively
or in a timely manner" or with an "appropriate degree of rigor"

---

[11] The Complaint does not specify which of the twelve reasons are
applicable to which allegedly false and misleading statements.
While this Opinion will draw all inferences in the plaintiff's
favor, where the Complaint has failed to explain why a
particular statement is false or misleading, the defendants'
motion to dismiss a claim based on that statement must be
granted.

by management or the Board committees.  Finally, plaintiff
claims that the statements were materially misleading for the
reason that various internal audits between 2005 and 2007
resulted in "adverse or seriously adverse rating[s]" being given
to ANZ's Custodian Services unit.

A.   Allegedly Misleading Statements

The plaintiff alleges that, throughout the Class Period,
ANZ made "numerous materially false and misleading public
statements."  The Complaint identifies around two dozen such
statements, which for ease of analysis fall roughly into three
categories: (1) general statements about the quality of ANZ's
risk management practices and controls; (2) statements about the
performance of ANZ's Institutional Division; and (3) disclosures
concerning ANZ's financial exposure to Opes Prime and
Primebroker.

1.   General Statements About Risk Management

The first set of allegedly misleading statements includes
general statements about the quality of ANZ's risk management
practices and controls.  For example, plaintiff identifies as
misleading a statement made by ANZ in its 2006 Annual Report,
released on or about November 1, 2006 (the first day of the
Class Period), that "ANZ recognises the importance of effective
risk management to its business success.  Management is

committed to achieving a strong risk control, resulting in 'no
surprises' and a distinctive risk management capability."
Likewise, Plaintiff maintains that a June 2007 press release was
false and misleading because Marriott stated that ANZ would
"continue[] to be committed to best practice in preparing its
financial statements" and would "maintain the strong control and
financial governance frameworks established under Sarbanes-Oxley
compliance."

   Other statements within this category concern the quality
of risk management oversight provided by various board
committees and executive departments.  For example, the 2006 and
2007 Annual Reports each stated that "Internal Audit provides
independent assurance that the design and operation of the risk
and control framework across the [Company] is effective" and
that, "operat[ing] under a Charter from the Audit Committee,"
Internal Audit has "unrestricted access to review all
activities" within ANZ.  The 2006 Annual Report also explained
that "the Audit Committee plays an active role in reviewing
significant issues arising from the work performed by Internal
Audit"[12] and maintains "a robust process for ensuring prompt
resolution of audit issues . . . . to ensure that any remedial
action is undertaken promptly."

_____

[12] The 2007 Annual Report contained substantially the same
language about the role of the Audit Committee.

2.   Statements About the Institutional Division

A second category of allegedly misleading statements concerns the performance of the Institutional Division, within which ANZ's securities lending businesses reside.  In general, these statements acknowledge the fact that Institutional had not performed up to expectations, but maintain that improvement was expected in the near term.

The Complaint relies on four examples from 2007.  First, ANZ's Form F-20, filed with the SEC in January 2007, stated:

> Institutional is in a stage of reinvigorating its business following a number of years of relatively flat earnings and asset growth, as a consequence of a comprehensive de-risking program.  The focus of the business is now on further initiatives to deliver revenue growth, combined with disciplined use of capital and continuing strong risk management.

Second, in March 2007, ANZ disseminated a press release reporting that

> Institutional is beginning to see the benefits of a more focused business model, with revenue growth expected to be comfortably within ANZ's target range for the full year. . . .
>
> Lending assets have grown modestly as we maintain a high level of discipline in terms of risk and balance sheet utilisation.  At the same time, the high level of liquidity held by our customers has seen customer deposits grow very strongly.  However, given the size of some transactions in the Institutional segment, growth rates can be quite volatile.

Third, in a September 2007 conference call, Smith stated that "I think [I]nstitutional is an area that we still have got a

significant upside.  We have a good franchise, we have a good

customer base, and I think there is considerable opportunity to

expand our business from there."  Finally, at the December 2007

annual meeting, Smith made the following comments:

> As you heard from Charles [Goode], our Institutional
> Division has a strong franchise and excellent customer
> base but it has been underperforming.  This is being
> addressed.  There are some early signs of improvement.
> In recent months, lending growth has been ahead of
> system and deposits are growing. . . .
>
> You heard an assessment of where ANZ is today from
> Charles.  I want to assure you that my initial
> priority is very clearly to restore the financial
> performance of ANZ and so returns [sic] to
> shareholders.  We will be doing this in 2008 and into
> 2009 by increasing revenue faster than costs [and]
> bringing [I]nstitutional back to an acceptable
> performance . . . .

These comments quoted above are alleged by plaintiff to be

materially false and misleading because Smith failed to disclose

that "ANZ's Institutional Division was suffering from woefully

deficient internal controls" and that "bringing [I]nstitutional

back to an acceptable performance [would be] impossible without

eliminating its securities lending operations."

Such allegedly misleading statements about the

Institutional Division continued into the following year.  On

February 18, 2008, an ANZ press release announced that there had

been "a turnaround in Institutional" in the "first four months

trading" of the fiscal year, and that "Institutional is on track

to deliver a turnaround in performance at an underlying level,

with excellent revenue growth."  A February 25, 2008 press release likewise allegedly misled investors by announcing "solid performances by the Retail and Institutional businesses," and "strong performance" overall.

 3. Statements About Opes Prime and Primebroker

 Finally, a third set of allegedly misleading statements relates specifically to ANZ's exposure to two of its securities lending counterparties: Opes Prime and Primebroker.  With regard to Opes Prime, a March 28, 2008 press release by ANZ stated:

> Following the appointment of a Voluntary Administrator by the Directors of Opes Prime Group Limited and the subsequent appointment by ANZ of Receivers, ANZ today advised its lending exposure to Opes Prime was supported by security in a portfolio of Australian equities.
>
> The portfolio is diversified and at current market prices is sufficient to cover the amount outstanding from Opes Prime.
>
> ANZ believes that based on an orderly realisation of the security portfolio, it is unlikely to incur a material loss on this exposure.

In an April 7 conference call, Smith stated, regarding Opes Prime:

> [I]t's tough for everybody, and I know that.  When irregularities of this nature occur within a company, there are no winners.  Although we don't expect any material losses from this, or other broker exposures, I am mindful of the effects on our reputation, and on the many Opes clients who are being impacted by the fallout from the actions of Opes Prime.  But that's really all I can say at the moment, given the matter is before the court.

On April 14, an ANZ media release disclosed that Smith would lead a review of, inter alia, the "[o]versight and control of ANZ's involvement in Securities Lending and the development and management of ANZ's client relationships including with the Opes Prime Group."  The release quoted Smith as saying:

> We will review our involvement in the Securities Lending business and the events surrounding the Opes Prime issue to ensure that all our processes and practices meet the highest ethical, risk management and regulatory compliance standards which our shareholders and the community expect of ANZ.

> The review will examine what has transpired, the accountability that ANZ and individual staff members might have for what has occurred, and a remedial program to swiftly address all the issues we identify.

> We will continue to work in cooperation with our regulators on this issue.  I also intend to report publicly on the key conclusions of the review and any resulting remedial actions.

With respect to Primebroker, ANZ disseminated a press release on July 4, 2008, announcing that it had appointed Receivers and Managers for Primebroker.  The release also disclosed that "[n]otwithstanding significant efforts by ANZ and Primebroker over recent weeks, there has been a further deterioration in Primebroker's position"; that "[t]he deterioration in Primebroker's position has also been to ANZ's detriment"; and that "[a]s a result, a provision of approximately $50 million is currently anticipated."  The release stated that ANZ's total exposure to Primebroker was $260

million and was "secured by a portfolio of equities and
property."

B.   Analysis of Allegedly Misleading Statements

Upon careful review, it is apparent that none of the
statements challenged by plaintiff constitute a materially false
or misleading statement or omission.  First, many of these
statements amount to optimistic generalizations, or "puffery,"
upon which no reasonable investor could rely and which courts
have routinely held to be nonactionable as outside the scope of
federal securities laws.  Second, other challenged statements
are of a type sheltered by the "bespeaks caution" doctrine,
because they are forward-looking in orientation and because they
tend to disclose the very risks or problems that plaintiff
alleges were undisclosed.  Finally, the plaintiff has frequently
failed to explain why a particular statement is false.

1.   Statements of Optimism

Simple "expressions of puffery and corporate optimism" do
not violate securities laws, as companies "are not required to
take a gloomy, fearful or defeatist view of the future."
Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (citation
omitted).  Statements are properly classified as "puffery" when
they are "too general to cause a reasonable investor to rely
upon them."  ECA, 553 F.3d at 206.

Of the three categories of statements made by defendants, all of the statements identified in the first category -- general statements about ANZ's risk management practices and controls -- constitute "puffery."  These statements include that "ANZ recognises the importance of effective risk management to its business success"; that ANZ's "[m]anagement is committed to achieving a strong risk control, resulting in 'no surprises' and a distinctive risk management capability"; that ANZ was "committed to best practice in preparing its financial statements"; that ANZ would "maintain the strong control and financial governance frameworks established under Sarbanes-Oxley compliance"; that the Audit Committee maintains "a robust process for ensuring prompt resolution of audit issues . . . . to ensure that any remedial action is undertaken promptly"; and that "Internal Audit provides independent assurance that the design and operation of the risk and control framework across the [Company] is effective."[13]  Statements similar to these have previously held by the Second Circuit to constitute puffery.

---

[13]  The plaintiff has made no effort to identify any falsity associated with several statements about ANZ's risk management operations.  They include such statements as "the Audit Committee plays an active role in reviewing significant issues arising from the work performed by Internal Audit"; that Internal Audit "operates under a Charter from the Audit Committee" and has "unrestricted access to review all activities within ANZ"; and that the Code of Conduct for Financial Officers "requires" financial officers to "adhere to principles of honesty and integrity . . . [and] ensure sound internal controls."

See <u>ECA</u>, 553 F.3d at 205-06 (defendant's "'risk management
processes . . . are highly disciplined and designed to preserve
the integrity of the risk management process'"); <u>In re Int'l
Bus. Machs. Corp. Sec. Litig.</u>, 163 F.3d 102, 107, 108 (2d Cir.
1998) ("<u>In re IBM</u>") (company was "'not . . . concerned about
being able to cover the dividend for quite a foreseeable
time'"); <u>San Leandro Emerg. Med. Group Profit Sharing Plan v.
Philip Morris Cos., Inc.</u>, 75 F.3d 801, 811 (2d Cir. 1996)
(Philip Morris "was 'optimistic' about its earnings and
'expected' Marlboro to perform well"); <u>Lasker v. N.Y. State
Elec. & Gas Corp.</u>, 85 F.3d 55, 59 (2d Cir. 1996) (defendant
employed "'business strategies [that would] lead to continued
prosperity'"; possessed a "'commitment to create earnings
opportunities'"; and would not "'compromise its financial
integrity'").  <u>But see</u> <u>Novak v. Kasaks</u>, 216 F.3d 300, 315 (2d
Cir. 2000) (holding that defendants' statements that a
retailer's inventories were "'under control'" and "'in good
shape'" were not nonactionable puffery where defendants
"allegedly knew that the contrary was true").

      The recent case of <u>ECA v. JP Morgan Chase Co.</u> is
particularly instructive.  In <u>ECA</u>, the plaintiff identified as
misleading various statements by J.P. Morgan Chase & Co.
("JPMC"), an investment bank, that are strikingly similar to
those at issue here.  These statements included that JPMC's

"'risk management processes . . . are highly disciplined and
designed to preserve the integrity of the risk management
process,'" that JPMC "'set the standard' for 'integrity,'" and
that JPMC "would 'continue to reposition and strengthen its
franchises with a focus on financial discipline.'"  533 F.3d at
205-06.  The Second Circuit held that these statements were "no
more than 'puffery'" and "too general to cause a reasonable
investor to rely upon . . . . [as] a guarantee that [JPM
Chase's] choices would prevent failures in its risk management
practices."  Id. at 206.  The Court of Appeals further
explained:

> Plaintiffs conflate the importance of a bank's
> reputation for integrity with the materiality of a
> bank's statements regarding its reputation.  While a
> bank's reputation is undeniably important, that does
> not render a particular statement by a bank regarding
> its integrity per se material.  In Lasker, it was
> undisputed that the "financial integrity" of the
> utility was important to its investors; but we still
> found that the "broad, general" statements regarding
> the utility's financial integrity could not reasonably
> be relied upon as a guarantee that the company's
> "actions would in no way impact [its] finances."  Here
> also, JPMC's statement that it "'set the standard for
> best practices in risk management techniques,'" --
> like its other similar statements -- is so general
> that a reasonable investor would not depend on it as a
> guarantee that JPMC would never take a step that might
> adversely affect its reputation.  No investor would
> take such statements seriously in assessing a
> potential investment, for the simple fact that almost
> every investment bank makes these statements.  Finding
> that JPMC's statements constitute a material
> misrepresentation would bring within the sweep of
> federal securities laws many routine representations

made by investment institutions.  We decline to
broaden the scope of securities laws in that manner.

Id. (citation omitted).  These conclusions from ECA apply with
equal force to the generalized, rosy statements challenged by
plaintiff in the instant case.  For the same reasons that ECA
concluded that JPMC's statements were outside the scope of the
Exchange Act, ANZ's generalized statements concerning the
quality of its risk management practices and controls are not
actionable.

Within the second category -- statements about the expected
future performance of the Institutional Division -- there, too,
many statements represent no more than general statements of
corporate optimism.  These statements include that
"Institutional is in a stage of reinvigorating its business
following a number of years of relatively flat earnings and
asset growth, as a consequence of a comprehensive de-risking
program"; that "[t]he focus of the business is now on further
initiatives to deliver revenue growth, combined with disciplined
use of capital and continuing strong risk management"; that "we
maintain a high level of discipline in terms of risk and balance
sheet utilisation"; that "[Smith] think[s] [I]nstitutional is an
area . . . [with] a significant upside" and "considerable
opportunity to expand"; that "[ANZ's] Institutional Division has
a strong franchise and excellent customer base"; and that "in

2008 and into 2009 by increasing revenue faster than costs," ANZ would "bring[] [I]nstitutional back to an acceptable performance."[14]  Cf. ECA, 553 F.3d at 205-06.

The only statements within the second category that may not constitute nonactionable optimism are the March 2007 press release's statement that Institutional's "revenue growth [was] expected to be comfortably within ANZ's target range for the full year"; and the February 18, 2008 press release's statement that "Institutional is on track to deliver a turnaround in performance at an underlying level, with excellent revenue growth."  These statements from the second category, along with all statements in the third category, therefore survive this step of the analysis.

2.   Bespeaks Caution Doctrine

Second, many of the statements identified by the plaintiff constitute forward-looking statements protected under the "bespeaks caution" doctrine.[15]  This judicially created doctrine removes liability for statements accompanied by sufficiently

_____

[14] A similar statement contained in the February 25, 2008 press release, which announced "strong performances by the Retail and Institutional businesses" and "strong performance" firm-wide, fails to support plaintiff's claim because the plaintiff has not identified any falsity associated with the statement.

[15] A subset of forward-looking statements is also protected by a safe-harbor provision of the PSLRA where certain criteria are met.  See 15 U.S.C. § 78u-5.

cautionary language, providing that "alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  Rombach, 355 F.3d at 173 (citation omitted).  In other words, the existence of cautionary language effectively negates the materiality of an alleged misstatement or omission.  If a disclosure contains cautionary language, the court does not look at the alleged misrepresentation in isolation, but considers the disclosure in its entirety "'to determine whether a reasonable investor would have been misled,'" asking "'whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.'"  Id. (quoting Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002)).

The bespeaks caution doctrine is limited in several important respects.  First, to gain protection under the doctrine, the cautionary language contained with the disclosure must, when examined in context, "warn[] of the specific contingency that lies at the heart of the alleged misrepresentation."  P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 97 (2d Cir. 2004); see also Hunt v. Alliance N. Am.

Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language . . . must relate directly to that by which the plaintiffs claim to have been misled."). Second, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has [already] transpired." Rombach, 355 F.3d at 173. Third, the bespeaks caution doctrine extends only to forward-looking statements, not to "misrepresentation[s] of present or historical facts." P. Stolz, 355 F.3d at 96-97.

Applying those principles, the statements concerning expectations for revenue growth in the Institutional Division constitute forward-looking statements that are not actionable. For example, while the March 2007 press release disclosed that revenue growth within the Institutional Division was "expected to be comfortably within ANZ's target range for the full year," it also cautioned that "growth rates can be quite volatile" given the size of the transactions. The February 18, 2008 press release stating that the Institutional Division "is on track to deliver a turnaround at an underlying level, with excellent revenue growth" is not actionable; a good-faith statement that ANZ was "on track" to achieve some goal does not serve as a guarantee that the goal will indeed be achieved.

As significantly, the plaintiff does not even explain how these statements of expectation about revenue growth in the

Institutional Division, released between March 2007 and February 2008, are false and misleading.  The plaintiff does not assert, for instance, that ANZ was not accurately describing its expectations for revenue.  For this additional reason, these forecasts of revenue for the Institutional Division are nonactionable.

Finally, the third category of statements, which concern ANZ's relationship with Opes Prime and Primebroker, are also protected under the bespeaks caution doctrine.  None of the statements challenged by plaintiff purport to guarantee that ANZ would be able to either avoid losses due to the collapse of those two entities or avoid increasing its loss reserves, and the Complaint does not suggest otherwise.[16]  For example, the statement that "ANZ believes that based on an orderly realisation of the [Opes Prime] security portfolio, it is unlikely to incur a material loss on this exposure" (emphasis added), and the statement that "we don't expect any material losses from [Opes Prime], or other broker exposures" (emphasis added), are each sufficient to put a reasonable investor on notice of the "specific contingency that lies at the heart of the alleged misrepresentation," namely, the risk of loss from

_____

[16] As noted above, the Complaint does not allege that ANZ actually lost money from its Equity Finance transactions with Opes Prime and Primebroker.

soured loans to Opes Prime and Primebroker.  P. Stolz, 355 F.3d at 97.

Other statements concerning Opes Prime or Primebroker even more clearly bespeak caution.  These statements include, for example, that the "initial priority of [Smith] is very clearly to restore the financial performance of ANZ" (emphasis added); that ANZ had "lending exposure to Opes Prime" (emphasis added); that "irregularities had  . . . been discovered inside the company" (emphasis added); that ANZ would "undertake a full review of the risks involved in the securities lending business," followed by a "remedial program to swiftly address all the issues we identify" (emphasis added); that Smith was "mindful of the effects on [ANZ's] reputation" from its exposure to Opes Prime; and that Primebroker suffered a "further deterioration in [its] position" that "has also been to ANZ's detriment."

The plaintiff has failed, moreover, to identify any falsity or material omission associated with any of the statements issued from March through July 2008 about Opes Prime and Primebroker.  Insofar as it complains generally that ANZ never described its lack of appropriate internal controls, that omission is irrelevant once ANZ's actual exposure to its lending counterparties was disclosed to the market.  The plaintiff's failure to explain in what way each of the identified ANZ

statements concerning Opes Prime and Primebroker was false or
misleading is fatal.

The core weakness in the Complaint is the plaintiff's
failure to match its theory of fraud to the public statements
made by ANZ.  In opposition to this motion, it argues that the
fraud consisted of ANZ's misrepresentation of its "equity
finance practices."  Those practices, however, are not the
subject of the representations cited in the Complaint.  Indeed,
in plaintiff's opposition to this motion it points to only four
documents published by ANZ which contain the allegedly
fraudulent statements, and none of them describes practices in
the Equity Finance unit.  The four documents are the 2006 and
2007 Annual Reports, the January 8, 2007 SEC Form 20-F, and the
March 2, 2007 press release.  The plaintiff emphasizes that
these four documents recite that ANZ has a "robust process for
ensuring prompt resolution of audit issues"; that Internal Audit
provides assurance that the operation of risk control is
effective across the Company; and that the Institutional
Division "is in a stage of reinvigorating its business . . . as
a consequence of a comprehensive de-risking program" and
maintains "a high level of discipline in terms of risk."  For
the reasons already explained, these statements are too general
to support a claim for fraud.

The plaintiff has essentially abandoned any contention that the remainder of ANZ's public statements suggests a claim of fraud.  With no specificity as to why or how the statements were false and misleading, any § 10(b) claim premised on the statements fails.  See Rombach, 355 F.3d at 174.

## II.  Control Person Claims

Plaintiff also asserts control person claims under § 20(a) of the Exchange Act against defendants Smith, Marriott, and Goode.  Section 20(a) provides that any person "who, directly or indirectly, controls any person liable under [§ 10(b) or Rule 10b-5] shall also be liable jointly and severally with and to the same extent as such controlled person," unless the controlling person "acted in good faith and did not . . . induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).  To establish § 20(a) liability against a defendant, a plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (citation omitted); see also In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 413-14 (S.D.N.Y. 2003).  Because the Complaint has failed to allege a "primary violation" by ANZ,

plaintiff likewise necessarily fails to state a viable § 20(a) claim. Accordingly, it is unnecessary to consider the defendants' argument that the Complaint fails to allege a basis for the exercise of personal jurisdiction over the Individual Defendants.

### CONCLUSION

For the foregoing reasons, the defendants' July 2, 2009 motion to dismiss the Complaint is granted in its entirety.

SO ORDERED:

Dated:   New York, New York
         December 14, 2009

                                        DENISE COTE
                                 United States District Judge

39